# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RICHARD ROGERS, individually and on behalf of similarly situated individuals,

        Plaintiff,

    v.

BNSF RAILWAY COMPANY,

        Defendant.

Case No. 1:19-cv-03083

Honorable Matthew F. Kennelly

---

## DEFENDANT BNSF RAILWAY COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF FACTS .................................................................................................. 2

    A.    The Parties and Relevant Non-Parties .................................................... 2

    B.    The Nascent/Remprex Auto Gate System ("AGS") ............................... 3

    C.    Remprex's Possession of Driver Registration Information .................... 5

    D.    Plaintiff's Specific Interaction with the Remprex AGS System............ 6

    E.    BNSF's Security Obligations.................................................................. 6

LEGAL STANDARD........................................................................................................... 7

ARGUMENT ....................................................................................................................... 7

    I.    Plaintiff's Specific BIPA Claim Is Preempted by Federal Law ............ 7

        A.    Plaintiff's Specific BIPA Claim Is Expressly Preempted by the FRSA................................................................................................ 8

        B.    Plaintiff's Claims Are Impliedly Preempted by the FRSA..................... 15

        C.    Plaintiff's Claims Are Preempted by the ICCTA ................................... 17

        D.    Plaintiff's Claims Are Preempted by the FAAAA ................................. 20

    II.    Plaintiff's Section 15(b) Claim Fails Because BNSF Did Not Collect Plaintiff's Biometrics ............................................................................. 22

    III.    Plaintiff's Section 15(b) Claim Is Untimely ....................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Am. Fam. Mut. Ins. Co. v. Krop,* 120 N.E.3d 982 (Ill. 2018) ........................................ 25

*Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 569 U.S. 641 (2013) ........................................ 21

*Atchison, T. and S. F. Ry. Co. v. Lennen,* 640 F.2d 255 (10th Cir. 1981) ...................................... 8

*Bank of Ravenswood v. City of Chicago,* 717 N.E.2d 478 (Ill. App. Ct. 1999)............................ 25

*Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 770 N.E.2d 177 (Ill. 2002). ............. 25

*Bernal v. ADP, LLC*, 2019 WL 5028609 (Cir. Ct. of Cook Cnty. Aug. 23, 2019)...................... 23

*Blair v. Nev. Landing P'ship*, 859 N.E.2d 1188 (Ill. App. Ct. 2006) ............................................ 25

*Burlington N. & Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790 (7th Cir. 1999)................................ 8, 9

*CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993) ................................................. 7, 8, 9, 14

*Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251 (2013) .................................................. 20, 21

*Donets v. Vivid Seats LLC*, No. 20-cv-03551, 2020 U.S. Dist. LEXIS 238106 (N.D. Ill. Dec. 15, 2020) ..................................................................................................................................... 24

*Egonmwan v. Cook Cty. Sheriff's Dep't.*, 602 F.3d 845 (7th Cir. 2010) ....................................... 7

*Feltmeier v. Feltmeier,* 798 N.E.2d 75 (Ill. 2003) ................................................................. 24, 25

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982)............................................. 15

*Fleury v. Union Pac. R.R. Co.*, 20-CV-00390, 2021 WL 1124309 (N.D. Ill. Mar. 24, 2021) ....... 9

*Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146 (7th Cir. 2020)......................................... 25

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995)....................................................................... 8

*Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861 (2000)......................................................... 15

*In re D.W.*, 827 N.E.2d 466 (Ill. 2005) ...................................................................................... 23

*Jacobs v. Hanwha Techwin Am., Inc.*, No. 21 C 866, 2021 WL 3172967 (N.D. Ill. July 27, 2021) ............................................................................................................................................... 23

*Kaiser v. Johnson & Johnson*, 947 F.3d 996 (7th Cir. 2020) ....................................................... 7

*Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472 (2013)...................................................................... 14

*Namuwonge v. Kronos, Inc.*, 418 F.Supp.3d 279 (N.D. Ill. 2019) ................................................. 23

*Nelson v. Great Lakes Educ. Loan Services, Inc.*, 928 F.3d 639 (7th Cir. 2019) ........................... 7

*Norfolk S. Ry. Co. v. Box*, 556 F.3d 571 (7th Cir. 2009) ................................................................ 15

*Northwest, Inc. v. Ginsberg*, 572 U.S. 273 (2014)........................................................................... 20

*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) .................................................................................. 8

*Richmond, Fredericksburg & Potomac R. Co. v. Dep't of Taxation,* 762 F.2d 375 (4th Cir. 1985) ............................................................................................................................................................ 8

*Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364 (2008) ...................................................... 20, 21

*See Cothron v. White Castle System, Inc.*, Dkt. No. 20-03202 (7th Cir. Nov 12, 2020) .............. 25

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984)..................................................................... 15

*Union Pac. R. Co. v. Chicago Transit Auth.*, 647 F.3d 675 (7th Cir. 2011).......................... 17, 18

*Wedemeyer v. CSX Transp., Inc.,* 850 F.3d 889, 894–95 (7th Cir. 2017) .................................... 17

**Statutes**

29 U.S.C. § 14501(c)(1) ................................................................................................................... 20

49 U.S.C. § 10501(b) ........................................................................................................................ 17

49 U.S.C. § 20106.......................................................................................................................... 8, 16

49 U.S.C. § 20101 ............................................................................................................................. 16

6 U.S.C § 1162(a) ............................................................................................................................. 11

6 U.S.C. § 1162(a)(1)(B) .................................................................................................................. 16

6 U.S.C. § 1162(d) ............................................................................................................................ 11

6 U.S.C. § 961 ................................................................................................................................... 12

740 ILCS 14/15(b) ............................................................................................................... 19, 22, 23

**Other Authorities**

78 Fed. Reg. 15962 (Mar. 13, 2013)........................................................................................ 12, 13

Black's Law Dictionary (11th ed. 2019)......................................................................................... 23

DHS, *2007 Critical Infrastructure and Key Resources Sector-Specific Plan*, at 90, *available at* https://www.hsdl.org/?view&did=474328 ............................................................. 14

Merriam-Webster Dictionary (2021) ....................................................................... 23

Minimum Security Criteria – Rail Carriers at 34, U.S. Customs and Border Protection (March 2020), *available at* https://www.cbp.gov/sites/default/files/ assets/documents/2020-Apr/CTPAT%20Rail%20Carriers%20MSC%20March%202020.pdf ................................... 13

TSA, *TWIC Card and Reader Technology,* https://www.tsa.gov/for-industry/twic-card-reader-technology ............................................................................................................... 14

**Rules**

Fed. R. Civ. P. 56 ...................................................................................................... 7

**Regulations**

49 C.F.R. § 1580.205(i) ........................................................................................... 11

49 C.F.R. § 172.800(b) .................................................................................. 12, 14, 15

49 C.F.R. § 172.802(a)(2) .............................................................................. 12, 14, 15

49 C.F.R. § 172.804 ............................................................................................ 12, 14

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant BNSF Railway Company ("BNSF") respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment.

