## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD ROGERS, individually and on behalf of all others similarly situated, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | No. 19-cv-03083 |
| BNSF RAILWAY COMPANY, a Delaware corporation, | ) ) ) | Hon. Matthew F. Kennelly |
| *Defendant*. | ) ) ) | |
| _____ | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BNSF RAILWAY COMPANY'S MOTION FOR SUMMARY JUDGMENT

November 11, 2021

Myles McGuire
Evan M. Meyers
David L. Gerbie
Brendan Duffner
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Floor
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
dgerbie@mcgpc.com
bduffner@mcgpc.com

*Attorneys for Plaintiff and the putative Class*

**TABLE OF CONTENTS**

Table of Authorities ............................................................................................... iii

  I.    INTRODUCTION .......................................................................................1

 II.    BACKGROUND ........................................................................................3

      A.    The Illinois Biometric Information Privacy Act .....................................3

      B.    BNSF's Automatic Gate Systems. .........................................................4

      C.    Facts Specific To Plaintiff ..................................................................... 6

III.    LEGAL STANDARD ................................................................................7

IV.    ARGUMENT ............................................................................................7

      A.    Defendant's Express FRSA Preemption Argument Should Be Denied, Again ......7

           i.    There is a strong presumption against FRSA preemption. ............................8

          ii.    Voluntary "guidelines" do not constitute a "regulation" or "order" that can form the basis for federal preemption .................................................. 8

         iii.    The "subject matter of the state requirement" here is biometric privacy—not railway safety ......................................................................10

         iv.    Defendant's cited "regulations" do not "substantially subsume" the subject matter of the state requirement; they merely touch upon it .............12

      B.    There Is No Conflict Preemption Of Plaintiff's Claims .......................13

      C.    Plaintiff's BIPA Claims Are Not Preempted By The ICCTA .............15

      D.    Plaintiff's BIPA Claims Are Not Preempted By The FAAAA .............19

      E.    BNSF Has Collected, Captured, Purchased, Stored, Received Through Trade, Or Otherwise Obtained Plaintiff's Biometrics. .........................................22

      F.    The Statute of Limitations Does Not Bar Plaintiff's Claims ...............23

  V.    CONCLUSION .......................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*
   770 N.E.2d 177 (2002) ................................................................................24

*BNSF Railway v. Box*,
   470 F. Supp. 2d 855 (C.D. Ill. 2007)........................................................8

*Bryant v. Compass Grp. USA, Inc.*,
   958 F.3d 617 (7th Cir. 2020) ....................................................................4

*Burlington N. & Santa Fe Ry. Co. v. Doyle*,
   186 F.3d 790 (7th Cir. 1999) ..................................................................11

*Costello v. BeavEx, Inc.*,
   810 F.3d 1045 (7th Cir. 2016) .................................................................21

*Cothron v. White Castle System, Inc.*,
   477 F. Supp. 3d 723 (N.D. Ill. 2020) ......................................................24

*Crumpton v. Octapharma Plasma, Inc.*,
   513 F. Supp. 3d 1006 (N.D. Ill. 2021) ................................................9, 10

*Dans City Used Cars, Inc. v. Pelkey*,
   569 U.S. 251 (2013) .................................................................................21

*Delaware v. Surface Transp. Bd.*,
   859 F.3d 16 (D.C. Cir. 2017)...................................................................16

*CSX Transportation, Inc. v. Easterwood*,
   507 U.S. 658 (1993) ...................................................................................8

*Fleury v. Union Pacific*,
   2020 WL 2588752 (N.D. Ill., March 24, 2021).............................*passim*

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
   505 U.S. 88 (1992) ...................................................................................13

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ...................................................................................9

*Michigan Ave. Nat. Bank v. Cty. of Cook*,
   732 N.E.2d 528 (Ill. 2000).......................................................................24

*Mintz v. Mathers Fund, Inc.*,
  463 F.2d 495 (7th Cir. 1972) ............................................................7

*Nelson v. Great Lakes Educ. Loan Services, Inc.*,
  928 F.3d 639 (7th Cir. 2019). ...........................................................7

*Norfolk S. Ry. Co. v. City of Alexandria*,
  608 F.3d 150 (4th Cir. 2010). ..........................................................16

*Peoples Outfitting Co. v. Gen. Elec. Credit Corp.*,
  549 F.2d 42 (7th Cir. 1977) ..............................................................7

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) ........................................................................10

*Rice v. Norman Williams Co.*,
  458 U.S. 654 (1982) ........................................................................13

*Rosenbach v. Six Flags Entm't Corp.*,
  2019 IL 123186, 129 N.E.3d 1197.........................................3, 4, 17, 19

*Rowe v. New Hampshire Motor Transp. Ass.*
  552 U.S. 364 (2008) ...................................................................20, 21

*Schlaf v. Safeguard Prop., LLC*,
  4899 F.3d 459 (7th Cir. 2018). ..........................................................7

*Smith v. CSX Transportation, Inc.*,
  247 F. Supp. 3d 952 (N.D. Ill. 2017) ...........................................18, 19

*Southern Pacific Transportation. Co. v. Pub. Util. Comm'n of State of Or.*,
  9 F.3d 807 (9th Cir. 1993) .................................................................8

*Tims v. Black Horse Carriers, Inc.*,
  2021 IL App (1st) 200563 ........................................................3, 23, 24

*Union Pacific R. R. Co. v. Chicago Transit Authority*,
  647 F.3d 675 (7th Cir. 2011) ......................................................15, 18

*Union Pacific R. Co. v. Chicago Transit Auth.*,
  2009 WL 448897 (N.D. Ill. Feb. 23, 2009) ........................................16

*Wedemeyer v. CSX Transp., Inc.*,
  850 F.3d 889 (7th Cir. 2017). ..........................................................15

*Wyeth v. Levine,*
   555 U.S. 555 (2009) ...........................................................................................13

**Statutes**

45 U.S.C. § 421 ....................................................................................................7

49 U.S.C. § 14501(c) Federal Aviation Administration Authorization Act ("FAAAA")............19

49 U.S.C.A. § 13102 ...........................................................................................20

740 ILCS 14/1 ...............................................................................................1, 15

740 ILCS 14/5 .................................................................................................. 3

740 ILCS 14/15 ....................................................................................... 1, 3, 19, 22

78 Fed. Reg. 15962, 15963 (Mar. 13, 2013) ............................................................ 9

**Other Authorities**

Fed. R. Civ. P. 56 ................................................................................................7

Illinois House Transcript, 2008 Reg. Sess. No. 276 .................................................. 3

Department of Homeland Security's Critical Infrastructure and Key Resources Sector-Specific Plan of May 2007 ................................................................................13

Transportation Security Administration's TWIC® Card technology ...........................13

# I.    INTRODUCTION

Defendant BNSF Railway Company ("BNSF" or "Defendant") systematically collected, captured, purchased, received through trade, or otherwise obtained, and stored the biometrics[1] of tens of thousands of truck drivers in Illinois without their informed written consent as required by law. Plaintiff's claims are brought pursuant to the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"). On behalf of a Class, he seeks remedy for Defendant's multiple violations of 740 ILCS 14/15 (b) ("Section 15(b)"). Section 15(b) of BIPA requires private entities like Defendant to inform individuals in writing that their biometrics are being collected, obtained, or stored; of the purpose for which the biometrics are being collected, obtained, or stored; and of the length of term for which they are being collected, obtained, or stored—and to gain a written release from those individuals *prior* to such biometrics being collected, obtained, or stored.

