IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RICHARD ROGERS, individually and on behalf of similarly situated individuals,<br><br>    Plaintiff,<br><br> vs.<br><br>BNSF RAILWAY COMPANY,<br><br>    Defendant. | Case No. 19 C 3083 |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

  Richard Rogers has sued BNSF Railway Company on behalf of a putative class for violations of the Illinois Biometric Information Privacy Act (BIPA). Rogers alleges that he is a truck driver who visits BNSF railyards. At some BNSF facilities, he is required to scan a biometric identifier into identity verification devices to gain entrance. According to Rogers, BNSF collects and stores this information without receiving driver consent and without informing drivers of its data retention policies, both of which are required under BIPA.

  BNSF has moved for summary judgment on Rogers's claims. The Court denies BNSF's motion for the reasons stated below.

### Background

**A. BIPA**

  BIPA requires a private entity that possesses biometric identifiers or information

to develop and make available to the public a written policy establishing a retention schedule and guidelines for permanently destroying the information when the initial purpose for collecting it has been satisfied or within three years of a person's last interaction with the entity, whichever is sooner. 740 ILCS 14/15(a). In addition, BIPA prohibits a private entity from collecting or obtaining a person's biometric identifier or information unless it first informs the person or her legally authorized representative in writing that the information is being collected or stored, as well as the purpose and length of term of the collection, storage, and use, and receives a written release executed by the person or her legally authorized representative. *Id.* § 15(b)(1)-(3). BIPA provides a right of action to a person aggrieved by a violation of the statute and permits a prevailing party to recover actual damages or liquidated damages of $1,000 for a negligent violation or $5,000 for an intentional or reckless violation. *Id*. § 20.

**B.     BNSF facility access**

The following facts are undisputed except where otherwise noted. BNSF is one of the largest freight railroad networks and railroad operators in North America. Among other cargo, it transports what the Department of Homeland Security (DHS) has deemed hazardous material, such as crude oil. Consequently, BNSF must comply with various federal laws and regulations for railyard security purposes.

BNSF operates four intermodal facilities in Illinois, where trailers and containers are loaded from trucks to trains and vice versa. These facilities use an Auto-Gate System (AGS) to control the entry and exit of truck drivers. The AGS has the driver pull through a portal where the vehicle is identified and photographed. The driver then proceeds to a kiosk. If the driver is not registered in the AGS, the kiosk directs the

driver to proceed to a driver's assistance building in a holding area, where a clerk registers the driver into the AGS. This registration includes recording the driver's information and scanning the driver's fingerprints, but it does not include obtaining written consent from the driver or informing the driver of the length of term for which the data will be stored. The driver can then proceed into the rest of the facility. On subsequent visits, a driver who is registered can enter an identifying number into the kiosk and place a finger on the kiosk scanner to gain entry to the facility.

BNSF contracted with a third-party company called Remprex to install and manage an AGS at each of its Illinois facilities. This contractual relationship is governed by a master agreement, but the parties dispute to what extent BNSF is involved in the operation of the AGS and which company ultimately owns the AGS. BNSF contends that Remprex is the sole operator and owner; Rogers contends that BNSF owns the AGS and, in effect, controls Remprex as the operator. The parties, however, agree that "Remprex provides 24/7 'intelligent gate operation' services at BNSF's intermodal facilities." Pl.'s L.R. 56.1 Resp. to Def.'s Stat. of Material Facts ¶ 5 (dkt. no. 128-2).

Rogers worked as a truck driver for a third-party logistics company and routinely drove to BNSF facilities in Illinois to drop off freight. He first visited one of these facilities in 2003 and visited one as recently as November 2020. His AGS registration information, which includes his fingerprint scan, first appears in the database on December 5, 2012.

**C. Procedural history**

Rogers sued BNSF in the Circuit Court of Cook County on April 4, 2019. BNSF removed the case to this Court one month later, on May 7. On October 31, 2019, the

Court denied BNSF's motion to dismiss. The Court held that based on the complaint, federal law did not preempt Rogers's claims and his claims were sufficiently pled. *See Rogers v. BNSF Ry. Co.*, No. 19 C 3083, 2019 WL 5635180 (N.D. Ill. Oct. 31, 2019).