## INTRODUCTION

Plaintiff Richard Rogers is a truck driver who visits BNSF's intermodal rail facilities in Illinois as part of his work. He alleges BNSF required him to scan his fingerprints into "biometrically-enabled Auto-Gate Systems" to enter and exit these facilities. SAC ¶ 16.[1] According to Plaintiff, BNSF—in violation of Section 15(b) of Illinois' Biometric Information Privacy Act ("BIPA")—collected his biometrics without first obtaining his written consent. Discovery has shown that Plaintiff's claim is deficient as both a matter of law and fact, and the Court should enter summary judgment for BNSF for three primary reasons.

First, Plaintiff's specific BIPA claim against BNSF is preempted by three federal laws: (i) the Federal Railroad Safety Act ("FRSA"); (ii) the Interstate Commerce Commission Termination Act ("ICCTA"); and (iii) the Federal Aviation Administration Authorization Act ("FAAAA"). Second, even if Plaintiff's claim was not preempted, Plaintiff has sued the wrong defendant. The record demonstrates that Remprex, LLC ("Remprex")—a third-party contracted by BNSF to operate and maintain the entry and exit gates at BNSF's intermodal facilities—and not BNSF, is the private entity that collected Plaintiff's alleged biometric information. Finally, Plaintiff's claim fails because it is barred by the statute of limitations. For these reasons, BNSF is entitled to summary judgment.

---

[1] "SAC" refers to Plaintiff's Second Amended Class Action Complaint (ECF No. 103).

# STATEMENT OF FACTS

## A.     The Parties and Relevant Non-Parties

Plaintiff Richard Rogers is an Illinois resident who visited BNSF's intermodal facilities in Illinois from 2003 to as recently as November 2020 in connection with his work as an intermodal truck driver for various third-party logistics companies.  SOF No. 1.[2]

BNSF is one of the largest freight railroad networks and railroad operators in North America.  SOF No. 2.  BNSF moves many products (including hazardous materials), transports freight to the Canadian and Mexican borders, serves more than 40 ports, maintains routes across 28 states and three Canadian provinces, operates 25 intermodal facilities, and has an average of 1,200 trains in service each day.  *Id.*  An "intermodal facility" or "hub" is a terminal where trailers and containers are loaded and unloaded from trucks to trains and vice versa.  SOF No. 3.

Non-party Remprex is a third-party service provider to BNSF.  SOF No. 4.  Since 2007, Remprex has performed a service it calls "intelligent gate operation," in which Remprex processes trucks and truck drivers moving through BNSF's intermodal terminals in Illinois and other parts of the country by means of Remprex's "automated gate system" or "AGS."  *Id.*  Consistent with the contracts between Remprex and BNSF, Remprex (not BNSF) and its employees operate and maintain the Remprex AGS system at BNSF's intermodal facilities, operating the checkpoints and Driver's Assistance Operations to provide twenty-four hours per day, seven days per week onsite coverage, including "[p]erform[ing] AGS driver registration including biometrics."[3]  SOF No. 5.

---

[2] "SOF" refers to BNSF's Rule 56.1(a)(2) Statement of Undisputed Facts, filed contemporaneously with this memorandum.

[3] BNSF does not concede that the "biometrics" used by Remprex to register drivers into the Remprex AGS constitute a "biometric identifier" or "biometric information" as defined by BIPA.  This disputed fact is immaterial to BNSF's motion for summary judgment.  Even if the "biometrics" used by Remprex to register drivers are either biometric identifiers or biometric information as defined by BIPA, BNSF is still entitled to summary judgment.

Non-party Nascent Technology, LLC ("Nascent") is another third-party service provider to BNSF. SOF No. 6. Nascent initially designed and sold the AGS system to BNSF in 2006. *Id.* Nascent owns the software that operates the Remprex AGS, and any changes to the AGS software must be made by Nascent. SOF No. 7.

Plaintiff alleges that BNSF "requires truck drivers, including Plaintiff, who visit its four intermodal facilities located in Illinois, to provide their biometric identifiers in the form of fingerprints and related biometric information as part of the process of accessing the facilities," and specifically alleges that "Plaintiff was required to register his biometric identifiers and/or biometric information into biometrically-enabled Auto-Gate Systems that partially control ingress and egress at the facilities." SAC ¶¶ 3, 16. The only time Plaintiff allegedly submitted his fingerprints was when Plaintiff used the Remprex AGS kiosk when entering BNSF's intermodal facilities in Illinois. SOF No. 9.

BNSF maintains four intermodal terminals in Illinois—Corwith, Cicero, Willow Springs, and Logistics Park Chicago ("LPC")—each of which utilizes an AGS operated and maintained by Remprex to control truck drivers entering and exiting from the facilities. SOF No. 10.

**B.     The Nascent/Remprex Auto Gate System ("AGS")**

Non-party Nascent designed the AGS system used at BNSF's intermodal facilities. SOF No. 11. The AGS system comprises both hardware and software. SOF No. 12. Nascent designs the software that operates the AGS. SOF No. 13. Nascent also selected the hardware used by the AGS and integrated that hardware into Nascent's AGS. SOF No. 14. Nascent initially sold the AGS to BNSF in 2006, with Remprex later becoming an authorized reseller of the AGS to BNSF. SOF No. 15. Both Nascent and Remprex describe the AGS as their system. SOF No. 16. Nascent owns the software that operates the AGS. SOF No. 17. Pursuant to the license agreement between Nascent and BNSF, any changes to Nascent's AGS software can only be done by Nascent. SOF

No. 18.  In addition to reselling the AGS to BNSF, Remprex has operated and maintained the AGS system at BNSF's intermodal facilities in Illinois and in other parts of the country since 2007.  SOF No. 19.  Remprex's AGS is designed and operated to be uniform and interconnected across multiple BNSF intermodal facilities regardless of location.  SOF No. 20.

The first step of the Remprex AGS has the truck driver pull through a "portal" that takes images of all parts of the vehicle in order to identify the equipment that is coming through (*i.e.*, pictures of the license plate, chassis, and container) and to create a record of the condition of the equipment entering the intermodal facility before the driver proceeds to the kiosk.  SOF No. 21.  At the kiosk, the driver is asked to enter an identifying number, usually the driver's commercial driver's license number.  SOF No. 22.