Throughout this litigation, Defendant has never really attempted to argue that BIPA was not violated. Nor could Defendant make such an argument in good faith, because discovery confirmed in an undisputed manner that the biometrics of Plaintiff and the putative class members were captured, collected, purchased, received through trade, or otherwise obtained, and stored and used without prior written consent. Facing a mountain of undisputed facts and law in the way of its path to avoiding any responsibility, Defendant's Motion for Summary Judgment ("Motion") (Dkt. 107) instead embraces the argument that "it didn't need to comply with the law" and that, if it did, then it was "somebody else's fault." Those arguments are wrong as a matter of law and, as discovery has shown, are wrong as a matter of fact.

As it did in its Motion to Dismiss (Dkts. 19-20), Defendant claims in its Motion that Plaintiff's claims are preempted by the Federal Railroad Safety Act ("FRSA"), the Interstate

---

[1] BIPA broadly regulates a wide variety of conduct related to obtaining "biometric identifiers" and "biometric information." Plaintiff refers to these categories of information collectively as "biometrics."

Commerce Commission Termination Act ("ICCTA") and the Federal Aviation Administration Authorization Act ("FAAAA"). Defendant's express FRSA preemption argument should be denied, again, because there is no federal regulation that "substantially subsumes" the subject matter of BIPA—namely biometric privacy rights. Additionally, discovery has only served to undermine Defendant's implied preemption and as-applied preemption arguments. There is no dispute that Defendant could easily comply with Section 15(b) of BIPA (the only provision at issue in this case) by having truck drivers sign a simple biometric collection consent form, as other similarly large rail operators have done.

Defendant's alternative argument is simply to point the finger at someone else: that, even if it is subject to BIPA, its service provider Remprex, LLC is the party at fault here because Remprex employees helped register truck drivers' biometrics into BNSF's Auto-Gate Systems (herein "AG Systems"). This argument ignores the facts that: (1) BNSF owns all of the biometric information collected from truck drivers; (2) BNSF owns the servers and associated databases which contain and store the biometric information; (3) such servers and information are located on and affixed on BNSF's property (4) BNSF owns all hardware used to obtain the biometrics at issue; and (5) to the extent Remprex was paid to assist BNSF in obtaining biometrics, the information was only gathered with BNSF's knowledge and solely for the benefit of, and under the supervision and control of BNSF. Put simply, the AG Systems, biometric data, and servers on which the ██████████ biometric information was stored all belong to BNSF.

Defendant's defense that it's really Remprex that "collects" truck drivers' biometrics is not only factually incorrect but misunderstands BIPA's purposefully broad scope. Even if it were true that Remprex "collected" the information at issue, Section 15(b) of BIPA unquestionably covers Defendant's conduct including, at a bare minimum, receipt through trade, or otherwise obtaining

Plaintiff and the Class Members' biometrics. *See* 740 ILCS 14/15(b) (regulating private entities that "collect, capture, purchase, receive through trade, or otherwise obtain" a person's biometrics). Thus, any argument that BNSF's acquisition, possession and ownership of Plaintiff's and the putative Class Members' biometrics without informed written consent somehow falls outside of Section 15(b)'s broad scope is simply not credible.

Defendant's final argument – that Plaintiff's claims are barred by the statute of limitations – runs contrary to binding precedent in *Tims v. Black Horse Carriers, Inc.,* which was issued by the Illinois First District Appellate Court on September 17, 2021, the day after Defendant filed its Motion. 2021 IL App (1st) 200563. *Tims* held that Plaintiff's Section 15(b) claims are subject to a five-year statute of limitations. Defendant's related position that Plaintiff's claims accrued only at his first registration is also contrary to *Tims* and is otherwise legally and factually unsupported. Even Defendant's expert agrees Plaintiff's biometrics were registered within the five-year statute of limitations. As a result, and as explained below, Defendant's Motion should be denied in its entirety.

## II.    **BACKGROUND**

### A.    **The Illinois Biometric Information Privacy Act**

BIPA was enacted in 2008 in response to the bankruptcy of a biometric payments company, Pay By Touch, that had been providing major retailers throughout Illinois with fingerprint scanners to facilitate consumer transactions. *See* Illinois House Transcript, 2008 Reg. Sess. No. 276; 740 ILCS 14/5. This was alarming to the Illinois Legislature because Pay By Touch's database was set to be sold in bankruptcy—leaving thousands of Illinoisans wondering about the status and ownership of their biometric and financial data. *Id.* Accordingly, the Illinois Legislature enacted BIPA, a generally applicable law governing private entities' use of biometric technology in

Illinois. *Id.* As laid out by the Illinois Supreme Court in its seminal *Rosenbach* decision and then reinforced by the Seventh Circuit, "the informed-consent regime laid out in section 15(b) is the heart of BIPA." *Bryant v. Compass Grp. USA, Inc.,* 958 F.3d 617, 626 (7th Cir. 2020); *Rosenbach v. Six Flags Entm't Corp.,* 2019 IL 123186, 129 N.E.3d 1197, ¶ 34 (Ill. 2019).

## B. BNSF's Automatic Gate Systems

Defendant operates four intermodal facilities in Illinois (1) Cicero; (2) Corwith; (3) Logistics Park Chicago ("LPC"); and (4) Willow Springs. (Plf's Resp. to SMF, No. 10).[2] At each intermodal facility in Illinois, ingress and egress is partially controlled by an AG System whereby visiting truck drivers provide their biometric identifiers in the form of fingerprints and related biometric information in order to gain entrance to such facilities. (Plf's Resp. to SMF, No. 10). Drivers must first be "registered" with the AG Systems prior to being able to use the biometric kiosks present in the vehicular entry lanes of BNSF's intermodal facilities. (Plf's Resp. to SMF, Nos. 23 -25). In order to "register" with the AG System at each BNSF facility in Illinois, drivers and their trucks are first permitted into BNSF's facilities. (Plf's Resp. to SMF, No. 23). Drivers enter into the facilities, park their trucks, and then proceed inside buildings known as "Driver Assistance Buildings" ("DAB"). Once in a DAB, drivers are directed by a clerk to submit their biometrics, which entails having their fingerprint scanned and captured by the AG System and the stored in BNSF's databases. (Plf's Resp. to SMF, Nos. 25, 30). Remprex employees usually staffed the DABs but were required to provide training to BNSF employees to ensure they could also register drivers' biometrics. (Plf's Resp. to SMF, Nos. 10, 24).