On August 25, 2021, the Court granted Rogers's motion to sever and remand his BIPA section 15(a) claim to the Circuit Court of Cook County. On September 10, 2021, Rogers filed a second amended complaint in which he narrowed his lawsuit by removing his BIPA section 15(a) and 15(d) claims, leaving the section 15(b) claim, which is still at issue.

BNSF has now moved for summary judgment on Rogers's remaining BIPA claim.

**Discussion**

**A.     Summary judgment**

To obtain summary judgment, a party must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The non-moving party must identify "specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019).

Along with its arguments on the merits of the BIPA claim, BNSF argues that three

federal statutes preempt Rogers's BIPA claim: the Federal Railroad Safety Act (FRSA), the Interstate Commerce Commission Termination Act (ICCTA), and the Federal Aviation Administration Authorization Act (FAAAA). The Court will address the preemption arguments first.

"Where a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663–64 (1993). "Preemption can occur in three different ways: express, conflict, and field." *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 646 (7th Cir. 2019). "Express preemption applies when Congress clearly declares its intention to preempt state law." *Id.* "If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Easterwood*, 507 U.S. at 664; *see also Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013). Conflict preemption applies "when state law stands as an obstacle to fully accomplishing the objectives of Congress." *Nelson*, 928 F.3d at 646–47. But "[t]he existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).

    1.    **FRSA**

        a.    **Express preemption**

Congress enacted FRSA "to promote safety in every area of railroad operations and to reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. To this end, FRSA provides that laws and regulations "related to railroad security shall be nationally uniform to the extent practicable." *Id.* § 20106(a)(1). It permits states to

adopt laws, regulations, and standards "related to railroad safety or security" until the Secretary of Transportation or the Secretary of Homeland Security "prescribes a regulation or issues an order covering the subject matter of the State requirement." *Id.* § 20106(a)(2). Accordingly, the Supreme Court has framed FRSA's preemption inquiry as whether federal regulation "substantially subsume[s] the subject matter of the relevant state law"; it is not enough that the federal regulations "'touch upon' or 'relate to' that subject matter." *Easterwood*, 507 U.S. at 664.[1] Said differently, FRSA preemption turns on whether federal regulation substantially subsumes "the safety concern that the state law addresses." *Fleury v. Union Pac. R.R. Co.*, 528 F. Supp. 3d 885, 892 (N.D. Ill. 2021) (quoting *Burlington N. & Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 796 (7th Cir. 1999)) (emphasis removed).

As for BIPA's subject matter, the statute, as the Court discussed in denying BNSF's motion to dismiss, "prescribes how [biometric information] is to be collected or stored." *Rogers*, 2019 WL 5635180, at *4. The statute "imposes disclosure, consent, and recordkeeping requirements related not to transportation of persons or property but rather to certain types of information." *Id.* at *2. The relevant concern of BIPA is biometric privacy: the law addresses the potential harms flowing from "compromised" biometric information given the "unique" and immutable nature of that information. 740 ILCS 14/5; *see also Fleury*, 528 F. Supp. 3d at 892 ("BIPA's subject matter is *how*

---

[1] BNSF argues that the proper preemption inquiry asks "whether federal regulations cover the specific allegations made by Plaintiff." Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 9 (dkt. no. 107-1). This proposed framing leads to the same outcome. Although BNSF uses biometric information to control ingress and egress to their facilities, Rogers's allegations arise from the "right to make an *informed* decision" in providing his biometrics. 2nd Am. Compl. ¶ 9 (dkt. no. 103) (emphasis in original).

biometric information is collected and used.").

Thus the question for FRSA preemption purposes is whether federal regulation, either from the Secretary of Transportation or Secretary of Homeland Security, substantially subsumes BIPA's biometric privacy subject matter. BNSF argues that federal regulation concerning railway security and the transportation of hazardous materials does so. *See* 49 C.F.R. § 1580.205(i) (requiring rail hazardous material shippers to "use physical security measures to ensure that no unauthorized individual gains access to the rail secure area"); 49 C.F.R. § 172.800(b) (requiring entities that transport hazardous materials to "develop and adhere to a transportation security plan"). To fulfill some of these regulatory obligations, BNSF complies with a voluntary government-private sector program called C-TPAT (Customs-Trade Partnership Against Terrorism). *See generally* 78 Fed. Reg. 15889 (Mar. 13, 2013) (notice of proposed rulemaking for C-TPAT). Though not in the Federal Register, BNSF contends that C-TPAT's rail carrier provisions include maintaining "access controls" to "prevent unauthorized access into facilities," and "biometric identification" is one such access control that it can employ. *See* Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 12–13 (dkt. no. 107-1). Based on this, BNSF argues that C-TPAT, read together with the other federal regulations BNSF cites, trigger FRSA express preemption.