If the driver is not registered in the Remprex AGS system, the kiosk will direct the driver to proceed to the "Driver's Assistance Building" or "DAB," which is in a holding area in the facility.  SOF No. 23.  The AGS, including the DAB, is operated and maintained exclusively by Remprex and Remprex employees, and no BNSF employees are involved in the registration of drivers into the AGS system.  SOF No. 24.  The unregistered driver will enter the DAB where a Remprex employee (often referred to as a "clerk") will register the driver into the AGS system by: (1) taking a picture of the driver's license; (2) recording the driver's license or other identifying number; (3) confirming the driver's information with the Uniform Intermodal Interchange and Facilities Access Agreement ("UIIA") database of registered drivers; (4) scanning the driver's fingers.  SOF No. 25.  After Remprex has registered and validated the driver's information, the driver can proceed into the intermodal facility.  SOF NO. 26.

On subsequent visits, registered drivers enter their identifying number into the kiosk and place a finger onto a scanner at the entry gate kiosk to authenticate their identity.  SOF No. 27.

When registered drivers place their finger on a scanner for authentication, the Remprex AGS system calls up the specific template stored for the specific driver identification number that has been presented and conducts the matching within the finger scanner itself, which then merely emits an output that either affirms or denies the match, and no new information is collected from the driver.  SOF No. 28.  There is no evidence of any BNSF employee ever registering a truck driver into the AGS.  SOF No. 29.

C.    **Remprex's Possession of Driver Registration Information**

The information Remprex collects from a driver when it registers a driver into the AGS, including information related to a driver's finger scan, is stored in Remprex's DriverReg Databases.  SOF No. 30.  Each individual Remprex AGS at BNSF's intermodal facilities maintains its own distinct DriverReg Database on a local server.  SOF No. 31.  Remprex also maintains a central database that was designed to synchronize driver registration records from the various Remprex AGS sites across BNSF's nationwide network.  SOF No. 32.  The servers that contain the information Remprex collects from a driver during registration are not connected to BNSF's network but are isolated on a separate network maintained by Remprex.  SOF No. 33.  Remprex alone is responsible for managing and maintaining the AGS servers.  SOF No. 34.

While the Remprex AGS sends some limited information to BNSF's systems related to chassis information, driver name, and driver identification number, no information related to a driver's finger scan data is transmitted to BNSF or any other party.  SOF No. 35.  While the DriverReg database contains AGSUserIDs with "bnsf.com" email addresses, there is no evidence that any BNSF employee had access to any information related to a driver's finger scan.  SOF No. 36.  There is no evidence that BNSF ever accessed information related to a driver's fingers scan. SOF No. 37.

### D. Plaintiff's Specific Interaction with the Remprex AGS System

Plaintiff has visited BNSF intermodal terminals in Illinois in connection with his job as an intermodal truck driver since 2003, with a visit to BNSF's Corwith facility as recently as November 2020. SOF No. 38. Plaintiff's driver registration information first appears in Remprex's DriverReg Databases on December 5, 2012. SOF No. 39.

### E. BNSF's Security Obligations

Security is crucially important for BNSF's railroad business and maintaining an accurate visitor authentication system is vital considering the sensitive cargo BNSF transports, the volume of cargo transported, the number of train cars in motion at any given time, and the number of truck drivers and other personnel entering a BNSF facility on a given day. SOF No. 40.

BNSF transports cargo designated as "hazardous material" by the U.S. Department of Homeland Security ("DHS"), including petroleum crude oil, alcohols, liquified petroleum gas, elevated temperature liquid, anhydrous ammonia, sulfuric acid, hydrochloric acid solution, sulfur, sodium hydroxide solution, and diesel fuel. SOF No. 41. Because BNSF is a shipper of hazardous material, BNSF is required by federal law and federal regulations to utilize an identity verification system at its railyards for security purposes. SOF No. 42.

BNSF is also a member of the U.S. Customs and Border Protection's ("CBP") Customs-Trade Partnership Against Terrorism ("C-TPAT") program. SOF No. 43. To become a C-TPAT member, a company must meet industry-specific eligibility requirements, including security standards and requirements set by CBP. SOF No. 44. Under CBP's current Minimum Security Criteria for Rail Carriers, BNSF members must implement access controls to prevent unauthorized access into facilities/areas, help maintain control of employees and visitors, and protect company assets, including the positive identification of all employees, visitors, service providers, and vendors at all points of entry. SOF No. 45. CBP's guidance to C-TPAT members identifies

"biometric identification systems" as a means of fulfilling a C-TPAT member's requirement to prevent unauthorized access into its facilities.  SOF No. 46.

Consistent with CBP's Minimum Security Criteria for Rail-Carriers Criteria ID 10.1, BNSF, among other things, contracts with Remprex to provide a variety of services at BNSF's intermodal facilities in the state of Illinois and across the country.  SOF No. 48.  Biometric technology used in connection with the AGS improves security at BNSF facilities because unlike other identity authentication systems (*e.g*., key cards), biometrics cannot be obtained and used by an unauthorized person to gain entry to a BNSF facility.  SOF No. 50.

## LEGAL STANDARD

Summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party."  *Egonmwan v. Cook Cty. Sheriff's Dep't.*, 602 F.3d 845, 849 (7th Cir. 2010) (quotation marks omitted).

## ARGUMENT

## I.      PLAINTIFF'S SPECIFIC BIPA CLAIM IS PREEMPTED BY FEDERAL LAW.

"Where a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663–64 (1993).  "Preemption can occur in three different ways: express, conflict, and field."  *Nelson v. Great Lakes Educ. Loan Services, Inc.*, 928 F.3d 639, 646 (7th Cir. 2019).  "Express preemption applies when Congress clearly declares its intention to preempt state law."  *Id.*  Conflict preemption includes "when state law stands as an obstacle to fully accomplishing the objectives of Congress."  *Id.* at 646–47.  An express preemption provision "does not 'entirely foreclose[] any possibility of implied pre-emption.'"  *Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1009 (7th Cir. 2020) (quoting *Freightliner Corp. v. Myrick*,

514 U.S. 280, 288 (1995); alteration in original). "[T]he absence of express pre-emption is not a reason to find no conflict pre-emption." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 n.5 (2011).

Plaintiff's specific BIPA claim against BSNF is preempted by three federal statutes: the Federal Railway Safety Act ("FRSA"), the Interstate Commerce Commission Termination Act ("ICCTA"), and the Federal Aviation Administration Authorization Act ("FAAAA").