To build its AG Systems, Defendant contracted with Nascent to program software to meet

---

[2] Plaintiff's Response to Defendant' Statement of Undisputed Facts and Plaintiff's Statement of Additional Material Facts, filed contemporaneously herewith as a single document, are referred to herein as "Plf's Resp. to SMF" and "Plf's SAMF," respectively.

BNSF's particular needs. (Plf's Resp. to SMF, No. 6). Defendant and Nascent designed this software, with BNSF approving of screen flows (i.e. the sequence and content of screens that are shown to each truck driver) and requiring certain inputs (i.e. what information the system will require truck drivers to type in, such as their commercial drivers' license numbers). (Plf's Resp. to SMF, No. 13). BNSF contracted with Remprex to staff and maintain BNSF's AG Systems. (Plf's Resp. to SMF, Nos. 13, 19). But Remprex does not own any part of BNSF's AG Systems. (Plf's SAMF, Nos. 13-14). Indeed, Remprex did not even exist as a company when BNSF purchased its first Illinois AG System. (Plf's SAMF, No. 7).

Remprex has staffed and partially operated BNSF's Illinois AG Systems subject to BNSF's direct supervision and control. (Plf's SAMF, No. 10) All of the hardware that comprises the AG Systems is owned by BNSF. (Plf's Resp. to SMF, Nos. 14-15; Plf's SAMF, No. 2). This includes, but is not limited to, the biometric kiosks, computers, servers on which biometrics are stored in an unencrypted manner, gate arms, and the photographing equipment. *Id.* Even upgrades related to routine maintenance of the AG Systems, such as replacing the servers on which the biometric identifiers and biometric information are stored, require BNSF approval. (Plf's Resp. to SMF, No. 10). Importantly, pursuant to contract, BNSF owns all of the data captured by and through its AG Systems. (Plf's SAMF, No. 11). This includes the biometric information collected from truck drivers and stored on BNSF's servers. *Id.* BNSF did not uniformly implement its biometric collection measures across its national network of intermodal facilities; instead, implementation of such systems appears to have been ad-hoc, and BNSF occasionally disabled its biometric collection regime for any number of reasons. (Plf's SAMF, No. 18). BNSF has also recently deployed a mobile application that allows drivers to authenticate themselves on their mobile devices using biometrics that remain on those devices and are never sent to BNSF. (Plf's SAMF,

No. 21). Through this RailPASS app, Defendant is still able to utilize biometric identity verification, without ever actually coming into possession of biometrics. *Id.*

C.      **Facts Specific To Plaintiff**

Plaintiff is an Illinois resident and part-time truck driver who visits BNSF's Illinois facilities as part of his job with a third-party logistics company. (Plf's Resp. to SMF, No. 1). Plaintiff first registered his biometrics with a BNSF AG System on December 5, 2012. (Plf's Resp. to SMF, No. 39). Thereafter, when Plaintiff entered BNSF's Illinois facilities, he would scan his fingerprints using an AG System kiosk and the kiosk would compare the biometric information with that of his biometric registrations and (usually) allow him to enter the facility. (Plf's Response to SMF, Nos. 27, 28). However, on several occasions, BNSF requested that Plaintiff re-register his fingerprints at the driver assistance building. (Plf's SAMF, Nos. 22-24). BNSF's driver registration databases obtained in discovery show that Plaintiff's biometrics were not only registered in 2012, but also at two different BNSF facilities in 2014. *Id.* These records indicate Plaintiff's biometrics were captured, collected, otherwise obtained, stored, and used at BNSF's Cicero location on October 16, 2014, and BNSF's Willow Springs location on November 26, 2014. *Id.* Each biometric registration created a mathematically unique record that was stored on each such facility's local BNSF server, where such information has remained ever since. *Id.*

During and throughout this period, BNSF updated its own Corporate Policy to include biometric data and specifically fingerprint data as a category of protected Confidential Information, and was thus aware of the sensitive nature and need to protect the biometrics it was collecting. (Plf's SAMF, Nos. 29-30). Even though it was easily achievable, BNSF never sought or gained informed written consent to collect, capture, purchase, receive through trade, or otherwise obtain, and store Plaintiff's or any of the putative Class members' biometrics for *any*

registration or subsequent scan *and* BNSF stored their biometrics in an unencrypted database. (Plf's Resp. to SMF 13; Plf's SAMF, Nos. 5, 26-28). Plaintiff was never informed in writing of the purpose of BNSF's biometric collection and storage, how long such information would be stored, or when it would be destroyed. (Plf's SAMF, Nos. 26-28).

## III.   LEGAL STANDARD

Summary judgment is a "drastic remedy" that "is never warranted except on a clear showing that no genuine issue as to any material fact remains for trial." *Peoples Outfitting Co. v. Gen. Elec. Credit Corp.*, 549 F.2d 42, 45 (7th Cir. 1977) citing *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498 (7th Cir. 1972); Fed. R. Civ. P. 56(a). A court reviewing a motion for summary judgment must "examine the record in the light most favorable to the [non-movant], granting them the benefit of all reasonable inferences that may be drawn from the evidence." *Schlaf v. Safeguard Prop., LLC,* 899 F.3d 459, 465 (7th Cir. 2018).

## IV.   ARGUMENT

### A.   Defendant's Express FRSA Preemption Argument Should Be Denied, Again.

"Express preemption applies when Congress clearly declares its intention to preempt state law" *Nelson v. Great Lakes Educ. Loan Services, Inc.,* 928 F.3d 639, 646 (7th Cir. 2019). The FRSA was enacted in 1970 for the purpose of promoting "safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons[.]" 45 U.S.C. § 421. Defendant argues that the FRSA expressly preempts Plaintiff's BIPA claims because several DHS regulations and standards taken together, including a voluntary government-private sector program, cover the subject of using biometrics as a security measure. (Mot. at 12). But Defendant's argument is full of holes and has already been properly rejected by this Court.