The Court disagrees and accordingly need not wade into the parties' dispute over whether C-TPAT can serve as a basis for preemption seeing as how it is a voluntary program. The regulations concerning railway security that BNSF points to all deal with "develop[ing] and implement[ing] a transportation security plan" for the purposes of safely transporting hazardous materials. *Id.* at 14 (citing 49 C.F.R. §§ 172.800(b),

7

172.802(a)(2)). In a similar vein, C-TPAT is a cooperative partnership between supply chain companies and DHS with the goal of enhancing security in exchange for facilitated processing of shipments. 78 Fed. Reg. at 15889; see also *Fleury*, 528 F. Supp. 3d at 892 ("[T]he C-TPAT security requirements . . . merely mention the use of biometric identification systems."). BNSF has not cited any federal regulation or, for that matter, any provision of C-TPAT, that addresses how it must collect or store biometric information, which is what BIPA covers. The Court agrees with the analysis in *Fleury v. Union Pacific Railroad Co.*, in which this Court's colleague Judge Jorge Alonso was presented with and rejected the same claim of FRSA express preemption premised on C-TPAT and related railway security regulation: "[a]t most, these DHS standards 'touch upon' or 'relate to" the collection of biometric information." *Id*. That, however, does not meet the "substantially subsume" requirement set forth in *Easterwood*. See *Easterwood*, 507 U.S. at 664.

For these reasons, the Court concludes that FRSA express preemption does not apply.

    b.    **Conflict preemption**

BNSF next argues that conflict preemption, which applies when the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," arises from FRSA and the previously discussed regulations. *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) (quoting *Crosby v. Nat'l*

8

*Foreign Trade Council*, 530 U.S. 363, 373 (2000)).[2] BNSF contends that BIPA imposes a duty that conflicts with federal law in two ways.

First, BNSF asserts that BIPA "prohibits mandatory use of biometric access controls," meaning BNSF cannot "comply[] with agency guidelines and standards, including the C-TPAP requirements that involve mandatory biometric access control." Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 15 (dkt. no. 107-1). BNSF has cited no evidence, however, indicating that C-TPAP requirements involve mandatory biometric access controls. Perhaps more to the point, BNSF admits that it has disabled the AGS biometric functions for various reasons, which suggests that biometric access controls in fact are not mandatory under the purported federal requirements. Def.'s Resp. to Pl.'s Stat. of Add. Material Facts ¶ 18 (dkt. no. 139-1). Put another way, BNSF does not support its use of biometrics as necessary for compliance with C-TPAP, when the record suggests that such use, if anything, is at most one way to comply.

Yet even if C-TPAP mandated biometric controls, BIPA does not proscribe their use. The state law simply requires consent and an appropriate data retention policy. If federal law permitted *unconsenting* biometric access controls or *indefinite retention* of biometric information, then BIPA conflict preemption might arise. But this is not the case. In short, Illinois law does not deprive BNSF of a federally prescribed option.

Second, BNSF argues that BIPA stands as an obstacle to Congress's intention of ensuring railway safety and security, especially for railways that transport hazardous materials. BNSF views compliance with BIPA as forcing railroads "to adopt a patchwork

---

[2] BNSF disclaims the proposition that it is impossible to comply with both state law and federal regulation, which is an alternative basis for conflict preemption. Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 14 (dkt. no. 107-1).