### A.      Plaintiff's Specific BIPA Claim Is Expressly Preempted by the FRSA.

The FRSA reflects Congress's intent that "to the extent practicable," "[l]aws, regulations, and orders related to railroad security shall be nationally uniform." 49 U.S.C. § 20106. The FRSA provides:

> A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C. § 20106(a)(2).

Although FRSA's current text refers expressly only to federal regulations and orders, it also covers federal "rules" and "standards." This provision is a recodification "without substantive change," *Burlington N. & Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 794 n.3 (7th Cir. 1999), of prior language that triggered preemption based on a federal "rule, regulation, order, or standard," *see Easterwood,* 507 U.S. at 662 (quoting 45 U.S.C. § 434 (1992)). Any doubt about the scope of FRSA preemption must be resolved in favor of the earlier, broader language. *Atchison, T. and S. F. Ry. Co. v. Lennen,* 640 F.2d 255, 258 (10th Cir. 1981) (discussing a similarly recodified railroad statute); *accord Richmond, Fredericksburg & Potomac R. Co. v. Dep't of Taxation,* 762 F.2d 375, 377 (4th Cir. 1985).

In applying this express preemption provision, the "State requirement" refers to the specific claims asserted by the plaintiff against the defendant, not to the general statute or body of state law

relied upon by the plaintiff. For example, *Easterwood* concerned a Georgia wrongful-death action based on common-law negligence "for failing to maintain adequate warning devices at the crossing and for operating the train at an excessive speed." 507 U.S. at 661. The Supreme Court did not ask whether the Secretary of Transportation had issued a regulation or order covering wrongful death or covering negligence generally. Instead, the Supreme Court explained, the express preemption inquiry concerned "whether the regulations issued by the Secretary cover the subject matter *of the two allegations*." *Id.* at 665 (emphasis added).

In ruling on BNSF's motion to dismiss, this Court framed the inquiry as "whether the Secretaries of Transportation or Homeland Security have issued regulations 'covering' the same subject matter as the BIPA." ECF No. 31 at 7. But as *Easterwood* holds, the correct inquiry is not whether there are regulations covering the general subject matter of the BIPA as a whole, but whether federal regulations cover the specific allegations made by Plaintiff.[4]

The relevant inquiry is therefore not whether a federal regulation generally "governs collection or storage of biometric information," the subject matter of BIPA. *See* ECF No. 31 at 7–8. Plaintiff's allegations do not concern the collection or use of biometric information in general. Plaintiff's allegations are based on BNSF's alleged collection or use of biometric information *for safety purposes*; specifically, the purpose of "instantly gather[ing] an accurate 'signature' of visitors to its facilities," which Plaintiff alleges is "part of the process of accessing the facilities."

---

[4] The district court in *Fleury v. Union Pac. R.R. Co.* similarly framed the inquiry incorrectly. It focused on the subject matter of the BIPA rather than focusing on the subject matter of the plaintiff's allegations. "In answering this question, the Court must first determine what the 'subject matter' of BIPA is." 20-CV-00390, 2021 WL 1124309, at *5 (N.D. Ill. Mar. 24, 2021). Such an inquiry might be appropriate when an entire statute is challenged as preempted. *See Doyle*, 186 F.3d at 796 (involving a state statute addressing "(1) who is qualified to operate a train or locomotive safely, and (2) what is the minimum number of crew persons needed to operate a train or locomotive safely."). But when an FRSA preemption argument concerns the specific application of a general statute (like the application of general negligence law in *Easterwood*), the Supreme Court has held that the focus of the preemption inquiry is the plaintiff's specific allegations, not the state law generally.

SAC ¶¶ 3–4. These biometric identifiers, Plaintiff alleges, are used by BNSF to "control ingress and egress at the facilities." *Id.* at ¶ 16. In other words, Plaintiff's allegations concern BNSF's alleged use of biometrics to control and monitor access to its facilities, as required to secure the facilities – unlike in many other BIPA cases, the alleged biometrics are not used for timekeeping or payroll purposes.

The undisputed evidence confirms, consistent with Plaintiff's allegations, that the purpose for the collection and use of biometric information was to enhance security by allowing BNSF to verify truck drivers' identities and prevent unauthorized access. SAC ¶ 4 (biometrics allow BNSF "to instantly gather an accurate 'signature' of visitors to its facilities"); *id.* at ¶ 16 ("Plaintiff was required to register his biometric identifiers and/or biometric information into biometrically-enabled Auto-Gate Systems that partially control ingress and egress at the facilities."); SOF Nos. 40–52. Testimony from BNSF and Remprex employees confirmed the importance of validating driver identities and confirmed that the implementation of "biometric readers" into the AGS was specifically to increase the security of BNSF's facilities. SOF No. 51 (citing testimony of BNSF employee Carlos Reyes and Remprex employee Timothy Ash). Documentary evidence confirms that the inclusion of "biometrics" into the AGS was to improve safety and security of BNSF's facilities. *Id.* (citing BNSF_0001342–1347, explaining Remprex AGS clerks conduct a security intervention if biometric validation fails, and citing BNSF_00004711, a presentation from 2008 noting that a benefit of the AGS is "[i]mproved security through use of biometric driver ID's").

The subject matter of Plaintiff's allegations is not "biometric information" generally—the subject matter of Plaintiff's allegations is BNSF's use of biometric information to control and monitor access to its facilities. With the inquiry correctly framed consistent with *Easterwood*, it becomes clear that Plaintiff's claims are expressly preempted.

The federal government has promulgated rules, regulations, orders, and standards that require BNSF to control and monitor access to its facilities. As Plaintiff's Complaint acknowledges, biometrics are an effective means for BNSF to secure its facilities. Federal standards expressly encourage BNSF to use biometrics to comply with this federal mandate.

In 2007, Congress required the Secretary of the Department of Homeland Security ("DHS") to "establish standards and guidelines . . . for developing and implementing the vulnerability assessments and security plans for railroad carriers[.]" 6 U.S.C § 1162(a). Among the security vulnerabilities identified by Congress are concerns about "physical security" and "alarms, cameras, and other protections systems" at "critical railroad carrier assets and infrastructure," including intermodal terminals. *Id.* § 1162(d). The resulting regulations require rail hazardous materials shippers—like BNSF—to "use physical security measures to ensure that no unauthorized individual gains access to the rail secure area." 49 C.F.R. § 1580.205(i); *see also* SOF No. 41 (noting that BSNF is a rail hazardous materials shipper).