### i.    There is a strong presumption against FRSA preemption.

Defendant's FRSA preemption argument again fails to contend with, or even address, the strong presumption against preemption in the FRSA context. (Mot. at 7-14). "[A] court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption. Thus, pre-emption will not lie unless it is the clear and manifest purpose of Congress." *Fleury v. Union Pacific,* 2020 WL 2588752 (N.D. Ill., March 24, 2021), citing *CSX Transportation, Inc. v Easterwood,* 507 U.S. 658, 663 (1993) (quotations omitted); *see also* (Dkt. 31 at *2). "To prevail on the claim that the regulations have pre-emptive effect, petitioner must establish more than that they 'touch upon' or 'relate to' that subject matter . . . for 'covering' is a more restrictive term which indicates that pre-emption will lie **only if the federal regulations substantially subsume the subject matter of the relevant state law**." *Easterwood,* 507 U.S. at 664 (emphasis added). The Supreme Court has further emphasized that "covering" in the context of the FRSA is employed with "considerable solicitude" for state law, further de-emphasizing the FRSA's preemptive authority. *See Easterwood*, 507 U.S. at 664 (specifically noting the presence of savings clauses before and after the operative, preemptory language). This understanding comports with current Seventh Circuit law, which provides that "in light of the restrictive term 'cover' and the express savings clauses in the FRSA, **FRSA preemption is even more disfavored than preemption generally.**" *BNSF Railway v. Box*, 470 F. Supp. 2d 855, 867 (C.D. Ill. 2007) citing *Southern Pacific Transportation. Co. v. Pub. Util. Comm'n of State of Or.*, 9 F.3d 807, 812 (9th Cir. 1993) (emphasis added).

### ii.    Voluntary "guidelines" do not constitute a "regulation" or "order" that can form the basis for federal preemption.

Since its failed Motion to Dismiss, Defendant now adds a citation to the voluntary C-TPAT program. (Mot. at 12). The FRSA covers, at most, federal "regulations, orders, rules and standards"

but the C-TPAT program is not only voluntary but is also self-described as "guidelines" which merely "address" security. It is *not* a mandatory regulation, order, rule or standard. (Mot. at 12, citing 78 Fed. Reg. 15962, 15963 (Mar. 13, 2013)). To the extent there is any requirement, such requirement merely relates to physical security, and not biometric privacy.[3] Were BIPA a state law that directly addressed physical and procedural security of railroads, BNSF's argument would at least be cogent, but alas, BIPA is no such law.[4] In reality, Defendant is well aware that these *guidelines* are not mandatory and do not require the use of biometric authentication systems. In fact, if they did, Defendant would be in violation, as it has elected *not* to uniformly adopt biometric identity verification AG Systems at all of its U.S. locations and regularly disables such systems for a variety of reasons. (Plf's SAMF, No. 18).

Defendant's failure to show why its election to participate in a voluntary program should be given the same preemptive weight as a mandatory federal order or regulation dooms its express preemption argument. After all, "Congressional purpose is the ultimate touchstone in every preemption case." *Crumpton v. Octapharma Plasma, Inc.*, 513 F. Supp. 3d 1006, 1013 (N.D. Ill. 2021), citing *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996) (internal quotation marks omitted). And further, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' ... we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was

---

[3] See (Dkt. 31 at *4) (finding that BNSF "cites only a regulation that requires it to use physical security measures to ensure that unauthorized persons do not gain access to secure areas in railroad facilities—a regulation that does not on its face require collection of biometric information, let alone prescribe how it is to be collected or stored.").

[4] In *Fleury v. Union Pacific Railroad Company,* 2020 WL 2588752 (N.D. Ill., March 24, 2021), Judge Alonso raised this same question, writing: "[t]o the extent that Union Pacific argues C-TPAT's minimum security requirements—or the other two DHS guidelines it references—can constitute a "regulation" or "order" that triggers FRSA preemption, Union Pacific does not adequately develop this argument, and the Court declines to conduct the analysis on its own." BNSF has not done so here either.

the clear and manifest purpose of Congress.'" *Wyeth v. Levine,* 555 U.S. 555, 565 (2009), citing *Lohr*, 518 U.S. at 485 quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947). BIPA is a generally applicable data privacy law that emanates from the historic police powers of the state. *See Crumpton*, 513 F. Supp. 3d at 1013; (Dkt. 31 at *3). Accepting Defendant's argument that its participation in a voluntary program is a valid basis for preemption effectively allows Defendant to *opt-in* to preemption and then subsequently thumb its nose at state laws that don't even interfere with the participation in such voluntary program. This would ignore the well-established presumption against preemption and short circuit the police power properly held by the Illinois Legislature.

### iii.     The "subject matter of the state requirement" here is biometric privacy— not railway safety.

In an effort to distinguish both this Court's previous ruling on express FRSA preemption and Judge Alonso's recent decision in *Fleury,* Defendant improperly advertises one line of dicta in *Easterwood* as a holding. (Mot. at 9 citing 507 U.S. at 665). Defendant's incorrect position is that the Court should re-frame its preemption analysis in terms of whether the Secretaries of Homeland Security have issued regulations covering the same subject matter of *Plaintiff's claims*, rather than BIPA itself. (*Id.*) In doing so, Defendant argues that the subject matter of Plaintiff's claims is "BNSF's alleged collection or use of biometric information *for safety purposes*." (Mot. at 9) (emphasis added by Defendant). Defendant does this because it knows that <u>BIPA has nothing to do with the railroad industry or safety</u>; it's a biometric privacy statute. But because there are no federal regulations regarding biometric privacy to form a basis for preemption, Defendant attempts to re-frame the analysis in order to inch closer to FRSA preemption. However, *Easterwood* itself does not support Defendant's position, and neither does controlling Seventh Circuit precedent that interprets and applies *Easterwood.*

- 10 -

Instead of re-framing its analysis as Defendant suggests, the Court should properly apply *Easterwood*, just as it did in denying BNSF's Motion to Dismiss: "[p]reemption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." (Dkt. 31 at *4), quoting *Easterwood*, 507 U.S. at 664. Indeed, the <u>actual</u> holding of *Easterwood* reads: "The Secretary's regulations therefore cover the subject matter <u>of the state law</u> which, like the tort law on which the respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings." 507 U.S. at 671 (emphasis added). Thus, the proper FRSA express preemption analysis is plainly to compare the federal regulations in question with the subject matter of the state law in question.

Plaintiff's position is reinforced by the Seventh Circuit's analysis in *Burlington N. & Santa Fe Ry. Co. v. Doyle,* which succinctly framed FRSA preemption analysis as requiring the court to "answer three sub-issues: What is the 'subject matter' of the state requirement? What action by the Secretary amounts to issuing an 'order'? [ . . . ] When does such an order or regulation 'cover' the subject matter of a state requirement?" 186 F.3d 790, 795 (7th Cir. 1999). The Seventh Circuit in *Doyle* focused on the subject matter of the state requirement, *not* the plaintiff's claims. *Id.* The Court should likewise do so here.

Even if the Court wanted to address the subject matter of Plaintiff's claims rather than the subject matter of the state law (the incorrect preemption analysis), there is a disputed question of fact that must be resolved in Plaintiff's favor. While Defendant argues that its use of biometrics is for safety purposes, Plaintiff disagrees because: (1) the biometric component of Defendant's AG Systems ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████; (2) Defendant's receipt of daily efficiency

reports from its service vendors implies that efficiency, not security, is a primary concern; (3) Defendant does not actually require mandatory use of the biometric component of its AG Systems as a matter of policy; and Defendant often disables the biometric capabilities of such systems. (Plf's SAMF, No. 18). As a result, to the extent the Court accepts Defendant's invitation to re-frame the analysis here, the discrepancy regarding the subject matter of Plaintiff's claims constitutes a material issue of fact that must be resolved in Plaintiff's favor for purposes of summary judgment.