9

of access controls at Illinois facilities," which "frustrat[es] the express Congressional purpose of 'uniform' railway safety regulation." Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 16 (dkt. no. 107-1) (quoting 49 U.S.C. § 20106(a)(1)). BNSF also contends that requiring truck driver consent deprives railroads "of the most effective means of securing their facilities." *Id.*

This argument also lacks merit. For one, BNSF cannot premise FRSA preemption on a "hypothetical or theoretical conflict." *Flying J, Inc. v. Van Hollen*, 621 F.3d 658, 662 (7th Cir. 2010). FRSA provides that laws "related to railroad security shall be nationally uniform *to the extent practicable*." 49 U.S.C. § 20106(a)(1) (emphasis added). And in the next paragraph, FRSA expressly contemplates a state "adopt[ing] or continu[ing] in force an additional or more stringent law . . . related to railroad safety or security . . . ." *Id.* § 20106(a)(2). The flexibility of this language suggests that any conflict with BIPA is, at most, hypothetical or theoretical.

The evidence also does not support BNSF's contention that enforcement of BIPA will create a patchwork of access controls. BNSF admits that it has not uniformly implemented biometric access controls across its facilities nationwide, though federal regulatory provisions applying to shippers of hazardous material presumably apply across the country. Relatedly, Rogers points out that BNSF sometimes regulates entry through a RailPass smartphone app that does not implicate BIPA—a point that BNSF fails to even acknowledge, let alone address, in its reply brief.

The Court holds that BNSF's compliance with BIPA would not frustrate Congress's purpose in passing FRSA. Conflict preemption therefore does not apply.

### 2. ICCTA preemption

BNSF argues ICCTA preempts Rogers's BIPA claim because it "would have the effect of . . . unreasonably interfering with railroad transportation." *Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 895 (7th Cir. 2017).[3] In addressing BNSF's earlier motion to dismiss, the Court agreed with Rogers, based on the record as it then existed, in rejecting this as-applied preemption challenge because any impact of BIPA's requirements on rail transportation was "not just indirect but also highly speculative." *Rogers*, 2019 WL 5635180, at *3. Now, however, BNSF asserts that the record suggests otherwise.

BNSF explains that it collects biometrics for the purpose of facilitating its intermodal operations, but that alone does not demonstrate the "significant" impact necessary to establish unreasonable interference. *See Union Pac. R. Co. v. Chi. Transit Auth.*, 647 F.3d 675, 683 (7th Cir. 2011) (describing how preemption under this standard applies when the interference is "significant"). Accordingly, BNSF further asserts that compliance with BIPA would require changes to its AGS procedure in Illinois—such as maintaining notice-and-consent documentation and implementing a three-year record retention policy—that supposedly would be "significant considering BNSF's size and scope." Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 19 (dkt. no. 107-1). BNSF also asserts that the use of biometric access controls is "integral" to its

---

[3] Although BNSF is not entirely clear in its opening brief, the reply brief only spells out an argument for as-applied preemption, not categorical preemption. *See* Def. BNSF Ry. Co.'s Reply in Supp. of Mot. for Summ. J. at 13–14 (dkt. no. 139); *see generally Wedemeyer*, 850 F.3d at 894 (detailing the difference between categorical and as-applied ICCTA preemption). Thus, to the extent that BNSF presented any categorical preemption argument in its opening brief, the Court considers it forfeited.

11

operations, implying that any change to how it employs these controls necessarily establishes unreasonable interference. *Id.*

The Court does not find this persuasive. Though BNSF is correct to note that it may be required to make procedural changes to comply with state law, this was already evident at the motion to dismiss stage of this lawsuit. So that does not affect the ruling on this point the Court made previously. And the additional contentions regarding BNSF's operational footprint and the importance of biometric access controls to its processes do not change the calculus.

First, it is not clear to the Court how the scope of BNSF's business as one of the largest railroad operators in North America has any bearing on the reasonableness of changing the company's biometric recordkeeping procedures. If anything, one could reasonably infer that a larger railroad operator has greater bandwidth than a smaller operator to implement facility-specific changes.

Second, the claimed inherent importance of biometric access controls does not help BNSF either. Even if the Court disregards the parties' factual dispute over whether biometric access controls are "integral" (which in itself suggests that summary judgment is inappropriate), BNSF has failed to point to evidence in the record indicating why the need to modify an "integral" procedure is inherently unreasonable. Evidence about compliance costs relative to transportation costs, for example, could shed light on the reasonableness of having to implement such changes. But given the absence of such evidence, the claimed adverse impact of BIPA compliance is highly speculative on the record before the Court.