In other words, the federal government has specifically issued regulations concerning security of railway facilities and requiring shippers of hazardous materials (like BNSF) to employ security measures to control access to their facilities and prevent access by unauthorized persons. Plaintiff's claims in this case concern BNSF's use of security measures—specifically the alleged use of biometrics—to control access to its facilities and to determine whether a person seeking access is authorized, precisely the subject matter covered by the federal regulations. Plaintiff's claims are thus preempted.

In addition, Congress required the Secretary of the Department of Homeland Security to promulgate regulations requiring railroad carriers to "prepare, submit to the Secretary for approval, and implement a security plan[.]" 6 U.S.C. § 1162(a). The implementing regulations require

anyone transporting certain hazardous materials to "develop and adhere to a transportation security plan," 49 C.F.R. § 172.800(b), which must include "[m]easures to address the assessed risk that unauthorized persons may gain access to the hazardous materials" that are stored or transported. *Id.* § 172.802(a)(2).

Rather than promulgate a specific regulation specifying new requirements for security plans, the Department of Transportation provided that a shipper can satisfy the requirements of Section 172.800 by conforming to regulations, standards, protocols, or guidelines issued by other Federal agencies, international organizations, or industry organizations:

> To avoid unnecessary duplication of security requirements, security plans that conform to regulations, standards, protocols, or guidelines issued by other Federal agencies, international organizations, or industry organizations may be used to satisfy the requirements in this subpart, provided such security plans address the requirements specified in this subpart.

49 C.F.R. § 172.804.

BNSF complied with this regulation in formulating its security plan. BNSF's security plan—specifically including the use of the biometric information Plaintiff challenges—conforms to standards and guidelines promulgated by the Department of Homeland Security in the C-TPAT program. 6 U.S.C. § 961 ("The Secretary … is authorized to establish a voluntary government-private sector program (to be known as . . . 'C-TPAT') to strengthen and improve the overall security of the international supply chain and United States border security[.]"); *see also* 78 Fed. Reg. 15962, 15963 (Mar. 13, 2013) (implementing C-TPAT).

The "security guidelines for C-TPAT program members address a broad range of topics including personnel, ***physical and procedural security***; ***access controls***; education, training and awareness; manifest procedures; conveyance security; threat awareness; and documentation processing." 78 Fed. Reg. 15962, 15963 (Mar. 13, 2013) (emphasis added). "These guidelines

offer a customized solution for the members, while providing a clear minimum standard that approved companies must meet." *Id.*

Current C-TPAT requirements for rail carriers include access controls to "prevent unauthorized access into facilities/areas, help maintain control of employees and visitors, and protect company assets." Minimum Security Criteria – Rail Carriers at 34, U.S. Customs and Border Protection (March 2020), *available at* https://www.cbp.gov/sites/default/files/assets/documents/2020-Apr/CTPAT%20Rail%20Carriers%20MSC%20March%202020.pdf (hereinafter "Minimum Security Criteria"). "Access controls include the positive identification of all employees, visitors, service providers, and vendors at all points of entry." *Id.*; *see also id.* ("Where applicable, a personnel identification system must be in place for positive identification and access control purposes."). The C-TPAT requirements specifically list "biometric identification" as an "access device." *Id.*

BNSF—a C-TPAT member since the program's inception—has implemented the required access control portion of its security program through a contract with Remprex. SOF Nos. 43, 50. Since July 1, 2007, Remprex has provided services under that contract, including controlling entry to BNSF facilities in Illinois. SOF No. 4. Remprex operates the AGS, which includes biometric driver registration as one of its components. SOF Nos. 5, 21–29. The AGS system satisfies the federal requirement that BSNF maintain a personnel identification system. And the AGS uses "biometric identification systems" to fulfill this requirement, as the C-TPAT requirements specifically permit. Minimum Security Criteria, at 34.

The C-TPAT minimum security standards with which BNSF complies are consistent with other DHS guidelines, which explain that surface transportation providers should "[e]nhance infrastructure and conveyance security" by "[i]mprov[ing] detection and deterrence, including

integration of biometric-based systems." *See* DHS, *2007 Critical Infrastructure and Key Resources Sector-Specific Plan*, at 90, *available at* https://www.hsdl.org/?view&did=474328. The Transportation Security Administration's "Transportation Worker Identification Credential" program similarly uses a "tamper- and counterfeit-resistant biometric smart card credential" and "a biometric fingerprint match." TSA, *TWIC Card and Reader Technology,* https://www.tsa.gov/for-industry/twic-card-reader-technology.

In sum, federal regulations require BNSF to develop and implement a transportation security plan, including measures to address the risks of access by unauthorized persons. 49 C.F.R. § 172.800(b), § 172.802(a)(2). Regulations expressly permit BNSF to satisfy these requirements by "conform[ing] to regulations, standards, protocols, or guidelines issued by other Federal agencies, international organizations, or industry organizations," 49 C.F.R. § 172.804, which BNSF did by conforming to C-TPAT's access-control guidelines (that include use of biometric information to verify identity). Because "the regulations issued by the Secretary cover the subject matter of [Plaintiff's biometric access control] allegations," Plaintiff's claims are expressly preempted. *See Easterwood.*, 507 U.S. at 665.

It is irrelevant that the regulations do not specifically **require** BNSF to employ biometric identification. BNSF does not contend that it was impossible to comply with both state law and federal regulations. But the express preemption provision does not require impossibility—it merely requires that the federal regulations cover the subject matter of the allegations. *Cf. Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013) (contrasting express preemption with impossibility). Each of these federal standards covers—*i.e.,* substantially subsumes—the subject matter of Plaintiff's BIPA claim. The claims are expressly preempted.

### B. Plaintiff's Claims Are Impliedly Preempted by the FRSA.

State law is impliedly preempted when it conflicts with federal law, which occurs when "the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984). With respect to the FRSA, "even if no federal regulation covers the subject, states are forbidden to adopt laws or regulations that conflict with or prevent achievement of federal objectives." *Norfolk S. Ry. Co. v. Box*, 556 F.3d 571, 572 (7th Cir. 2009). "Federal regulations have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

The duty Plaintiff seeks to impose on BNSF interferes with the full purposes and objectives of Congress in two ways. First, Plaintiff contends that Illinois law prohibits mandatory use of biometric access controls. According to Plaintiff, Illinois allows biometric access controls to be employed only with consent. SAC ¶ 19 (alleging that BNSF "failed to obtain informed written consent"). But as discussed above, DHS's regulations expressly permit BNSF to implement a security plan by complying with agency guidelines and standards, including the C-TPAP requirements that involve mandatory biometric access control. 49 C.F.R. § 172.800(b), § 172.802(a)(2).