> ### iv.     Defendant's cited "regulations" do not "substantially subsume" the subject matter of the state requirement; they merely touch upon it.

Defendant's hodgepodge of federal "regulations" do not "substantially subsume" BIPA because such regulations either make no reference at all to biometrics or biometric information, or at most, merely make a passing reference to "biometric identification systems."[5] This Court has already found that "[t]his is far too general to have a preemptive effect vis-à-vis the BIPA." (Dkt. 31 at *4). Ultimately the same logic applied by this Court in denying Defendant's Motion to Dismiss defeats Defendant's argument here, because Defendant still "cites only a regulation that requires it to use physical security measures to ensure that unauthorized persons do not gain access to secure areas in railroad facilities—a regulation that does not on its face require collection of biometric information, let alone prescribe how it is to be collected or stored." (Dkt. 31 at *4). Nothing in the Motion, and no facts gained in discovery, should change that conclusion here.

Even the C-TPAT guideline, which merely contains *the words* "biometric identification systems," does not require their use and simply names them in passing. (Mot. at 12). Moreover,

---

[5] Defendant's citations to 49 C.F.R. 172.800 *et seq,* 49 C.F.R. 1580.107 *et seq.,* the Transportation Security Administration's TWIC® Card technology, and the C-TPAT program track those made by the Defendant in *Fleury.* In *Fleury,* Judge Alonso found that these programs and regulations do not preempt BIPA claims.

Defendant's citations to the Department of Homeland Security's Critical Infrastructure and Key Resources Sector-Specific Plan of May 2007 and the Transportation Security Administration's TWIC® Card technology (Mot. at 8) – neither of which are regulations that mandate procedures for collecting or storing biometric information – are not enough to save its preemption argument, particularly given the strong presumption *against* preemption. Such regulations, at most, merely "touch upon" the subject matter of the BIPA. *Easterwood*, 507 U.S. at 664.[6]

Accordingly, given the strong presumption against preemption in the context of the FRSA and the categorical distinction between railroad security measures and the subject matter of BIPA, and given the standard set forth in *Easterwood*, Seventh Circuit precedent, this Court's prior Order, and Judge Alonso's decision in the nearly-identical *Fleury* case, the Court should again conclude that Plaintiff's BIPA claims are not expressly preempted by the FRSA.

### B.     There Is No Conflict Preemption Of Plaintiff's Claims.

Conflict preemption,[7] which is a type of implied preemption, exists where the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" or if "compliance with both federal and state regulations is a physical impossibility." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (internal citations omitted). Here, the second half of the conflict preemption rule can be ignored because "BNSF does not contend that it was impossible to comply with both state law and federal regulations." (Mot. at 14).

Importantly, "[t]he existence of a hypothetical or potential conflict is insufficient to warrant

---

[6] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

[7] The same strong presumption against express preemption applies to conflict preemption. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Plaintiff thus incorporates by reference his arguments from Section IV(A)(1), *supra.*

the pre-emption of the state statute." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).

Here, Defendant's conflict preemption argument is completely hypothetical; Defendant does not

actually *require* the use of biometrics, as a matter of policy. (Plf's SAMF, Nos. 17). BNSF also

does not use biometrics to control ingress at each of its facilities nationwide. (Plf's SAMF, No.

18). Nor does BNSF always require drivers to submit their biometrics using the AG Systems at its

Illinois facilities, rather it allows them to use a mobile application that does not implicate BIPA.

(Plf's SAMF, No. 21). It is thus unambiguous that BNSF has no uniform nationwide system, and

the "patchwork" Defendant complains would be caused by BIPA compliance already exists.[8] Thus,

Defendant's argument that BIPA's requirement to gain informed written consent frustrates some

federal objective regarding the mandatory use of biometric systems simply has no basis in the facts

of this case.

Defendant's argument that BIPA's informed written consent mandate frustrates some

federal objective regarding the mandatory use of biometric systems also has no basis in the

regulations it cites. Contrary to Defendant's assertion, federal law does not "expressly provide[]

the option to use mandatory biometric identifiers to control access to rail facilities." (Mot. at 15).

Defendant's continued portrayal of the use of biometric identifiers as "federal law" or "mandatory"

is incorrect and Defendant wrongly inserts "mandatory" as a descriptor of the C-TPAT program.[9]

(Mot. at 15). While C-TPAT *mentions* biometrics, it does not permit, require, or even contemplate

their mandatory use or otherwise allow Defendant to ignore relevant state laws. Indeed, if use of

biometric identity verification systems were mandatory, BNSF would be in violation of such

mandate as it has not implemented biometrics at all its intermodal facilities, and regularly disables

---

[8] *See also* https://www.bnsf.com/news-media/railtalk/service/gateless-in-seattle.html (BNSF press release dated June 1, 2020, detailing Defendant's roll-out of new AG System technology at only one location).
[9] *See* Plaintiff's express preemption analysis, § IV(A)(*ii*), *supra*.

the biometric capabilities of its AG Systems for various reasons entirely unrelated to security. (SAMF No. 18). Nothing in BIPA prevents Defendant from requiring that drivers use its biometric system and refusing or altering access to drivers who choose not to provide their biometrics. *See* 740 ILCS 14/1 *et seq.* Lastly, Defendant can and already does utilize several other ways of granting entrance to its facilities, such as its RailPASS app, which does not require the submission of biometrics to BNSF. Defendant's RailPASS app utilizes biometrics, and thus inherits such technologies' inherent advantages, but because all biometric verification is done on device, and is not transferred to BNSF (unlike the biometrics captured through the AG Systems), Defendant's use of its RailPASS app does not at all implicate BIPA. (Plf's SAMF, No. 21).

In short, Defendant can require mandatory use of biometrics if it wants to, or it can utilize any combination of appropriate and legal methods to ensure appropriate ingress and egress. BIPA merely ensures that BNSF *first* discloses its biometric practices and obtains written consent. BIPA thus does not frustrate any express purpose of Congress.

### C.    Plaintiff's BIPA Claims Are Not Preempted By The ICCTA.[10]

The ICCTA confers exclusive jurisdiction over the regulation of railroad transportation to the Surface Transportation Board. *See Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 894 (7th Cir. 2017). Under the "as-applied" preemption standard, only restrictions that "unreasonably interfere" with railroad transportation justify ICCTA preemption. *Union Pacific R. Co., v. Chicago Transit Auth.*, 647 F.3d 675, at 682 (7th Cir. 2011). The burden of proof is on the party advocating for preemption to show such unreasonable interference. *See id.* Additionally, the impact on railroad transportation must be "significant" for preemption to lie under this standard. *Id.* at 683.