The Court holds that ICCTA preemption does not apply.

### 3. FAAAA preemption

FAAAA preemption bars state law claims "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c). But it does not preempt state laws "affecting carrier prices, routes, and services in only a tenuous, remote, or peripheral manner." *Dan's City Used Cars*, 569 U.S. at 261 (cleaned up).

In denying BNSF's motion to dismiss, the Court rejected its FAAAA as-applied preemption argument because "the impact of the BIPA on motor carrier prices, routes, or services [was] 'too tenuous, remote, or peripheral' to give rise to FAAAA preemption." *Rogers*, 2019 WL 5635180, at *3 (quoting *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1055 (7th Cir. 2016)). As with ICCTA preemption argument, BNSF's contention at that point was "highly speculative." *Rogers*, 2019 WL 5635180, at *3. BNSF contends that the record now suggests otherwise.

BNSF pins this argument on the notion that complying with BIPA "would materially impact the efficiency of [its] facilities' operations" because "employees would need to manually verify driver identities prior to allowing a driver on the property." Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 22 (dkt. no. 107-1). To support this contention, BNSF cites only the proposition that it will need to manually verify identities "[w]ithout the use of the Remprex AGS's 'biometric reader.'" Pl.'s L.R. 56.1 Resp. to Def.'s Stat. of Material Facts ¶ 54 (dkt. no. 128-2).

The Court finds this argument unpersuasive. BNSF relies on the unsupported premise that complying with BIPA will force it to entirely forgo the use of the preexisting system, a proposition that is not supported by the evidence. As Rogers points out,

13

BNSF has implemented the alternative RailPass biometric system, which complies with BIPA and yet does not rely on manual verification. Rogers also points to the undisputed evidence that at least one other major rail carrier has attempted to implement an informed consent regime for truck driver biometrics, which suggests that compliance is feasible. Furthermore, BNSF's own briefing undercuts its contention on this point. BNSF writes that BIPA compliance would lead to "*possibly eliminating* the use of biometrics," which is far short of the certainty that it claims. Def.'s Mem. of L. in Supp. of Mot. for Summ. J. at 22 (dkt. no. 107-1) (emphasis added). In short, BNSF's FAAAA preemption argument remains on the same speculative footing as earlier in the litigation.

The Court concludes that FAAAA preemption does not apply.

**4.     Merits**

On the merits of Rogers's BIPA claim, BNSF argues that it did not actively or affirmatively collect biometric information. Instead, BNSF contends that only Remprex employees collected driver biometric information, such that BNSF at most possessed any biometric information and accordingly did not violate the law. *Cf.* 740 ILCS 14/15(b) ("No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier . . . ."); s*ee also Jacobs v. Hanwha Techwin Am., Inc.*, No. 21 C 866, 2021 WL 3172967, at *2 (N.D. Ill. July 27, 2021) ("[T]his court concludes that for Section 15(b)'s requirements to apply, an entity must, at a minimum, take an active step to collect, capture, purchase, or otherwise obtain biometric data."); *Namuwonge v. Kronos, Inc.*, 418 F.Supp.3d 279, 286 (N.D. Ill. 2019) (explaining "there is a difference between *possessing* and *collecting* biometric

14

information").

There is conflicting evidence regarding BNSF's role in operating the AGS, such that summary judgment is inappropriate. *See, e.g.*, Pl.'s L.R. 56.1 Resp. to Def.'s Stat. of Material Facts ¶ 24 (dkt. no. 128-2). On the one hand, BNSF points to evidence indicating that Remprex clerks primarily operate the AGS and register the truck drivers by scanning their fingerprints. BNSF also emphasizes that the AGS biometric information is stored on Remprex databases. Thus, BNSF says, Remprex is the party that Rogers should have sued.

On the other hand, Rogers points to e-mail address evidence suggesting that BNSF employees were also involved in the registration of drivers, as well as contractual provisions that Remprex was obligated to provide BNSF employees with training on how to use the AGS. Rogers also underscores the admitted fact that "Remprex takes direction from BNSF regarding the management and use of the AG systems pursuant to a Master Agreement between the two entities," which tends to show that BNSF ultimately called the shots on whether and how biometric information was collected. Def.'s Resp. to Pl.'s Stat. of Add. Material Facts ¶ 10 (dkt. no. 139-1).