If Plaintiff's theory is correct, then state law will deprive BNSF of an option that federal law expressly provides: the option to use mandatory biometric identifiers to control access to rail facilities. State laws are preempted when they eliminate an option provided by federal law in this way. *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 881 (2000) (holding that a state law "duty to install an airbag" would conflict with "the variety and mix of devices that the federal regulation sought"); *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 156 ("[T]he State has created 'an obstacle to the accomplishment and execution of the full purposes and objectives' of the due-on-sale regulation."). Here, federal law provided BNSF with the option of complying with the C-

TPAT guidelines—including their authorization of biometric access control—in its security plan. State law cannot deprive BSNF of this option.

Second, permitting claims like Plaintiff's would stand as an obstacle to Congress's purpose in ensuring railway safety and security. *See* 49 U.S.C. §§ 20101, 20106; 6 U.S.C. § 1162(a)(1)(B) (requiring "security plan[s]" that "addresses security performance requirements"). State law cannot stand as an obstacle in securing railways that transport hazardous materials.

Here, the undisputed facts demonstrate that BNSF's intermodal facilities (through the Remprex AGS) have employed biometric access controls to prevent unauthorized access to its facilities. If Plaintiff were correct, BIPA requires BNSF to obtain consent of each driver before collecting biometric information for access control purposes. As Plaintiff recognizes, biometrics are a very reliable means of identification. SAC ¶ 4 ("[B]iometric identifiers allows private entities, such as Defendant, to instantly gather an accurate "signature" of visitors to its facilities"). If railroads could employ biometric access controls only with a truck driver's consent, railroads would be deprived of the most effective means of securing their facilities. Moreover, railroads would be forced to adopt a patchwork of access controls at Illinois facilities, with some drivers providing biometric information and others refusing, frustrating the express Congressional purpose of "uniform" railway safety regulation. 49 U.S.C. § 20106; *see also* SOF No. 20 (Remprex's operation of the AGS system at BNSF's intermodal facilities is uniform and interconnected across BNSF's intermodal facilities inside and outside of Illinois).

Plaintiff's specific BIPA claim is impliedly preempted because if Plaintiff's allegations were correct, BIPA's requirements would stand as an obstacle to accomplishing Congress's full purpose in achieving nationally secure railroads and, to the greatest extent possible, preventing unauthorized access.

### C.    Plaintiff's Claims Are Preempted by the ICCTA.

As the Court previously recognized, in the ICCTA, Congress "expressly conferred on the [Surface Transportation] Board exclusive jurisdiction over the regulation of railroad transportation."  ECF No. 31 at 4 (citing *Union Pac. R. Co. v. Chicago Transit Auth.*, 647 F.3d 675, 678 (7th Cir. 2011)).  Like the FRSA, the ICCTA contains an express preemption provision:

The jurisdiction of the Board over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carries; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive.  Except as otherwise provided in this part, the remedies provided under this part with respect to the regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).

The statute defines "transportation" to include railroad property "related to the movement of passengers or property, or both, by rail" as well as "services related to that movement," meaning that "ICCTA's preemption provision applies to railroad property and facilities that are related to movement of persons or property," including BNSF's intermodal facilities in Illinois.  *See* ECF No. 31 at 4.  If enforcing BIPA against BNSF "would have the effect of preventing or unreasonably interfering with railroad transportation," then "the statute would in fact be preempted as applied to BNSF."  *Id.* at 5 (citing *Wedemeyer v. CSX Transp., Inc.,* 850 F.3d 889 (7th Cir. 2017); *Chi. Transit Auth.,* 647 F.3d at 681).

Previously, the Court denied BNSF's motion to dismiss on this basis because, at the pleadings stage, the Court was constrained to Plaintiff's allegations.  *Id.*  Now, however, discovery

is complete, and the undisputed facts demonstrate that Plaintiff's specific BIPA claim, as applied against BNSF, impermissibly interfere with BNSF's operations.

The record demonstrates that any alleged biometrics captured from Plaintiff were captured only for the purpose of facilitating BNSF's intermodal operations. Plaintiff is an intermodal truck driver for third-party logistics company. SOF No. 1. Plaintiff alleges that BNSF "requires truck drivers, including Plaintiff, who visit its four intermodal facilities located in Illinois, to provide their biometric identifiers in the form of fingerprints and related biometric information as part of the process of accessing the facilities," and specifically that "Plaintiff was required to register his biometric identifiers and/or biometric information into biometrically-enabled Auto-Gate Systems that partially control ingress and egress at the facilities." SAC ¶¶ 3, 16. The only time Plaintiff allegedly submitted his fingerprints to BNSF was when Plaintiff used the AGS kiosk to enter BNSF's intermodal facilities in Illinois. SOF No. 9.

The record also demonstrates that the AGS, including the use of the "biometric reader" on the AGS kiosk, is integral to BNSF's intermodal operations. Finger scans are used by Remprex to validate a driver's identity before entering BNSF's intermodal facility. SOF Nos. 21–27. Remprex's operation of the AGS system at BNSF's intermodal facilities is uniform and interconnected across BNSF's intermodal facilities inside and outside of Illinois. SOF No. 20.

In short, Plaintiff's specific BIPA claim arises from and relates to BNSF's intermodal operations, and, therefore, is preempted by the ICCTA. ICCTA preemption "has been recognized as broad and sweeping." *Chicago Transit Auth.*, 647 F.3d at 678. A state statute "may be preempted 'as applied' based on the degree of interference that the particular action has on railroad transportation—this occurs when the facts show that the action would have the effect of preventing or unreasonably interfering with railroad transportation. *Id.* at 679 (internal quotations omitted).

Plaintiff's specific BIPA claim would require BNSF—through its contracts with Remprex—to make changes to the AGS procedure in Illinois only that would differ from the AGS procedure currently implemented across BNSF's nationwide network. For example, unlike the rest of the nationwide network, the AGS in Illinois would need to maintain a strict record of particularized notice-and-consent documentation for drivers in Illinois. *See* 740 ILCS 14/15(b) (requiring written notice and consent to capture, use, or otherwise obtain biometrics). Similarly, the AGS in Illinois would need to implement and adhere to a strict three-year record retention policy for drivers who pass through an Illinois intermodal terminal. 740 ILCS 14/15(a) (requiring entities to develop and adhere to guidelines for permanently destroying biometrics "when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity"). The impact of these changes to BNSF's operations is significant considering BNSF's size and scope. BNSF transports freight across the Canadian and Mexican borders, serves more than 40 ports, spans 28 states, operates 25 intermodal facilities and over 7,700 locomotives, with an average of 1,200 trains in service each day. SOF No. 2. To facilitate these operations, BNSF—through its contract with Remprex—has deployed a uniform, system-wide process by which Remprex clears and validates both drivers and cargo for transport around the country. SOF Nos. 20–27. Plaintiff's BIPA claims would frustrate (if not eliminate) that aspect of BNSF's operations.