---

[10] Defendant's preemption argument includes a discussion premised on claims arising from Section 15(a) of BIPA. (Mot. 19). However, on August 25, 2021, the Court determined it lacks jurisdiction over Plaintiff's Section 15(a) claim and remanded it to state court. (Dkts. 97, 101). As a result, any analysis relating to Section 15(a) is completely inappropriate, irrelevant and should be disregarded.

Defendant's ICCTA argument never gets off the ground because, as this Court previously found, "BIPA has nothing to do with regulating rail transportation." (Dkt. 31 at *2). This is because "BIPA imposes no restrictions on the movement of property by rail nor on the receipt of property at railroad facilities." *Fleury,* at 14. Rather, BIPA is a generally applicable data privacy statute. Moreover, it is "well-settled that although ICCTA's preemption language is unquestionably broad, 'it does not encompass everything touching on railroads.'" *Fleury,* at 12 quoting *Delaware v. Surface Transp. Bd.,* 859 F.3d 16, 18 (D.C. Cir. 2017). It is similarly well-settled that "the ICCTA does not preempt those state or local laws that have a more remote or incidental impact on rail transportation." *Fleury,* at 14-15 citing *Norfolk S. Ry. Co. v. City of Alexandria,* 608 F.3d 150, 158-160 (4th Cir. 2010). Plaintiff's claims simply have nothing to do with regulating rail transportation; they involve the collection of his biometrics without his informed written consent.

Even if this Court were willing to accept that ICCTA preemption could even potentially be relevant here now that discovery is complete, Defendant's argument would still fail, as courts view as-applied preemption as a "fact intensive inquiry." *Fleury,* at 15 citing *Union Pacific R. Co. v. Chicago Transit Auth.*, 2009 WL 448897, at *8. Here, material issues of fact abound. For example, Defendant claims that "the biometric reader on the AGS kiosk is integral to BNSF's intermodal operations." (Mot. at 18). But if but such readers were actually integral, they wouldn't regularly be turned off. (Plf's. SAMF, No. 18). Defendant also claims that its AG Systems are uniform across the nation – but they're not. (Plfs. SAMF, No. 18). Defendant, without support, further claims that compliance with BIPA "would frustrate (if not eliminate)" the biometric aspect of BNSF's operations. (Mot. at 19). But, as set forth above, discovery shows that Defendant already maintains a patchwork of ingress processes at its intermodal locations. (Plf's SAMF, No. 18). Not every BNSF location uses biometrics, and even at those facilities equipped with biometric

technology, individuals are not required to use the biometric component. (Plf's SAMF, Nos. 18).

Discovery has also uncovered that the biometric capabilities at Defendant's facilities can be, and

often are, shut off for various reasons. (Plf's SAMF, No. 18). As a result, the use of the biometric

reader is not integral to Defendant's intermodal operations and, at the very least, there is a material

factual dispute on this issue.

Consequently, Defendant cannot meet its burden to show that, under the as-applied

standard, BIPA "unreasonably interferes" with railroad transportation. Indeed, the Court has

already dismissed Defendant's ICCTA arguments as "highly speculative." (Dkt. 31 at *3). The

facts uncovered in discovery not only failed to bolster Defendant's argument, but instead highlight

that compliance with BIPA is not only possible, but also cheap and easy.

For example, all physical infrastructure necessary for Defendant's compliance is already

in place. Each time a new truck driver enters a BNSF facility, they are directed to the driver

assistance building to scan their fingerprints and drivers' license and have their photograph taken.

(Plf's Resp. to SMF, Nos. 9, 23-25). All the data collected from each driver is then stored on

Defendant's servers. (Plf's Resp. to SMF, Nos. 9, 23-25; Plf's SAMF, Nos. 3-5). Given that

compliance with Section 15(b) of BIPA can be accomplished in one signed sheet of paper (or its

electronic equivalent), it would be convenient and easy to gain individuals' informed written

consent at the time of their first registration and store this information on Defendant's servers. *See*

*Rosenbach*, 2019 IL 123186, ¶ 37. Even more, the inter-organizational infrastructure necessary for

Defendant's compliance is in place as well. Defendant could simply direct its service provider

Nascent to add a BIPA-compliant consent screen to BNSF's AG System kiosks' screen flows.

(Plf's SAMF, Nos. 26, 28). This would be a one-time fixed cost and could be easily implemented

through existing inter-organizational processes whereby BNSF requests a software change to be

executed by its service providers. (Plf's SAMF, Nos. 26-28). Tellingly, Defendant admits that it is possible for it to comply with BIPA (Mot. at 14), and, in fact, Defendant's competitors already have begun to comply, or at least attempt compliance. (Plf's SAMF, No. 35); *Fleury,* at 2 (noting that railroad-defendant added a post-suit "disclosure and consent" virtual form to its biometric in-gate kiosks). While Defendant takes the position that compliance with BIPA is *too hard,* it fails to support this argument and instead relies on the Court to speculate in its favor, and against all reason, that the costs would be unreasonable.

In sharp contrast to the instant case, the vast majority of cases where the ICCTA has preempted state laws have involved laws that directly impeded a private railroad entity's access to tracks or have otherwise obstructed the physical movement of freight. For example, in *Union Pacific R. R. Co. v. Chicago Transit Authority*, the CTA's decision to condemn property leased by Union Pacific prevented the railroad from operating its trains and building new tracks, and raised right-of-way concerns for railway traffic. 647 F.3d 675, 683 (7th Cir. 2011). These restrictions were incompatible with the ICCTA. *Id.* Similarly, in *Smith v. CSX Transportation, Inc.*, the plaintiff's negligence claims would have prevented CSX from idling its trains on tracks adjacent to plaintiff's property, which was "necessary to the operations of CSX's railroad business." 247 F. Supp. 3d 952, 957(N.D. Ill. 2017). That court ruled that the negligence claim was preempted by the ICCTA because it would have directly obstructed railroad operations on the affected section of tracks, impeding railroad transportation. *Id.* Defendant has offered no evidence that compliance with BIPA would impede its access to tracks or its physical movement of freight.

In short, compliance with BIPA would not prevent Defendant from operating its trains or tracks in exactly the way it deems appropriate. Unlike in the *Chicago Transit Authority* case, where the CTA's actions of condemning property and denying the railroad access to property had a

significant impact on railroad transportation, Section 15(b)'s procedural requirements – *e.g.*, obtaining consent to collect, obtain, and store biometrics – are nominal and merely administrative. The Illinois Supreme Court has even emphasized that compliance with BIPA "should not be difficult" and noted that the law establishes minimal burdens on private entities that collect or store biometrics. *Rosenbach*, 2019 IL 123186, ¶ 37.