Viewing the evidence in the light most favorable to Rogers, a jury could find that BNSF, and not just Remprex, violated BIPA, whether by collecting, capturing, receiving through trade, or otherwise obtaining the biometric information at issue.

BNSF next argues that Rogers's claim is untimely because his biometric information was first collected on December 5, 2012, but he did not file his complaint

15

until April 4, 2019.[4]  This argument rests on a "one-and-done" theory of claim accrual, meaning the clock to file suit begins to run upon the first BIPA violation, and critically, never resets upon subsequent violations.  Rogers disagrees and argues that the statute of limitations starts anew upon each BIPA violation.  Thus, the question of timeliness hinges on the rules regarding when a BIPA claim accrues.[5]

Answering this question requires, first, examining BIPA's text.  Section 15(b) provides:

> No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:
>
>> (1) informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;
>>
>> (2) informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>>
>> (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally

---

[4] The Illinois Appellate Court recently held that a five-year statute of limitations applies to claims under Section 15(b) of BIPA in *Tims v. Black Horse Carriers, Inc.*, 2021 IL App (1st) 200563 (1st Dist. Sept. 17, 2021).  Because the Illinois Supreme Court has not yet decided this issue, and there is no basis to believe that it would decide the point differently from the appellate court, *Tims* controls this Court.  *See Nationwide Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir. 2015) ("Where the Illinois Supreme Court has not ruled on an issue, decisions of the Illinois Appellate Courts control, unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently.").

[5] The Seventh Circuit recently certified this question to the Illinois Supreme Court.  *See Cothron v. White Castle Sys., Inc.*, 20 F.4th 1156, 1166–67 (7th Cir. 2021); *see also Watson v. Legacy Healthcare Fin. Servs., LLC*, 2021 IL App (1st) 210279, at *5 (Dec. 15, 2021) (rejecting the one-and-done claim accrual theory for BIPA).  The Court is aware of this and is prepared to address any potential impact on the present case once the Illinois Supreme Court rules.

authorized representative.

740 ILCS 14/15(b). Of note, the statute premises a violation on the triggering actions of collecting, capturing, etc., rather than the failure to provide notice or receive consent. The statutory language also does not differentiate between the initial and subsequent instances of when an entity collects biometric information, which might otherwise indicate a limitation on when a violation occurs. Accordingly, the Court agrees with Rogers and finds the plain text dispositive: the statute clearly provides that a private entity violates the law *each time* it fails to comply with the statute through one of the triggering terms, rather than only the first time. *See also Cothron v. White Castle Sys., Inc.*, 477 F. Supp. 3d 723, 732 (N.D. Ill. 2020) (interpreting section 15(b) as accruing upon every violation).

BNSF does not directly reply to Rogers's plain language argument. Instead, it contends that a one-and-done accrual rule typically applies to Illinois privacy torts, and that because BIPA is a privacy tort, the same rule would apply. In particular, BNSF points to Illinois invasion of privacy claims, on which a cause of action accrues at the time the privacy interest is first invaded, even if there are subsequent invasions of that interest.

The Court does not find this argument persuasive. Most important, Illinois courts have repeatedly held that courts must follow the statutory text when it is clear. *See, e.g.*, *Petersen v. Wallach*, 198 Ill. 2d 439, 447, 764 N.E.2d 19, 24 (2002). Because the Court finds BIPA's text clear, it does not matter that other Illinois torts, such as common law invasion of privacy claims, follow different claim accrual rules. The Court also notes BNSF makes no attempt to grapple with the text of the statute in its summary judgment

briefing.

At bottom, the plain language of the statute controls. The clock for Rogers's BIPA claims reset upon each violation, meaning his claim in the present case is timely, as BNSF is claimed to have continued to scan his fingerprints dozens of times within the five years preceding this suit. The Court concludes that BNSF is not entitled to summary judgment on the merits of Rogers's BIPA claim.

## Conclusion

For the foregoing reasons, the Court denies the defendant's motion for summary judgment [dkt. no. 107].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 15, 2022