Discovery has made clear that Plaintiff's claims are not merely "tortious acts committed by a landowner that happens to be a railroad company," nor are Plaintiff's claims "acts that do not have anything to do with rail transportation." ECF No. 31 at 5. Plaintiff's claim against BNSF stems *exclusively* from his interactions with BNSF's intermodal operations, and if Plaintiff's specific BIPA claim is allowed to proceed against BNSF, then BNSF would have to make

significant changes to its intermodal process in Illinois. That is exactly the sort of impermissible interference in rail operations the ICCTA was designed to prevent.

### D. Plaintiff's Claims Are Preempted by the FAAAA.

Similar to the ICCTA, the Court previously acknowledged that the FAAAA contains a broad preemption provision. ECF No. 31 at 5–6. Under the FAAAA, "a State … may not enact or enforce a law … related to a price, route, or service of any motor carrier … with respect to transportation of property." *Id.* at 6 (quoting 29 U.S.C. § 14501(c)(1)). The ordinary meaning of "related to" is a broad one, and the statute's use of those words "expresses a broad preemptive purpose." *Id.* (quoting *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013)). "[A] state law or enforcement action that has a connection with or reference to carrier rates, routes, or services is preempted by the FAAAA, even if the effect 'is only indirect.'" *Id.* (citing *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008)).

The Court denied BNSF's motion to dismiss on this basis. Constrained to the pleadings, the Court concluded, "at least on the present record, the impact of the BIPA on motor carrier prices, routes, or services is 'too tenuous, remote, or peripheral' to give rise to FAAAA preemption." *Id.* at 7. With discovery complete, BNSF respectfully submits that Plaintiff's specific BIPA claim is preempted under the FAAAA.

To be clear, BNSF does not claim that BIPA is categorically preempted by the FAAAA. BIPA is a generally applicable statute. But, as applied here, Plaintiff's specific BIPA claim against BNSF runs afoul of the FAAAA. In such circumstances, a claim is preempted under the FAAAA if: (1) the claim "concern[s] a motor carrier's transportation of property" (*Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 261 (2013)); (2) the claim (as opposed to the law under which it is advanced) "has a connection with, or reference to [motor carrier's] prices, routes, or services" (*Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 284 (2014) (internal quotations and citation omitted));

and (3) the claim emanates from a "state-imposed obligation" (*id.* at 285). Here, Plaintiff's BIPA claim satisfies all three conditions.

First, Plaintiff's specific BIPA claim concerns a motor carrier's transportation of property. Plaintiff is a motor carrier (SOF No. 1), and "transportation" means, "services related to the movement of property, including arranging for, receipt, delivery, elevation, transfer in transit … storage, handling … and interchange of passengers and property." *Dan's City Used Cars, Inc.*, 569 U.S. at 261 (internal quotations and citation omitted). Here, Plaintiff alleges that BNSF "requires truck drivers, including Plaintiff, who visit its four intermodal facilities located in Illinois, to provide their biometric identifiers in the form of fingerprints and related biometric information as part of the process of accessing the facilities," and specifically that "Plaintiff was required to register his biometric identifiers and/or biometric information into biometrically-enabled Auto-Gate Systems that partially control ingress and egress at the facilities." SAC ¶¶ 3, 16. The only time Plaintiff allegedly submitted his fingerprints to BNSF was when Plaintiff used the AGS kiosk when entering BNSF's intermodal facilities in Illinois. SOF No. 9. Simply put, Plaintiff's specific BIPA claim arises entirely from his ability to transport property in and out of BNSF facilities.

Second, Plaintiff's specific BIPA claim has a connection with, or reference to a motor carrier's prices, routes, or services.[5]  Again, the only time Plaintiff allegedly submitted his fingerprints to BNSF was when Plaintiff used the AGS kiosk when entering BNSF's intermodal facilities in Illinois. SOF No. 9. Plaintiff only did so as part of his work as a motor carrier. SOF

---

[5] The fact that BIPA's requirements are targeted at BNSF in its capacity as a railyard operator is of no importance. All that matters is that Plaintiff's claim bears directly on how he provides delivery services. *See Rowe*, 552 U.S. at 373 (finding FAAAA preempted shipping regulation because it impacted manner in which motor carrier provided services); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 569 U.S. 641, 652 (2013) ("We have often rejected efforts by States to avoid preemption by shifting their regulatory focus from one company to another in the same supply chain.").

No. 1. The record demonstrates that the AGS system is operated by Remprex to processes trucks and truck drivers moving through BNSF's intermodal terminals in Illinois and other parts of the country. SOF Nos. 20–27. In addition to enhancing security at BNSF's intermodal facilities, the AGS improves the efficiency of the intermodal process. SOF Nos. 53–54. Plaintiff's allegations concede as much. SAC ¶¶ 3, 16. Efficiency is critical as BNSF transports freight to the Canadian and Mexican border, serves more than 40 ports, spans 28 states and three Canadian provinces, operates 25 intermodal facilities, and has an average of 1,200 trains in service each day. SOF No. 2. To facilitate these operations, BNSF—through its contract with Remprex—has deployed a uniform, systemwide process by which Remprex clears and validates both drivers and cargo for transport around the country. SOF Nos. 20–27.

If Plaintiff's specific BIPA claims were allowed to proceed, BNSF would be required to make Illinois-specific changes to the AGS, including possibly eliminating the use of biometrics in Illinois. Such a change would materially impact the efficiency of the facilities' operations. Remprex employees would need to manually verify driver identities prior to allowing a driver on the property. SOF No. 54. This process would slow down intermodal operations, and in turn, would result in greater operational costs for BNSF.

Finally, Plaintiff's claim is clearly based on a state-imposed obligation, specifically BIPA. *See* SAC ¶¶ 28–36. Accordingly, the claim is preempted under the FAAAA.

## II. PLAINTIFF'S SECTION 15(b) CLAIM FAILS BECAUSE BNSF DID NOT COLLECT PLAINTIFF'S BIOMETRICS.

Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifiers or information without first receiving the individual's informed consent. 740 ILCS 14/15(b). BIPA does not impose this

notice-and-consent requirement on private entities that are merely "in possession" of biometric information.  *See* 740 ILCS 14/15(a), (c)–(e).