Discovery has confirmed that this is true. Gaining informed written consent to collect, obtain, and store biometrics during drivers' initial registrations would not result in any trains being halted, delayed, or in any trucks being denied access to tracks. Nor would Defendant be forced to remove its biometric information-based systems at all; Defendant would merely have to conform its biometric processes – not its train or railway operations – to the requirements of BIPA, which would not materially impact such processes. As it stands, Defendant already maintains a process whereby drivers are expected to enter BNSF's facilities, dismount from their vehicles and register their biometrics. (Plf's Resp. to SMF Nos. 9, 23). Defendant could simply add a disclosure and consent screen/waiver during the initial registration of biometrics. (Plf's SAMF, No. 26) *See generally* 740 ILCS 14/15. Defendant offers no explanation of how adding a simple informed written consent procedure would materially impact its operations. In sum, Plaintiff's claims are merely tortious acts committed by a landowner who "happens to be a railroad company" and are therefore not preempted by the ICCTA. (Dkt. 31, at *3) citing *Smith, v. CSX Transp., Inc.,* 247 F. Supp. 3d at 956.

**D.     Plaintiff's BIPA Claims Are Not Preempted By The FAAAA.**

Defendant asserts a third basis for preemption, the Federal Aviation Administration Authorization Act, 49 U.S.C. § 14501(c) (the "FAAAA"). The FAAAA preempts state law claims "related to a price, route, or service of any motor carrier . . . with respect to the transportation of

property." 49 U.S.C. § 14501(c). Preemption under the FAAAA is only proper if the effect of the state regulation is that *motor carriers* will have to offer delivery services that differ significantly from what the market might dictate absent the regulation. *Rowe v. New Hampshire Motor Transp. Assn.*, 552 U.S. 364, 373 (2008) (emphasis added).

Defendant's argument is completely backwards because, first and foremost, *it is not a motor carrier*. "The term 'motor carrier' means a person providing motor vehicle transportation for compensation." 49 U.S.C.A. § 13102. Defendant actually uses *Plaintiff's* standing as a motor carrier as its own in making its FAAAA preemption argument. (Mot. at 21) ("First, Plaintiff's specific BIPA claim concerns a motor carrier's transportation of property. Plaintiff is a motor carrier . . .") (emphasis in original). Defendant's upside-down argument dooms it, as the FAAAA preempts state law claims related to a price, route, or service of any motor carrier, so Defendant's discussion of its *own* services is inappropriate and irrelevant. (Mot. at 22) ("This process would slow down intermodal operations, and in turn, would result in higher operational costs *for BNSF*") (emphasis added). There is nothing in Defendant's argument or the record regarding BIPA's effect on the prices, routes, or services of actual motor carriers. If Defendant's framing were correct, then any lawsuit brought by a truck driver would allow the defendant to insert itself into a preemption analysis using the plaintiff's own status as a motor carrier. This is unworkable, illogical, and contrary to Congressional intent. The analysis should stop here.

However, even setting aside Defendant's lack of standing to assert FAAAA preemption using Plaintiff's status as a motor carrier, FAAAA preemption is still inappropriate because, as this Court previously found, "BIPA does not refer to, and has no connection with, motor carrier services, rates, or routes, and it does not concern transportation of property. Rather, it is a generally-applicable statute that in this situation just happens to apply to a railroad." (Dkt. 31 at

*3). Nothing revealed or produced in discovery should change this conclusion. And, in fact, Defendant has not met its burden of showing why the Court's previous conclusion was wrong. Numerous cases have rejected FAAAA preemption based on a state law's merely tangential link to a "price, route, or service" or to the definition of "transportation." *See, e.g.*, *Dans City Used Cars, Inc. v. Pelkey* 569 U.S. 251, 253 (2013) (common law claims stemming from how property stored after delivery not preempted); *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1055 (7th Cir. 2016) (state employment laws were not preempted because the "impact of the IWPCA is too 'tenuous, remote, or peripheral' to warrant FAAAA preemption.")

Moreover, compliance with Section 15(b) of BIPA is both easy and cheap, such that even if BNSF were deemed a "motor carrier," Plaintiff's claims are not preempted because compliance with Section 15(b) of BIPA would not require BNSF to offer "significantly different" services. *Rowe,* at 373. As set forth in Plaintiff's ICCTA argument, the physical and intra-organizational infrastructure for Defendant's compliance is already in place. Yet Defendant, again without citation or proof, argues that it would have to "make Illinois-specific changes to the AGS, including possibly eliminating the use of biometrics in Illinois" and claims that compliance with BIPA would result in "higher operational costs for BNSF." (Mot. at 22). This is the same undeveloped argument, bereft of fact or citation, that Defendant made in its Motion to Dismiss— an argument that was properly rejected as "highly speculative." (Dkt. 31 at *3). The baseless and unsupported nature of Defendant's position is further exposed by the fact that its competitors have shown that compliance with BIPA is possible, with no negative effect on rates, prices, or services in the record. (Plf's SAMF, No. 35); *Fleury,* at 2 (noting that railroad-defendant added a post-suit "disclosure and consent" virtual form to its in-gate kiosks). Clearly, Defendant has failed to meet its burden to show that compliance with Section 15(b) of BIPA would require BNSF to offer

"significantly different" services, and its argument should be denied, again.

      **E.**    **BNSF Has Collected, Captured, Purchased, Received Through Trade, Or Otherwise Obtained Plaintiff's Biometrics.**

BIPA governs more than just the "collection" of biometrics and importantly includes a catch-all, prohibiting entities from "receiv[ing] through trade" or "otherwise obtain[ing]" biometrics, to prevent entities from escaping BIPA liability by playing definitional shell games with BIPA's list of prohibited verbs. Despite the rather obvious statutory intent in including a catch-all, Defendant still attempts to unleash a messy web of definitions in an effort to show it has not taken an "active" enough role to be liable for "collection" under Section 15(b). (Mot. at 22-23). Defendant, without citation to a BIPA case, claims that "[o]ne does not passively 'collect' or 'capture' something." (Mot. at 23). None of this makes sense in light of the fact that Defendant was no mere passive actor. Instead, BNSF (1) contracted with service providers to collect, store, and use truck drivers' biometrics exclusively for *its* own benefit; (2) managed, supervised, and controlled the specific biometric collection procedure and processes at its facilities; (3) ensured its employees would receive training to operate the AG Systems; (4) has actual and constructive possession of Plaintiff's and the Class Members' unencrypted biometrics, as such information is stored on *its* servers on *its* property; and (5) specifically contracted to ensure that it *owns* all information collected through the AG Systems, including biometrics. (Plf's SAMF, Nos. 2-5, 8-12). Thus, it is obvious that Defendant's actions lie well within 740 ILCS 14/15(b) (regulating private entities that "collect, capture, purchase, *receive through trade*, *or otherwise obtain*" a person's biometrics) (emphasis added).