Here, the legislature intended for Section 15(b) to apply only to the private entity that *actively* or *affirmatively* collects, captures, purchases, receives through trade, or otherwise obtains an individual's biometric information.  *See Jacobs v. Hanwha Techwin Am., Inc.*, No. 21 C 866, 2021 WL 3172967, at *2 (N.D. Ill. July 27, 2021) ("[T]his court concludes that for Section 15(b)'s requirements to apply, an entity must, at a minimum, take an active step to collect, capture, purchase, or otherwise obtain biometric data."); *Namuwonge v. Kronos, Inc.*, 418 F.Supp.3d 279, 286 (N.D. Ill. 2019) (holding there "is a difference between *possessing* and *collecting* biometric information") (emphasis in original); *Bernal v. ADP, LLC*, 2019 WL 5028609, at *1 (Cir. Ct. of Cook Cnty. Aug. 23, 2019) (holding "possession alone not to be enough to make an entity subject to § 15(b)").

First, Section 15(b)'s verbs —"collect, capture, purchase, receive through trade, or otherwise obtain"—connote affirmative action by a private entity to acquire an individual's biometric information.  One does not passively "collect" or "capture" something.  Nor does one "purchase" or "receive through trade" something without exchanging one thing for another.  Similarly, to "obtain" means "*to bring* into one's own possession; to procure, *esp. through effort*," Black's Law Dictionary (11th ed. 2019) (emphasis added), or "to gain or attain usually by planned action or effort."  Merriam-Webster Dictionary (2021).  All these verbs require action.

Second, because the Illinois legislature expressly omitted the term "possession" from Section 15(b) while including the term in BIPA's other provisions, the mere "possession" of biometrics is insufficient to trigger its notice-and-consent requirements.  *In re D.W.*, 827 N.E.2d 466, 479 (Ill. 2005) (applying "the familiar maxim *expressio unius est exclusio alterius*, meaning,

'to express or include one thing implies the exclusion of the other, or of the alternative.'") Plaintiff's Section 15(b) claim *only* applies to the private entity that collected, captured, purchased, received through trade, or otherwise obtained his alleged biometrics. BNSF is not that entity.

The alleged collection of Plaintiff's biometric information resulted from Plaintiff's use of the AGS system. The record demonstrates that Remprex—not BNSF—maintained and operated the AGS, including being *solely* responsible for registering drivers' biometrics. SOF Nos. 19, 21–27, 30–37. It was exclusively Remprex employees—not BNSF employees—who collected a driver's information for registration into the AGS system, including any scans of a driver's fingers. SOF No. 21–29. Plaintiff's Section 15(b) claim against BNSF fails as a matter of law.

## III. PLAINTIFF'S SECTION 15(b) CLAIM IS UNTIMELY.

BIPA does not include a statute of limitations, and the issue of what statute of limitations applies to BIPA claims is currently under consideration by the Illinois Appellate Court. *See Donets v. Vivid Seats LLC*, No. 20-cv-03551, 2020 U.S. Dist. LEXIS 238106, at *3 (N.D. Ill. Dec. 15, 2020) (staying a case "pending decisions from the Illinois Appellate Court in *Tims v. Black Horse Carriers*, App. No. 1-20-0563 and *Marion v. Ring Container Techs.*, LLC, App. No. 3-20-0184" addressing "which statute of limitations period applies to BIPA claims"). BNSF submits that either the one-year or two-year statute of limitations applies to Plaintiff's and the putative class members' claims. Even if the five-year statute of limitations applies, however, Plaintiff's Section 15(b) claim is time barred because his claim began running more than five years before filing this suit.

A claim accrues, and the limitations period begins to run, when "facts exist that authorize one party to maintain an action against another." *Feltmeier v. Feltmeier,* 798 N.E.2d 75, 85 (Ill. 2003). Specifically, where there is a "single overt act" from which subsequent damages may flow,

a claim accrues "on the date the defendant invaded the plaintiff's interest and inflicted injury[.]"[6] *Id.* With BIPA claims, courts have held that the invasion of a plaintiff's interest and the resulting injury are one and the same. *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1154 (7th Cir. 2020). For tort claims, "the cause of action usually accrues when the plaintiff suffers injury." *Am. Fam. Mut. Ins. Co. v. Krop,* 120 N.E.3d 982, 987 (Ill. 2018).[7]

Invasion of privacy claims accrue at the time the injured party's interest in privacy is allegedly invaded. *See Blair v. Nev. Landing P'ship*, 859 N.E.2d 1188, 1193 (Ill. App. Ct. 2006) (privacy claim accrued when employer first displayed employee's image). This is true even if there are subsequent consequences of the initial invasion—or even republication of material that offends a privacy interest. *See id.* at 1194 (claim accrued with first display, despite nine years of republication); *see also Bank of Ravenswood v. City of Chicago,* 717 N.E.2d 478, 484 (Ill. App. Ct. 1999). The same holds true for Section 15(b) claims.

Here, Plaintiff's interests were allegedly invaded, and his injury occurred, when his biometrics were allegedly collected without first adhering to BIPA's notice and consent requirements. That first happened on December 5, 2012. SOF No. 39. Because this was well before even the possible five-year statute of limitations, Plaintiff's Section 15(b) claim fails as a matter of law.

## CONCLUSION

For these reasons, BNSF respectfully requests the Court grant its motion for summary judgment and enter an order dismissing Plaintiff's claim and for judgment in favor of BNSF.

---

[6] Illinois law recognizes a few exceptions to its general accrual rule, none of which applies here. *See, e.g., Feltmeier,* 798 N.E.2d at 85; *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 770 N.E.2d 177, 192 (Ill. 2002).

[7] The issue of when a BIPA claim begins to accrue is currently before the Seventh Circuit. *See Cothron v. White Castle System, Inc*., Dkt. No. 20-03202 (7th Cir. Nov 12, 2020) (argued on Sept. 14, 2021).

Dated: September 16, 2021

Respectfully submitted,

**BNSF RAILWAY COMPANY**

By: */s/ Elizabeth B. Herrington*
    By Its Attorneys

Elizabeth B. Herrington
Alex D. Berger
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive, Suite 2800
Chicago, IL 60606-1511
Telephone: +1.312.324.1000
Facsimile: +1.312.324.1001
beth.herrington@morganlewis.com
alex.berger@morganlewis.com

*Counsel for Defendant BNSF Railway
Company*

**CERTIFICATE OF SERVICE**

I, Elizabeth B. Herrington, certify that on September 16, 2021, I caused a copy of the foregoing to be served upon all counsel of record via the Court's CM/ECF system.

*/s/ Elizabeth B. Herrington*
Elizabeth B. Herrington