Here, Defendant owns and possesses the biometric information of tens of thousands of truck drivers, including Plaintiff. (Plf's SAMF, No. 12). If Defendant were to go out of business as Pay By Touch did, Plaintiff's and the proposed Class Members' biometrics would be an asset

of BNSF that could be sold or "otherwise obtained" by another entity through bankruptcy – even though there was never the required consent for BNSF to obtain those biometrics in the first place. Thus, Defendant's table pounding that it was often Remprex employees who were physically present when truck drivers pressed their fingers to BNSF's machines (and to collect biometrics requested by Defendant and then owned by Defendant) misses the point of the statute. To allow Defendant to escape liability because it hired Remprex to provide the labor required to illegally "collect, capture, purchase, *receive through trade*, *or otherwise obtain*" the biometrics at issue would defy legislative intent, common sense, and the intentionally broad statutory language itself. Plaintiff is entitled to judgment as a matter of law on this issue, but at the very least, there is a dispute of fact that requires denial of Defendant's Motion.

> **F.    The Statute of Limitations Does Not Bar Plaintiff's Claims.**

Defendant asserts that Plaintiff's claims are barred by the statute of limitations because Section 15(b) of BIPA should be governed by a one or two-year statute of limitations. (Mot. at 24). But on September 17, 2021, the day after Defendant filed its Motion, the Illinois First District Appellate Court rendered its long-awaited decision in *Tims v. Black Horse Carriers, Inc.,* 2021 IL App (1st) 200563 (1st Dist. Sept. 17, 2021).[11] *Tims* held that claims under Section 15(b) of BIPA are subject to the five-year default statute of limitations codified in the Illinois Code of Civil Procedure. *Tims,* 2021 IL App (1st) 200563, ¶ 1 citing 735 ILCS 5/13-205.[12] Defendant cites no precedent for a one or two-year statute of limitations to apply to Section 15(b) claims—because

---

[11] The *Tims* decision is attached hereto as <u>Exhibit A.</u>
[12] Because the Illinois Supreme Court has not yet decided the applicable statute of limitations for BIPA claims, *Tims* binds this Court. *See Donets v. Vivid Seats LLC,* No. 20-CV-03551, 2020 WL 9812033, at *1 (N.D. Ill. Dec. 15, 2020) citing *Nationwide Agribusiness Ins. Co. v. Dugan,* 810 F.3d 446, 450 (7th Cir. 2015) ("Where the Illinois Supreme Court has not ruled on an issue, decisions of the Illinois Appellate Courts control, unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently.").

none exists. (*See* Mot. at 24-25). As a result, there are no persuasive indications that the Illinois Supreme Court would decide this issue differently than the *Tims* court, and this Court should apply a five-year limitations period to Plaintiff's Section 15(b) claims. *Dugan,* 810 F.3d at 450.

Relatedly, Defendant argues a "one-and-done" claim accrual theory that because Plaintiff *first* registered his biometrics with Defendant on December 5, 2012, Plaintiff's claims are barred even under a five-year statute of limitations. (Mot. at 24). Defendant's defense is creative but entirely misguided. Instead, the Court should root its claim accrual analysis in the letter of the statute. *Michigan Ave. Nat. Bank v. Cty. of Cook,* 732 N.E.2d 528, 535 (Ill. 2000) ("The statutory language must be given its plain and ordinary meaning…"). When analyzing claim accrual in *Cothron v. White Castle System, Inc.,* Judge Tharp correctly found the text of BIPA to be "unambiguous and therefore dispositive" and held "[a] party violates Section 15(b) when it collects, captures, or otherwise obtains a person's biometric information without prior informed consent. This is true the first time an entity scans a fingerprint or otherwise collects biometric information, but it is no less true with each subsequent scan or collection." 477 F. Supp. 3d 723, 732 (N.D. Ill. 2020). Judge Tharp rejected this "one-and-done" theory being advanced by Defendant and instead held that the defendant committed a series of repeated, independently-actionable violations. *Id.* citing *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 770 N.E.2d 177, 192 (2002). The Court should reach the same result here and find that Plaintiff, who registered his biometrics with BNSF's AG Systems on multiple occasions as late as November 2014 and has scanned his finger dozens of additional times within the five-year limitations period, was harmed each time he scanned his finger to enter Defendant's facilities.[13] (Plf's SAMF, Nos.

---

[13] Even if the Court rejects Judge Tharp's holding in *Cothron* that each scan constitutes an actionable BIPA violation, Plaintiff's multiple re-registrations of his fingerprints within the statute of limitations render his claim timely and distinguish this case from *Cothron*. (Plf's SAMF, Nos. 22-24).

22-24); (See also Expert Report of David Kalat, Dkt. 108-16 Ex. A at ¶ 42).

Even if the Court were to depart from Judge Tharp's logic, Defendant's "one-and-done" theory is still fatally flawed. This is because, aside from the countless additional fingerprint "scans" Plaintiff was subjected to within the limitations period, his fingerprints were also *re-registered* at least two times within the limitations period. (Plf's SAMF, Nos. 22-24; See also Expert Report of David Kalat, Dkt. 108-16 Ex. A at ¶ 42).[14] Each registration required a *new* capture of his biometrics and created a *new* and mathematically distinct record in BNSF's various databases and thus a separate cause of action under Section 15(b). *Id.* Moreover, these additional violations multiplied the risk to Plaintiff should *any* of BNSF's servers have been breached –

███████████████████████████████████████████████████████████

(Plf's SAMF, No. 5). Put another way, when BNSF captured, collected, received through trade, or otherwise obtained Plaintiff's biometric information at two Illinois sites in late 2014, it was as if it was capturing such information for the *first time*. Thus, even under a most Defendant-friendly accrual theory, Plaintiff's Section 15(b) claims, originally brought on April 4, 2019, are timely.[15]

## V.   **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.

---

[14] For further analysis of the flaws in Defendant's statute of limitations argument, including its "one-and-done theory," please see Plaintiff's Reply in Support of Motion for Class Certification. (Dkt. 126, at §III(A)).

[15] What makes Defendant's conduct even more egregious is that, despite knowingly storing biometric information on its own servers, and despite specifically amending its Corporate Policy on Confidential Information to include biometrics in 2017 (Plf's SAMF, Nos. 29-30), ███████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████

Dated: November 11, 2021

Respectfully submitted,

RICHARD ROGERS, individually and on behalf of classes of similarly situated individuals

By: /s/David L. Gerbie          
One of Plaintiff's Attorneys

Myles McGuire
Evan M. Meyers
David L. Gerbie
Brendan Duffner
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Floor
Tel: (312) 893-7002
mmcguire@mcgpc.com
emeyers@mcgpc.com
dgerbie@mcgpc.com
bduffner@mcgpc.com

*Attorneys for Plaintiff and the putative Class*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on November 11, 2021, I filed the foregoing *Plaintiff's Memorandum of Law in Opposition to Defendant BNSF Railway Company's Motion for Summary Judgment* via the Court's CM/ECF electronic filing system. A copy of said document will be electronically transmitted to all counsel of record:

<u>/s/David L. Gerbie           </u>