1

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

| | | | |
|---|---|---|---|
| 4 | RICHARD ROGERS, individually, and on | ) | Docket No. 19 C 3083 |
| 5 | behalf of similarly situated individuals, | ) | |
| 6 | Plaintiffs, | ) | |
| 7 | vs. | ) | Chicago, Illinois |
| | | ) | September 6, 2022 |
| 8 | BNSF RAILWAY COMPANY, | ) | 2:00 o'clock p.m. |
| 9 | Defendant. | ) | |

```
10                       TRANSCRIPT OF PROCEEDINGS
11          BEFORE THE HONORABLE MATTHEW F. KENNELLY

12
   APPEARANCES:
13

14

15   For the Plaintiff:      MCGUIRE LAW, P.C.
                             BY:  MR. DAVID LOUIS GERBIE
16                                MR. BRENDAN JAMES DUFFNER
                                  MR. EVAN M. MEYERS
17                           55 W. Wacker, 9th Floor
                             Chicago, IL 60601
18                           (312) 893-7002

19
                             LOEVY & LOEVY
20                           BY:  MR. JONATHAN I. LOEVY
                                  MR. MICHAEL I KANOVITZ
21                           311 N. Aberdeen, 3rd FL
                             Chicago, IL 60607
22                           (312) 243-5900

23
   Court Reporter:          MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                          Official Court Reporter
                            219 S. Dearborn Street, Suite 2102
25                          Chicago, Illinois  60604
                            (312) 435-5639
```

1    APPEARANCES CONTINUED:

2
     For the Defendant:        MORGAN, LEWIS & BOCKIUS LLP
3                              BY:  MS. ELIZABETH BROOKE HERRINGTON
                                    MR. GREGORY THOMAS FOUTS
4                                   MR. TINOS DIAMANTATOS
                               110 N. Wacker Dr., Suite 2800
5                              Chicago, IL 60606
                               (312) 324-1000
6
7                              WEIL, GOTSHAL & MANGES LLP
                               BY:  MS. CLAIRE LOCKERBY CHAPLA
8                              2001 M Street NW, Suite 600
                               Washington, DC 20036
9                              (202) 682-7234

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (The following proceedings were had by video:)

2         THE CLERK:  19 C 3083, Rogers v. BNSF Railway.

3         THE COURT:  This is Judge Kennelly.  We're proceeding

4    by video because the courthouse is closed.

5         I want to get everybody's names on the record to

6    start off with, and then I want to talk about how we're going

7    to go about doing this.  Why don't we start with having

8    everybody on the plaintiff's side please give your names.

9         MR. LOEVY:  Good afternoon, your Honor.  Jon Loevy

10   for the plaintiffs.

11        THE COURT:  Mr. Kanovitz, you're muted.

12        MR. KANOVITZ:  Thank you.  Good afternoon.  Mike

13   Kanovitz for the plaintiff.

14        MR. MEYERS:  Good afternoon.  Evan Meyers for

15   plaintiff.

16        MR. GERBIE:  Good afternoon.  David Gerbie on behalf

17   of the plaintiff.

18        MR. DUFFNER:  Good afternoon.  Brendan Duffner on

19   behalf of the plaintiff.

20        THE COURT:  All right.  I think that's everybody on

21   plaintiff's side.  Defense counsel.

22        MS. HERRINGTON:  Good afternoon.  Beth Herrington on

23   behalf of Defendant BNSF.

24        MR. DIAMANTATOS:  Your Honor, good afternoon.  Tinos

25   Diamantatos, also on behalf of BNSF.

1          MR. FOUTS:  Greg Fouts on behalf of BNSF.

2          MS. CHAPLA:  Good afternoon, your Honor.  Claire

3   Chapla on behalf of BNSF.

4          THE COURT:  So I'm going to ask you a favor.  So I'm

5   obviously at home because the courthouse was closed.  And I

6   was having some problems on my laptop this morning with Webex.

7   My camera kept cutting out; so that means I have to do this on

8   my iPad.  Unfortunately, all of my notes and materials on the

9   motions in limine are also on my iPad.  iPads do split

10   screens, but they get really small.  What I'm going to ask you

11   to do is if you're not going to be presenting argument, please

12   turn off your camera.  That way I don't have 15 pictures on a

13   tiny little sliver of my device here.

14          So what I want to do is just a couple of comments

15   generally just to reiterate something I said I think in the

16   order that I entered yesterday that I want to talk about the

17   motions in limine and motions to strike.  Then we'll talk

18   about some other logistical stuff.

19          First of all, we've been given a start date of the

20   4th of October.  I know that -- at least I think that a

21   religious holiday starts that evening, Yom Kippur.  I'm going

22   to need to know at some point whether that is an issue, in

23   other words, proceeding on, I guess, it would be Wednesday is

24   going to be an issue for anybody on either trial team.  And

25   we'll have to figure out whether we just take a day off or

1  work around it or whatever.  Just have that in mind.  I want
2  to circle back to that at the end.

3       Secondly, I'm pretty sure, though not a hundred
4  percent positive, that we're going to be in my regular
5  courtroom, which is on the 21st floor.  So to the extent that
6  I was going to do kind of a walk through today, it really
7  isn't terribly complicated.  I can talk you through some of it
8  at the end, and then maybe later in the week this week or
9  maybe even sometime early next week, we can have maybe some
10 subset of you all come over to the courtroom.  And I can kind
11 of show you physically how things are going to be set up.
12 I'll do my best to talk through that at the end today.

13       So before we jump into the motions in limine, are
14 there any settlement-related developments of any note that I
15 should know about before we start spending a huge amount of
16 time on this?

17       MR. LOEVY:  Not from the plaintiffs' side, your
18 Honor.

19       MS. HERRINGTON:  Not from defense either.

20       THE COURT:  This is the point at which I need people
21 who aren't going to be presenting argument to flip off your
22 cameras.  You can turn them off and on.  If you're going to
23 argue motion 9 or something, you can turn it back on then.

24       We're going to start off with the ones filed by the
25 plaintiffs.  Number 1 is entitled Motion to Bar Reference to

1 | Actual Or Liquidated Damages.

2 | So, you know, the defense cites this case called

3 | *Watson* in its response. *Watson* expressly doesn't say anything

4 | about damages. They say we're not going to say anything about

5 | damages. So this comment in a footnote where there's an

6 | opinion about it being discretionary really doesn't have much

7 | of a bearing on an issue that we have here, which I think the

8 | issue is whether the statute calls for a set amount or whether

9 | it's an amount up to that amount. That's what it seems to me

10 | like the issue is. The plaintiff is arguing that for each

11 | violation, it's depending upon whether the violation is

12 | knowing or reckless or not, it's a certain amount, and

13 | otherwise, it's a different amount. Whereas, the defendants I

14 | think are arguing that, essentially, it's up to whatever the

15 | amount is in the statute.

16 | Am I understanding the defendant's argument

17 | correctly?

18 | If you're saying something, you're muted.

19 | MR. DIAMANTATOS: Very good. Yes. Thank you.

20 | Apologies about that. Yes, your Honor, I will be arguing this

21 | one on behalf of the defense.

22 | We do object to the plaintiffs' motion in limine,

23 | your Honor. Our position, as you stated it, Judge, it's

24 | really just -- if I can unpack it a little bit.

25 | THE COURT: I'd actually rather you just directly

1  answer my question first because we got about 17 motions in
2  limine, and I don't got 17 times 20 minutes.  Okay?  So let's
3  start off with my question.

4          MR. DIAMANTATOS:  Sure.  Our position is that the
5  damages award is discretionary, not mandatory, and that's for
6  the members of the jury to decide.

7          THE COURT:  What does that mean?  Does that mean it's
8  anywhere from zero to, let's say, a thousand for a violation
9  under 20, part 1, with the jury to decide a specific amount?
10 Or does it mean something other than that?

11         MR. DIAMANTATOS:  It means that exactly, your Honor.

12         THE COURT:  How do we expect -- how is the jury
13 supposed to decide the specific number if they find a
14 violation?  The jury instruction that you -- that the defense
15 provided on this basically gives them no clue.  It doesn't
16 even say what the standard is.  So how is the jury supposed to
17 decide what the right number is?

18         MR. DIAMANTATOS:  Well, the members of the jury, your
19 Honor, will hear, of course, that if they find that there was
20 a negligent violation that they may award up to $1,000.
21 That's what the statute says.  If they find and the plaintiffs
22 prove reckless conduct that they may award up to $5,000.  And
23 the ultimate decision will be up to the members of the jury to
24 collectively deliberate on what they heard during the course
25 of the trial.

1         THE COURT:  Time out.  Did you hear my question?

2         MR. DIAMANTATOS:  Yes, your Honor, I did.

3         THE COURT:  Let's try answering it.

4         MR. DIAMANTATOS:  Well, Judge, as --

5         THE COURT:  Do you want to try again?

6         MR. DIAMANTATOS:  No, your Honor.  I understand your

7 question.

8         THE COURT:  In a case about emotional distress, we

9 ask the jury to put the value on emotional distress.  In a

10 case about pain and suffering, we ask a jury to place a value

11 on pain and suffering.  There's nothing in your proposed jury

12 instructions that tells them how they're supposed to go about

13 deciding whether it's 0, a thousand, $459.29, or something in

14 between.  So how are we supposed to decide that?  What are the

15 criteria?

16         MR. DIAMANTATOS:  Your Honor, as I think with many

17 cases where there aren't specific instructions that describe

18 for the members of the jury, they hear the totality of the

19 evidence.  They decide what damages, if any, they may award.

20 Here, it's our position that there is a statutory cap as to --

21         THE COURT:  Respectfully, respectfully, in other

22 types of cases, we're at least telling them what the injury or

23 harm is that they're awarding the damages for.  We're telling

24 them it's emotional distress.  We're telling them it's pain

25 and suffering.  We're telling them it's loss of a normal life.

1   We're telling them it's lost income.

2          Here we're not telling them anything, at least in the

3   way you guys have written your proposed jury instructions.

4   We're just telling them, come up with a number from one to a

5   thousand.

6          MR. DIAMANTATOS:  Well, here, the members of the

7   jury, Judge, would be deciding whether or not there was a

8   violation by BNSF specifically as it relates to the biometric

9   statute and that that statute provides certain statutory

10  damages.  So, respectfully, your Honor, we think that there is

11  a framework, that the members of the jury are going to have to

12  collectively decide what conduct BNSF engaged in, whether the

13  plaintiffs have proved that conduct.  And, number one, was it

14  negligent conduct?  Or, number two, was it reckless conduct?

15  And then the statute itself provides the framework; that

16  there's a thousand-dollar ceiling for negligent, if the

17  plaintiff proves its case as to BNSF and a $5,000 --

18         THE COURT:  Where do you get ceilings, caps, and up

19  to?  None of that language is in the statute.

20         MR. DIAMANTATOS:  Well, the statute itself, your

21  Honor, uses language.  And if we just look at the straight

22  statutory construction here as it relates to the BIPA statute,

23  you know, terms like "must" and "may" argues.  So that's a

24  clear indication on the face of the statute itself that the

25  drafters of the statute intended that there be discretion as

1   it relates to the damages.

2           THE COURT:  But it doesn't say that the jury may

3   award damages.  It says a prevailing party may recover.  And

4   then for each of the subparts, it gives two alternatives.  It

5   says liquid damages of a thousand dollars or actual damages,

6   whichever is greater.  It doesn't say liquid damages of up to

7   a thousand dollars or whichever is greater.  And it doesn't

8   say that the jury may award.  It just says a prevailing party

9   may recover.

10          I guess I'm having a -- is there any other statute

11  that you've been able to find in Illinois law that reads this

12  way that would be interpreted in the way you're proposing?

13          MR. DIAMANTATOS:  No, your Honor.  I think that what

14  -- the statute language that you just read, Judge, Statute 20

15  of BIPA, which says, "a prevailing party may recover for each

16  violation"; that the use of that term "may" indicates that

17  there is discretion there in terms of what a party may have to

18  pay as part of a BIPA violation.

19          THE COURT:  But the "maybe" doesn't relate to what

20  somebody has to pay, and it doesn't relate to the jury.  It

21  relates to the prevailing party.  It basically gives -- it

22  basically gives them an option between liquidated and actual,

23  whichever is greater.

24          MR. DIAMANTATOS:  If you compare that, your Honor, to

25  the first sentence in BIPA Section 20 where the Illinois

1    legislature specifically used the phrase where it says, "any
2    person agrees violation of this act shall have a right of
3    action in the state court," and it goes on.
4         So it's our position that the legislature, in
5    drafting this particular statute, makes it clear that when it
6    intends to use the word "shall" and that there's no discretion
7    there that it does so.  And then as it relates to damages,
8    there may be recovery.  And as your Honor pointed out, there's
9    various statutory amounts depending on the conduct that the
10   plaintiffs have the burden of proving.
11        THE COURT:  That would mean then attorneys' fees, if
12   the plaintiff prevails, are optional too.
13        MR. DIAMANTATOS:  That's right, your Honor.
14        THE COURT:  Okay.  That's pretty close to insane.
15   I'm just going -- I just have to say it that way.  That's
16   pretty close to insane.
17        Yeah.  Okay.  Let me hear from the plaintiff on this.
18        MR. DIAMANTATOS:  Your Honor, if I may.
19        THE COURT:  No, let me hear from the plaintiff on
20   this.
21        MR. KANOVITZ:  Judge, if you look at the damages
22   provision, it uses several important terms.  One is
23   "liquidated damages."  That term has a meaning under the law,
24   which is a pre-set measure of damages that relieves a party
25   from the burden of having to prove damages under circumstances

1   where proof may be difficult or uncertain.  There's no

2   liquidated -- up to a certain amount of liquidated damages

3   because liquidated damages fixes the amount.  It has the term

4   "whichever is greater," which clearly shows that if we decide

5   not to pursue actual damages, we can pick the greater of the

6   two, which we are exercising our option to pursue only the

7   liquidated damages.

8          And then outside of that provision, we have what the

9   Illinois Supreme Court has told us in the *Six Flags* case,

10  which is that a lot of thought went into this section by the

11  general assembly and that the general assembly wanted people

12  to be able to seek a remedy without needing to prove the

13  actual damages because that was the most effective means of

14  obtaining enforcement in a circumstance where you're dealing

15  with a new technology where the damages could happen long

16  after the violation and the general assembly was looking to

17  get compliance and enforcement.

18         THE COURT:  Mr. Diamantatos, really short.

19         MR. DIAMANTATOS:  Yes, your Honor.  First I'll talk

20  about the *Rosenbach* decision, and then I'll circle back to a

21  point your Honor mentioned earlier.

22         The plaintiff, when citing to *Rosenbach*, the question

23  that was certified to the Illinois Supreme Court in that case

24  was whether one qualifies as a, quote/unquote, aggrieved

25  person under Section 20 of BIPA and may seek liquidated

1   damages and injunctive relief pursuant to BIPA if she has not

2   alleged some actual injury or adverse effect beyond violation

3   of her rights under the statute.

4          The Illinois Supreme Court, of course, answered that

5   question yes, and the Court in *Rosenbach* looked to the plain

6   and unambiguous statutory language and concluded that the

7   legislature's choice of the word "aggrieved" convinced that

8   intent to allow anyone to sue based on a private entity's

9   failure to comply with BIPA, even if that person suffered no

10  additional harm or consequences from the statutory violation.

11         The *Rosenbach* court reasoned that this enforcement

12  mechanism was integral to implementation of the legislature's

13  objectives when private entities face liability for failure to

14  comply with BIPA's requirements without requiring affected

15  individuals or customers to show some injury beyond violation

16  of their statutory rights.  Those entities have the strongest

17  possible incentive to conform with the law and prevent --

18         THE COURT:  (Indecipherable).

19         MR. DIAMANTATOS:  -- before they occur.  So

20  *Rosenbach*, your Honor, showed an aggrieved party may file suit

21  under BIPA, even if they were not harmed.  But to be clear,

22  *Rosenbach* did not hold, your Honor, and it's not followed from

23  the decision that --

24         THE COURT:  I wouldn't say that it holds that.  Okay.

25  Look, I don't think the defendant's reading of the statute is

1  sustainable.  As Mr. Kanovitz said, the term "liquidated

2  damages" has an established meaning in the law.  It means a

3  fixed amount.  That's the way I think the statute reads too.

4  The jury is going to determine a number of violations.  And

5  it's going to determine level of intent, if any.  It's not

6  going to determine the amount.  The Seventh Amendment has

7  nothing to do with this.  It's no different from any other

8  statute in which there is a fixed statutory penalty.

9          MR. DIAMANTATOS:  Your Honor, this is another

10  statute.  You asked for an analogy.  And I do have an analogy,

11  to the extent it's helpful to your Honor.

12          THE COURT:  Yeah.

13          MR. DIAMANTATOS:  So if you look to, for example, the

14  Fair Labor Standards Act at Section 216(b) of that act.

15          THE COURT:  I asked for an Illinois statute.

16          MR. DIAMANTATOS:  I understand, your Honor.  It's a

17  federal statute to the extent it doesn't help shed any light

18  on this.

19          THE COURT:  I don't think it helps.  I made a ruling.

20          Motion No. 2 has to do with some exhibits.  It sounds

21  like 800 pages or something like that that it sounds like are

22  recently obtained or downloaded by the plaintiff on the

23  defendant's web page.  So one of the things that the plaintiff

24  argues in response to this motion is that these materials

25  should have been produced earlier.  And I'm really not seeing

1   much of a response to that point by the defendants, or much in

2   the way of addressing -- I'm sorry.  This is -- let me make

3   sure I got the right side's motion.  This is part of the

4   problem having this so tiny.

5        This is plaintiffs' motion number 2.  My apologies.

6   Not defendant's motion number 2.  The other one was

7   plaintiffs' motion number 1.

8        Back to my point.  The plaintiff says this material

9   should have been produced by the defendants in response to

10  discovery requests.  I'm not seeing a whole lot of a response

11  by the defendants to that point.  So can somebody address that

12  particular point, please.

13       MR. DIAMANTATOS:  Yes, your Honor, Tinos Diamantatos

14  for BNSF.  I will address that.

15       And this, your Honor, really touches on three

16  different motions in limine, this particular issue, two from

17  the plaintiff, and one --

18       THE COURT:  There's a bunch of them that are linked

19  together.  I get that.

20       MR. DIAMANTATOS:  That's right, your Honor.  So I

21  think just some pertinent facts here as they relate to your

22  Honor's decision on this particular motion.

23       Before the conclusion of fact discovery, Judge, which

24  was close to two years ago as your Honor knows, you allowed

25  the parties ample time to engage in fact discovery.  The

1   plaintiffs produced 141 pages of discovery.  Candidly, on the
2   eve of trial -- and we lay this out in our papers, beginning
3   in mid August.
4           THE COURT:  Stop.  Look, I'm going to say this again
5   for the second and the last time.  I don't have unlimited time
6   to devote to this.  We've got about 17 or something like that,
7   maybe it's 19 motions in limine.  I don't have unlimited time
8   to devote to this.  I want my questions answered directly
9   first thing out of people's mouth.  That seems to me to be a
10  relatively elementary point.
11          So I get that the plaintiff only recently produced
12  this.  But ordinarily a party doesn't have to produce the
13  other side's documents.  And what the plaintiff is saying is
14  that these are the defendant's documents that the defendant
15  should have produced under discovery requests.  So I want a
16  response to that particular point, that the plaintiffs'
17  contention that the defendant should have produced these
18  documents pursuant to the plaintiffs' discovery requests.
19          If you don't answer that in the next -- I mean, you
20  deal with the judges, right?  Generally speaking, we do not
21  get our questions answered.  It's common.
22          MR. DIAMANTATOS:  Your Honor --
23          THE COURT:  It's par for the course.
24          MR. DIAMANTATOS:  -- I understand.
25          THE COURT:  I'm not done talking.  The first time it

1   happens, you chalk it up to somebody's got their talking
2   points.  The second time it happens, you start wondering.  And
3   the third time it happens, you figure they don't have a viable
4   answer.  Okay?  So I'm about there.
5           So let's talk about my question.  Thanks.
6           MR. DIAMANTATOS:  Your Honor, they're publicly
7   available documents.  First of all, for the most part, of
8   those 880 pages, they are publicly available.  They are from
9   the Internet.  They are not from custodians in this case.  So
10  the notion that defendants --
11          THE COURT:  All of the discovery, purely discovery
12  from custodians in the case, there was no obligation to
13  produce anything beyond something that was held by some
14  agreed-upon custodian?  Is that what you're saying?
15          MR. DIAMANTATOS:  No, your Honor.  But when you look
16  to these documents, the materials that plaintiffs have
17  produced, they are publicly available website information,
18  your Honor.
19          I'm sorry.  Did you have a question, Judge?
20          THE COURT:  I get it.  I'm saying yes.  I get that.
21          MR. DIAMANTATOS:  Yes.  And what the plaintiff says
22  is that because the defendant produced certain demonstrative
23  photographs and web pages that the plaintiff then went out and
24  started looking for this information and found these 880 pages
25  of, again, website information, information that was not from

1    any identified custodian, information that did not come up

2    during the course of fact discovery, which closed some time

3    ago, and then dumped it on the defense on the eve of trial to

4    say these are now exhibits they want to use, substantively,

5    not for demonstrative purposes.

6        THE COURT:  Let me walk through how I look at this.

7    So if I ask -- if party one asks party two during discovery,

8    produce all of your policies and procedures relating to X.

9    Okay?  And there's a policy and procedure relating to X on a

10   publicly available website, unless there's some understanding

11   that we don't have to produce documents from your website or

12   that you only have to produce documents from certain sources

13   that don't include the websites, for example, custodians A

14   through X, then the proposition that it's publicly available

15   is not an answer to the notion that it should have been

16   produced during discovery.

17       There's all sorts of things that are publicly

18   available that still have to get produced during discovery.

19   So that doesn't get me very far.  I asked you a direct

20   question because there was this reference in the response to

21   there wasn't a custodian.  So I asked you a direct question

22   about whether discovery was limited to e-discovery from

23   certain custodians, and you immediately told me no.  So that

24   means that that's off the table.

25       And I get how this got discovered.  Okay?  I get how

1    it got discovered.  It was because you had this other exhibit,

2    which you're referring to as a demonstrative.  And the

3    plaintiff says they went and looked for it.  I mean, they were

4    pretty up front about when they found this.  But I go back to

5    kind of the basic point.

6         So if -- under Rule 37(c)(1), if something is

7    produced late, it's excluded unless it's justified or it's

8    harmless.  So if -- if these are materials that ought to have

9    been produced by the defendant during discovery, then the

10   plaintiffs' late production of the defendant's own materials

11   is almost by definition justified.  Okay?

12        So I give you one more shot at why I shouldn't just

13   make that finding right now and move on to the next thing.

14        MR. DIAMANTATOS:  Well, your Honor, it's our position

15   that there is no justification for the late production of

16   these documents.  Again, this is plaintiffs' case.  And to the

17   extent that they found information on BNSF's website that they

18   believe speaks to the issues of the case, why was that not

19   addressed by the plaintiffs during the course of discovery?

20        THE COURT:  It seems to me that's the wrong question.

21   It seems to me the first question is, if it was responsive to

22   a document request by the plaintiff, why didn't the defendant

23   produce it?  I mean, unless you can show me something in your

24   document request responses that says we're not producing

25   anything that's on our website, you know, it would have to be

1    in the response, by the way, which, you know, that went on for
2    several pages about this particular point.
3            MS. HERRINGTON:  If I might jump in, your Honor.
4    Some of these are -- they predate the class period.
5            THE COURT:  Was there some agreed-upon limitation as
6    to -- you said that in the response too.  Was there some
7    agreed-upon time limitation regarding discovery?
8            MS. HERRINGTON:  Well, we did when we objected --
9    yes.  Yes.
10           THE COURT:  What was it?
11           MS. HERRINGTON:  Throughout the class period, 2014.
12           THE COURT:  So there was an agreed-upon limitation of
13   discovery for things that arose during the class period.
14   That's what you're telling me.
15           MS. HERRINGTON:  There was an objection by BNSF, and
16   it was left uncontested by plaintiff.
17           THE COURT:  So you said in your responses, we're only
18   producing documents going back to the beginning of the class
19   period and plaintiff never came in and contested that.  That's
20   what you're saying?
21           MS. HERRINGTON:  Correct.
22           THE COURT:  Let me ask the plaintiff about that.
23   Does anybody want to dispute what Ms. Herrington just said?
24           MR. KANOVITZ:  Judge, as you know, we came into the
25   case --

1          THE COURT:  You know, don't start telling me we're

2     late comers to the ball game.  That's part of what you pick up

3     when you come in.

4          MR. KANOVITZ:  Understood.  I would like to ask the

5     counsel that was in the case before.

6          THE COURT:  I don't care who answers.  Mr. Meyers,

7     Mr. Gerbie, I don't care.  Whoever.  Is Ms. Herrington right

8     that they put a limitation on what they were producing and

9     nobody came in and contested it?

10         MR. GERBIE:  Your Honor, I don't believe that that's

11    entirely accurate.  I believe some documents were produced

12    that predated the class period.

13         THE COURT:  We're going to move on to my next

14    question, which is a follow-up to that.  So which of these

15    documents predate the class period?  And what I mean by

16    predate the class period is they would not have been on the

17    website at any point during the class period.  Which of these

18    documents would fall within that description?

19         MS. HERRINGTON:  Judge, to be fair, I don't know

20    which they got from a website and which they got from other

21    places.  There are things called annual reviews.  I'm just

22    looking.  It's a lot of documents.  Pictures of Warren

23    Buffett.  BNSF tweets/online materials, news releases.

24    There's a lot of stuff here.

25         THE COURT:  Listen, there's no tweets from 2011

1    because not too many people were --

2         MS. HERRINGTON:  I think you're right.  But I'm just

3    looking at the 800 pages.  There's a lot of stuff here.  I

4    don't know that we were able to find it all on the website; so

5    I'm not sure where they got it.

6         THE COURT:  We can come back to that.  Now I want to

7    turn to the other part of 37(c)(1).

8         I mean, there's a general statement in the response

9    that any time you get documents late in the ball game, it's

10   harmful.  And I get that.  But I think in making a

11   determination of whether something is harmful or harmless, I

12   need to know a little bit more than that.

13        You folks all have an advantage over me.  I don't

14   know how particular things fit into particular people's cases.

15   So I need somebody on the defense side to articulate to me how

16   you were harmed by the use of basically the defendant's own

17   documents, which Mr. Diamantatos told me about six times were

18   publicly available.  So tell me how the defendant's harmed by

19   that.

20        MR. DIAMANTATOS:  Well, I think the ability, your

21   Honor, to use those particular documents --

22        THE COURT:  Let me rephrase my question.  Don't give

23   me a general platitude.  Give me something specific.

24        MR. DIAMANTATOS:  We have no idea how the plaintiffs

25   plan on -- through which witness, what is their theory as it

1    relates to these documents, all things that become explored,
2    of course, Judge, during the course of depositions when we
3    have these exhibits available to us.  We can see how the
4    plaintiffs are using them.
5           The reason I started with the numbers, Judge, is
6    because that matters.  When you're analyzing harm under 37(c)
7    when we had 141 pages of documents during the course of
8    depositions to understand how the plaintiff is using these
9    documents, what's their theory, what --
10          THE COURT:  Time out.  You're not telling me you --
11   you can't tell me with a straight face that the defendant
12   thought that the plaintiffs' universe of exhibits for use for
13   trial was going to consist of the 140 pages they produced in
14   discovery.  I mean, in any kind of a case like this, you know
15   to a moral certainty it's going to be the defendant's
16   documents that are the ones that are used.  You're not trying
17   to tell me that you thought that the plaintiffs' total
18   universe of exhibits was going to be 140 pages, are you?
19          MR. DIAMANTATOS:  I'll tell you, your Honor, we fully
20   did not expect that four times that number --
21          THE COURT:  Thanks for changing my question.  Which
22   I'm just going to note that you did.  You changed my question.
23   I'll take that as a no, we didn't expect it was going to be
24   140 pages they produced.
25          Somebody on the plaintiffs' side needs to tell me how

1     these documents are going to be used.  Go.

2           MR. KANOVITZ:  So in each of these documents, there's

3     essentially a single page where BNSF is claiming that it is

4     responsible for the biometrics.  The language differs, you

5     know, given -- on a particular document, but it's quite clear

6     what we're using it for.

7           THE COURT:  I'm talking about that's what it's for.

8           MR. KANOVITZ:  Yes.

9           THE COURT:  So presumably anything outside the class

10    period anyway wouldn't be all that terribly significant or

11    probative, let's say, in the words of Rule 403.

12          MR. KANOVITZ:  I think it would be probative,

13    because, for example, in the 2011 report or the 2013 report

14    might be where they're saying, we installed the gates because

15    we want to get truckers through faster.

16          THE COURT:  Okay.  So now you know.  All right?  By

17    the way, I wouldn't have had to ask anybody about this in a

18    deposition.  So now you know how they're going to use the

19    documents.

20          Tell me how you're harmed.

21          MR. DIAMANTATOS:  The fact that they were produced,

22    your Honor, just a few short weeks before trial.

23          THE COURT:  Okay.  We're going to come back to

24    number 2.

25          Next is number 3 by the plaintiff.  This has to do

1   with these three exhibits, which I think it's photographs from

2   the facility, screen shots from the Remprex website, and then

3   some YouTube videos uploaded by Remprex.

4           So you refer to these as demonstrative exhibits, and

5   that means different things when said by different people.  So

6   I need to know exactly how it is that the defense is planning

7   to use these exhibits at the trial.

8           MR. DIAMANTATOS:  Yes, your Honor.  I will address

9   that.  We plan on using the photographs and the group exhibits

10  simply to aid the witness who will be testifying about the

11  facilities.  As that witness is describing certain things that

12  presumably the members of the jury have never visited, a

13  secure location, it's purely for demonstrative purposes.

14          THE COURT:  They're going to point to this; they're

15  going to point to that.

16          MR. DIAMANTATOS:  When he describes certain machinery

17  or where the gates are, that's why those photographs are

18  there, solely to aid in the presentation of that witness'

19  explanation of those areas to the members of the jury.

20          THE COURT:  You know that "demonstrative" means the

21  jury doesn't get it during deliberation, right?

22          MR. DIAMANTATOS:  Correct.  We don't anticipate --

23          THE COURT:  Talk to me about the videos.

24          MR. DIAMANTATOS:  The videos, your Honor, and the

25  Remprex information, we also don't plan on using that

1   substantively.  We plan on using it for impeachment purposes
2   with some of the witnesses that we anticipate the plaintiffs
3   may call during the course of this case, including individuals
4   from Remprex.  And throughout the course of cross-examination,
5   to the extent that those documents or YouTube videos speak to
6   certain things that those witnesses are testifying about as it
7   relates to Remprex, we anticipate to use them for impeachment
8   purposes only and, again, not for substantive reasons.  That's
9   it.
10          THE COURT:  I'll just point out -- not that it's
11  harmful to you in this situation -- that "impeachment
12  purposes" and "demonstrative" mean two different things.  But
13  I will tell you that under the pretrial order rules, as
14  they've existed since before I was a lawyer -- I'm not going
15  to go into how long ago it is now; it's a number with four,
16  more than one digit, put it that way -- you haven't had to
17  disclose exhibits that are going to be used solely for
18  impeachment.  That's never been part of the pretrial order
19  rules.  That doesn't obviate somebody from the need to
20  disclose them for discovery.
21          Just talk to me a little bit about how it is that
22  you -- I mean, I think part of the objection here is that they
23  got produced relatively late in the ball game as well.  So can
24  you just kind of talk to me about how that happened.
25          MR. DIAMANTATOS:  Judge, it's similar to how you

1    described it a few moments ago that during the course of trial
2    preparation, once we received from the plaintiff what we'll
3    call the witness list, we saw that their case relies, in large
4    part, on Remprex.  As we're preparing and looking at the
5    publicly available Remprex information, like the YouTube
6    videos and website, we decided to pull certain information.
7           And your Honor, of course, is correct.  We know we
8    don't have to disclose exhibits that we plan on using for
9    impeachment purposes, to the extent that that becomes
10   something that we need to do at trial.  But in abundance of
11   caution, we decided to do it anyway.  We included it with this
12   group of demonstratives, the photographs, and that was it.
13          THE COURT:  Time out.
14          Let me hear from the plaintiff on this one.
15          MR. DIAMANTATOS:  Yes, your Honor.
16          MR. KANOVITZ:  Judge, these documents go way beyond
17   anything I've seen called a demonstrative and, in fact, are
18   substantive evidence.
19          So, for example, they want to show the kiosk.  Well,
20   the kiosk has -- and these are repeated pictures, a big
21   Remprex sticker on it.  Now, we know that at different points
22   in time, it didn't have a Remprex sticker on it.  But their
23   purpose, pretty clearly, is to say this is associated with
24   Remprex.  The purpose in the videos that Remprex created about
25   how a truck goes through is to show this is what Remprex is

1    doing.  There's pictures from the office with people like
2    right next to a Remprex sign or a piece of paper on a bulletin
3    board.
4            THE COURT:  And these are videos of the site or sites
5    at issue in this case?
6            MR. KANOVITZ:  No.  It's just --
7            THE COURT:  I have one side shaking up and down, and
8    I got the other side shaking back and forth.
9            MR. KANOVITZ:  From what I saw, these are simply like
10   an accident reconstructionist-type video that somebody would
11   make.  It's a cartoon.
12           THE COURT:  Let me ask defense counsel.  Are these --
13   I haven't seen the things, obviously.  Are these actual videos
14   from a site that is at issue in the case?
15           MR. DIAMANTATOS:  I think there's two kind of
16   separate ones, your Honor.  The photographs of the kiosk, they
17   were taken at a facility, the Corwith facility that's here in
18   Illinois, right?  So that it is pertinent and the witnesses
19   who will be testifying about what --
20           THE COURT:  I'm asking about the videos.
21           MR. DIAMANTATOS:  The videos here are not specific to
22   a particular location is my understanding, but, again, these
23   are materials that Remprex has put out there pretty much
24   universally to show the services that they offer and how they
25   operate.

1    THE COURT:  Mr. Kanovitz was saying a second ago that
2    the -- again, I haven't seen these things -- that the videos
3    have kind of Remprex's logo and signs and identifying
4    information all over the place.  Do we have actual photographs
5    of the actual sites and whatever that are at issue in this
6    case so we know whether those kinds of photographs -- whether
7    those kinds of logos and names, et cetera, appear there?
8        MR. DIAMANTATOS:  Yes, I'll tackle that, Judge.  Yes,
9    we do.  We have the videos, as you described them, the Remprex
10   cartoon videos; and then you have actual photographs that we
11   took in preparation of trial at the Corwith facility, which is
12   one of BNSF's facilities here in Illinois, that shows
13   photographs of those logos and the kiosk locations that, of
14   course, the members of the jury can --
15       THE COURT:  So, Mr. Kanovitz, you're telling me
16   there's some material difference between the amount or
17   prominence of the Remprex logos on the actual stuff as opposed
18   to in these videos?  Is that what you're telling me?
19       MR. KANOVITZ:  What I'm saying is the purpose is to
20   show the location of this or that.  They don't need
21   pictures --
22       THE COURT:  I got that before.  That's why I didn't
23   ask that.  I asked what I just termed my question.
24       MR. KANOVITZ:  I'm sorry, Judge.  Could you repeat
25   it?

1    THE COURT:  Right.  Okay.  I've said this probably
2    more times in my career that this is not one of those Sunday
3    morning talk shows where everybody just comes in and says
4    their talking points irrespective of what the questions are.
5    You actually have to answer.  I'm going to read it back to
6    you.
7        Mr. Kanovitz, you're telling me there are some
8    material differences between the amount and prominence of the
9    Remprex logos on the actual stuff as opposed to in these
10   videos.  Is that what you're telling me?
11       MR. KANOVITZ:  No, Judge.  It's two separate things.
12   The videos it's prominent, and in the pictures it's prominent.
13       THE COURT:  No, I'm talking about in the actual sites
14   that are at issue in the case.  Is their Remprex logos there?
15       MR. KANOVITZ:  I believe they picked a point in time
16   in a certain site where it's more prominent than it might have
17   been at other times.  But because we only got it at this last
18   second, we have very little with which to prove that.
19       THE COURT:  Okay.  So you understand on the
20   plaintiffs' side that a demonstrative means -- we've already
21   discussed this.  I guess I don't have to repeat it, but I
22   will.  It doesn't go into evidence.  And, I mean, it seems
23   like to me that if I'm going to let this in, what I would need
24   to do, because it's pretty clear that one of the key contested
25   issues in the case has to do with BNSF's responsibility as

1   opposed to Remprex's responsibility -- I mean, if there's

2   anything that's a key issue in the case, it's that.  I would

3   have to give the jury some kind of a limiting instruction.

4          Would I have to do it when you're talking about the

5   exhibits to say, ladies and gentlemen, you're going to see --

6   you're going to see something that's not an actual video of

7   anything in real life that's at issue in this case.  It's got

8   logos on it.  You have to disregard those.  That's not part of

9   the evidence.  This isn't part of the evidence.  It's not an

10  actual video.  Any time you try to use this stuff, if I let it

11  in, if I let you use it at all -- "let it in" is the wrong

12  word.  If I let you use it at all, I'm going to have to

13  basically give that limiting instruction.  So I assume that

14  that's something you're willing to live with.

15         MR. DIAMANTATOS:  Yes, your Honor.  We're certainly

16  okay with your Honor providing limiting instructions to the

17  members of the jury about a limited use of a substantive

18  exhibit or what a demonstrative is.

19         THE COURT:  We're going to come back to number 3 too.

20         All right.  Number 4 says, bar references and

21  suggestions at trial that biometrics have not been collected.

22         Here's my problem with plaintiffs' motion number 4.

23  It's basically a mini partial motion for summary judgment

24  saying, don't allow argument on something that the plaintiff

25  has to prove.  I don't think that's a proper motion in limine.

1    So I'm going to deny it without prejudice to, you know,

2    objections at trial or Rule 50 motion at the appropriate time,

3    if you think that there's, you know, legitimate basis to find

4    otherwise.  So that's number 4.

5           Number 5 has to do with preemption.  Okay.  I want

6    somebody on the defense side to listen really carefully to

7    this question.  Because I do not intend to repeat it.  Is the

8    defendant seriously arguing that federal preemption is an

9    issue for the jury?  Yes or no?

10          I can't hear you.

11          MS. CHAPLA:  I apologize, your Honor.  I was on mute.

12   I said no.

13          THE COURT:  Then why would you be putting in evidence

14   about federal preemption in a jury trial?

15          MS. CHAPLA:  Because, your Honor, we need to develop

16   a factual record to support the affirmative --

17          THE COURT:  But the jury -- why would one do that in

18   front of the jury?

19          MS. CHAPLA:  Well, your Honor, again, as I said, we

20   need to develop the factual record to support --

21          THE COURT:  Why put it in front of the jury?  If it's

22   not an issue for the jury, then why would you need to develop

23   the record in front of the jury?

24          MS. CHAPLA:  I think there's a distinction here

25   between evidence relevant to preemption and evidence that is

1  relevant to preemption that is also relevant to other issues
2  in the case that will be for the jury.

3          THE COURT:  I'm not hearing anything about that in
4  the arguments.  Okay?  The motion asked to bar references to
5  federal preemption, and the response says:  "We need to put
6  this evidence in in order to make our record."  So I'm going
7  to make this real simple.

8          The ruling on the federal preemption was not some
9  sort of a preliminary ruling.  Go back and read it.  I said at
10  the end of each of the four sections, preemption does not
11  apply.  That's a ruling.  I have made a ruling that preemption
12  does not apply.  You guys tried to take an interlocutory
13  appeal on that, which, if it was a tentative ruling, you know,
14  you wouldn't have even bothered to do.  It's a final ruling.
15  Evidence about preemption, argument about preemption does not
16  come in during the trial, period.  It's not an issue for the
17  jury anyway, even if it was still an open, which it's not.
18  Motion number 5 is granted.

19          Now we're on to motion number 6.  Okay.  And that has
20  to do with arguments about safety and security.

21          So what I get collectively from the motions in limine
22  on both sides is that each side wants to put in something
23  about why BNSF has or Remprex or whoever it is or why BNSF
24  contracted with Remprex to put in this system.  Okay?  And the
25  defendant wants to put in it's all about safety and security.

1   The plaintiff wants to put in it's about moving things along
2   and making more money and profits.  So each side has got a
3   motion in limine, and they kind of go like this, right past
4   each other.

5          So can somebody tell me what issue or issues in the
6   case -- and I'm really talking about two motions now; it's the
7   corresponding one on the defense side -- that the reason for
8   putting in the system or having the system or having it set up
9   the way it's set up, the underlying reason for that, what
10  issue does that bear on what the jury is going to have to
11  decide in this trial starting on the 4th of October?

12         MR. LOEVY:  From plaintiffs' side, your Honor, the
13  answer is no issue.  The issue is whether the statute was
14  violated.  The motive to violate the statute is probably
15  neither here nor there.  So that's why we responded to their
16  motion.

17         THE COURT:  Why did you guys then ask to object to
18  their motion to keep out evidence about profit motive or
19  whatever their motion said?

20         MR. LOEVY:  We don't want to lose both ways, but our
21  final word was, we see their point, and we agree that the
22  better reading is what's relevant is whether the statute was
23  violated, not why.

24         THE COURT:  All right.  That's the plaintiffs'
25  answer.  Let me here from the defendant then.

1    MS. CHAPLA:  Your Honor, on the defendant's side, we
2    think that this evidence is relevant primarily to BNSF's
3    mental state and whether it violated the statute negligently,
4    recklessly, or intentionally, which, of course, is an issue
5    the jury would be asked to decide.
6        THE COURT:  So explain to me how the reason for
7    putting in the system bears on whether the statute was
8    violated negligently, recklessly, or intentionally.
9        MS. CHAPLA:  Because, your Honor, BNSF has to comply
10   with a number of obligations under federal law that required
11   it to have certain security measures in place at these
12   facilities.  This was not -- as plaintiffs I think will argue
13   to the jury, this was not a profit-making enterprise.  The
14   system was put in place specifically to comply with security
15   obligations and to control access to sites where hazardous
16   materials pass through.  And that is highly relevant to --
17       THE COURT:  But the plaintiff is not -- as I
18   understand the plaintiffs' claims, and as I understood the
19   plaintiffs' claims when I ruled on the motion for summary
20   judgment, the plaintiff isn't arguing there can't be a system.
21   The plaintiff is arguing that you violated the provisions of
22   BIPA that relate to obtaining the information, how that's to
23   be obtained, and what disclosures have to be made and whatnot.
24   I mean, is there a claim in this case that -- by the
25   plaintiff, as you understand it, that somewhere in their

1   complaint or in the pretrial order or something that they
2   filed that indicates that they're saying there can't be a
3   security system to begin with?

4           MS. CHAPLA:  No, your Honor.  But the purpose of this
5   evidence about the safety and security issues is to show why
6   biometrics in particular were used and why biometrics are such
7   an effective means of controlling access to these sites for
8   which hazardous materials pass.

9           THE COURT:  What does that have to do with the issues
10  the jury is going to have to decide on whether the statute was
11  violated and whether and the level of intent for violating the
12  statute.  I get that BNSF needs to have, you know, security
13  controls in letting people in and out of its yard, but that's
14  not -- I don't understand what issue in the case that the jury
15  is going to have to decide that relates to.

16          MS. CHAPLA:  It's not that highly relevant, your
17  Honor, to why BNSF retained Remprex in particular to handle
18  access to its facilities and to collect biometrics.  And the
19  jury, I think, will be hearing a lot about what Remprex did
20  and Remprex's operation of the autogate system.  And it's
21  important to provide context for why BNSF retained this
22  third-party contractor in the first place with expertise and
23  specialty in this area, which held itself out as an expert.

24          THE COURT:  What's -- again, we just kind of keep
25  coming back to the same question.  What's the issue that the

1    jury has to decide that what you just said relates to?  What's

2    the issue?  I mean, I can pull up your proposed jury

3    instructions.  Tell me what issue it relates to.

4              MS. CHAPLA:  Again, your Honor, it relates to --

5              THE COURT:  "Again" isn't working, right?  You're

6    getting that, right?  So you're not answering my question.

7    What issue in the case that the jury has to decide does it

8    relate to that, you know, BNSF needed to have, you know,

9    security systems, they needed to do biometrics, and they

10   decided to hire Remprex?  What issue in the case does that

11   have to do with?  Those are the things you just told me.

12             MS. CHAPLA:  Whether BNSF acted recklessly or

13   negligently in having the system in place.

14             THE COURT:  That's not what recklessly relates to.

15   Recklessly involves violating the statute.  There's no

16   contention -- at least the jury isn't going to be asked to

17   decide whether BNSF recklessly put in a security system.  The

18   question is whether they recklessly, negligently, or knowingly

19   violated the statute.  And that would seem to have something

20   to do with their awareness of the statutory requirements and

21   whether they, you know, did or didn't take steps to comply

22   with them.  Not whether it was a good idea to have a security

23   system to begin with or whether it needed to include

24   fingerprints or finger scans or whatever the right lingo is.

25   I'm just completely missing the point here.

1    MS. HERRINGTON:  If I might add, your Honor, it also
2   goes to the very issue of who collected it, right?  The
3   parties are fighting over who collected it.  Part of our
4   explanation of who collected, that it was not BNSF, but it was
5   Remprex, has to do with why did we have this contract?  What
6   were they going to do under it?
7        And what they were going to do was they were going to
8   collect information and keep that information.  And without
9   being able to discuss what the purpose of the contract was and
10  what they were doing and why, we are hamstrung in arguing
11  about who collected and who did not collect.  And that's the
12  very issue the jury is deciding.
13       THE COURT:  Okay.  Respond to that last point, if
14  somebody would, on the plaintiffs' side.  This has a bearing
15  on the -- what I'll call the control issue.
16       MR. LOEVY:  Well, I was with Ms. Herrington when she
17  said it bears on who collected it, but not why they collected
18  it.  And that's what this motion is about.  You know, they can
19  say, we have a contract.  We hired Remprex, and they tried to
20  push the blame to Remprex.  What's that got to do with
21  security or why?
22       THE COURT:  Okay.  Ms. Herrington, you want to
23  respond to that?
24       MS. HERRINGTON:  Yes.  It's incredibly important.
25  Why did we hire an expert?  Why didn't we just hire anybody

1   off the street to do security?  Because they're experts in

2   security.  And it goes to our explanation of who was doing the

3   collection of the information and why.  I think the context is

4   incredibly important for the jury to understand why an expert

5   was retained and why they were the ones doing any collection

6   of information.

7         THE COURT:  Give me just a second here.  I'm just

8   looking at some other part of the final pretrial order.

9         So I don't think that this evidence that's being

10   discussed has any bearing on intent.  I'm looking at the

11   defendant's proposed jury instruction about intent, which is

12   defendant's instruction number 3.  I'm not saying I'm going to

13   adopt that one, but it seems like an appropriate thing to look

14   at since it's the defendant that wants to put the evidence in.

15   The instruction is, generally speaking, worded pretty

16   correctly.

17         "Defendant negligently violates BIPA if conduct of

18   its employees failed to use care that a reasonably prudent

19   person would use in the same circumstances" -- the next part

20   is the important part -- "regarding the plaintiffs' rights

21   under BIPA.  Defendant recklessly violates BIPA, dot, dot,

22   dot, if its conduct was in conscious disregard or utter

23   indifference to" -- next point is important -- "plaintiffs'

24   rights under BIPA.  Same for intentionally."

25         None of this evidence reported in, whether it's a

1   good idea or bad idea, has anything to do with the intent
2   issue.  None.  Zero.  Zip.  It's not relevant to that at all.
3          I can see the argument that evidence about -- that
4   some limited, very limited amount of evidence about the reason
5   why we hired Remprex is relevant on the question of control.
6   So, in other words, if the point is something along the lines
7   of, we have these very important safety obligations.  We deal
8   with hazardous materials.  We deal with other dangerous stuff.
9   We have to have these systems in place, and we hired a company
10  that had expertise in that.  This is how we know that they had
11  the expertise, and we basically turned it all over to them,
12  which I think is essentially the main thrust of the
13  defendant's position.  It seems to me that, to some very
14  limited extent, references to safety and security are relevant
15  and not unfairly prejudicial as it relates to that.
16         So I'm going to deny the motion, but really only in
17  part.  Because what I'm going to say about that is this.
18  You're not going to get to repeat this over and over again.
19  You're not going to get to dwell on it.  It has a very focused
20  and limited value.  This is not a case about whether it's a
21  good idea or a bad idea to have safety and security.  It's not
22  a case about whether it's a good idea or a bad idea for a
23  company to make a profit.  That's not what the case is about.
24         The case is about whether the practices violated this
25  very specific statute and what, if any, the consequences of

1   that should be.  So my very strong advice to the defendant is
2   you have one witness talk about this, and you have him or her
3   do that in a very focused way because probably the first time
4   you get it in is going to be the last because that's when
5   Rule 403 is going to kick in, given the limited probative
6   value and the fact that this is not going to be turned into a
7   trial whether safety is a good idea or not because that would
8   run afoul of at least three of the negative parts of Rule 403.

9           So conversely on the plaintiffs' side, I'm not seeing
10  this profit thing as being relevant at all.  We'll come back
11  to that one in a second.

12          So we're now going to move on to the other
13  defendant's motion -- or plaintiffs' motion, rather.

14          The next one is these depositions.  Okay.  I really
15  only had one question about this one, plaintiffs' motion
16  number 7.  On Ms. McRae, M-c-R-a-e -- actually, I have one
17  question for the plaintiff, one question for the defendant.

18          The defendant says at page 12 of their response that
19  after the emails from November of 2020 that you attach, there
20  was a further email exchange or there was a further exchange
21  in which BNSF supplemented its Rule 26(a) disclosures to
22  include Ms. McRae and some general statement of the subject
23  matter, and then there was a joint motion to extend the
24  discovery cutoff to take her deposition.  And I granted it,
25  and then the plaintiff didn't take her deposition.  And so

1   kind of the argument on Ms. McRae is you had your shot; you
2   didn't take it.  You shouldn't do it again less than a month
3   before trial.  Tell me why that argument is wrong.
4           MR. LOEVY:  I think that argument is right, your
5   Honor, and it's unfortunate.  We, as a collective team, didn't
6   appreciate that that was the full context, or we wouldn't have
7   made that argument.  Going back and looking at it, they're
8   right.
9           THE COURT:  Okay.  So I guess I have -- is there
10  anything else -- honestly, of the three people, in terms of
11  the particular circumstances relating to them, McCabe was
12  probably your best case.  So you want to say anything about
13  the other two, McCabe and Bass?  Does the plaintiff want to
14  say anything about those?
15          MR. LOEVY:  On the plaintiffs' side, your Honor, you
16  know, we stand on the same principle.  You know, I agree with
17  you that McRae was the strongest, but -- there's no prejudice.
18          THE COURT:  I will say this.  The Rule 26(a)(1)
19  disclosures leave something to be desired, and by that I mean
20  they're woefully insufficient.  It basically says something
21  along these lines.  This person -- and this is true of all
22  three -- has knowledge of the operations of the facility,
23  quote/unquote.  That's pretty woefully insufficient.  But
24  there was a pretty extended discovery period in this case, and
25  nobody came to me and said -- nobody tried to get those beefed

1   up, at least to the extent it's not discussed in here.  And
2   nobody came to me and said, make them be more specific.  So
3   that was the chance.  Motion number 7 is denied.
4           Back to number 2 and number 3 now.  2 being -- 3
5   being the demonstratives -- or the so-called
6   demonstratives/impeachment exhibits.
7           So I think -- so, first of all, the photograph sounds
8   like, from what Mr. Diamantatos says, that that's actually
9   going to be used as a legit demonstrative.  It sounds like the
10  other two are going to be used for impeachment.  What I'm
11  going to say -- and I would hope that by the time we try the
12  case, people will have a little bit better idea of how the --
13  let's just say the level of Remprex logoing on these exhibits
14  compares with the level of Remprex logoing in real life.
15  Anytime these things are used, there's going to be limiting
16  instructions about that that basically tells the jury, hey,
17  pay no attention to the Remprex stuff in here because it's not
18  put up there as an actual depiction of what actually existed
19  in this case.  And so, you know, if you want to use these
20  exhibits knowing that the judge is going to make a comment
21  about them to the jury every time they're used, then I think
22  you can do that.  I think it's relatively harmless, and it
23  doesn't seem like there was -- there's no indication that
24  these, you know, ought to have been produced before.
25          So the motion in limine number 3 is denied with that

1  caveat.

2       I'm going to grant number 2, plaintiffs' number 2,

3  which is to allow these exhibits, but that's subject to this

4  limitation.  If you can show me on specific things that they

5  are outside the relevant time period in a way that renders

6  them irrelevant or unfairly prejudicial, I'll deal with that

7  when we get to the trial in the case.  So I think that -- I

8  think that under 37(c)(1), there's both a justification, and

9  there's a significant amount of harmlessness here.

10       The justification is is that based on the argument

11  I've heard today -- and I've asked all these questions several

12  times -- it looks like these exhibits ought to have been

13  produced before.  But the fact that plaintiff is producing the

14  defendant's own materials back to them later doesn't mean that

15  that's unjustified.

16       And on the harmlessness issue, given the purpose for

17  which they're going to be used, which is, basically, it sounds

18  like to show sort of what I'll say quasi admissions -- I'm

19  using air quotes there -- about whose system it was or who put

20  it in or who had it put in.  That's not going to hurt anybody

21  in any unfair way at all.  So 2 is granted.  Yeah, 2 is

22  granted.

23       So I think we are done with the plaintiffs'.  We're

24  going to move over to the defendant's.

25       Just in terms of time, we've done 7.  We have 15 to

1    go.  So we're going to move pretty quickly through these
2    because a lot of them have kind of been talked about a little
3    bit.  Give me just a second to flip over and squint.
4            We're going to skip number 1, which I assume is
5    probably the most significant one.  That's why it's number 1.
6            Okay.  Number 2 has to do with evidence of the
7    party's financial condition.  The plaintiff objects, but it's
8    not clear exactly what -- to me what exactly the plaintiff
9    wants to put in.  So I need to know what exactly the plaintiff
10   intends to put in that has something to do with the
11   defendant's financial condition.
12           MR. LOEVY:  Your Honor, what we would want to put in
13   would be dependent on what they elicit.  Generally we want to
14   be able to show -- let me start again.
15           What we want to show is that BNSF has a tremendous
16   amount of economic weight to throw around and that on the
17   issue of bias and other issues, Remprex is essentially
18   beholden to BNSF because of the vastly disproportionate market
19   share.  And BNSF is going to want to say, hey, we're a third
20   party; they're a third party.  They can say whatever they
21   want.  We want to show that Remprex is really dependent on
22   BNSF because BNSF is like the planet around which everything
23   revolves and has so much gravity that they cannot pretend --
24           THE COURT:  Okay.  I mean, just taking that at face
25   value, why does that require you to put in anything about

1   BNSF's net worth or the fact that it's, you know, Berkshire

2   Hathaway or Warren Buffett has some interest in it or

3   whatever?  I'm not getting the connection.  I mean, I get

4   that, you know, you can put in this is a really big contract

5   for Remprex.  It's worth a lot of money.  It's an important

6   contract to them.  It's X percent of their business, or

7   whatever, but what does that have to do with putting in

8   evidence of BNSF's financial condition?

9           MR. LOEVY:  BNSF -- the other bookend to that is not

10  only the big contractor Remprex, but BNSF can control future

11  contracts and is really the person in the industry -- the

12  entity in the industry you have to keep happy.

13          Where I started, your Honor, was it really is

14  somewhat dependent on how the trial folds out.  We would be

15  limiting our proof to what you said a minute ago which is, you

16  know, they're a big deal, and this is a big contract.  This is

17  a big part of it, but we would want it without prejudice to a

18  ruling that if the door is opened, that we could show, hold on

19  a second, BNSF actually has a lot more weight than --

20          THE COURT:  Defendant's motion number 2 is granted,

21  subject to reconsideration if the defendant opens the door.

22  And what you'll need to do, obviously, is just let me know

23  outside the presence of the jury --

24          MR. LOEVY:  Thank you, your Honor.

25          THE COURT:  -- something has happened that causes

1  that, that relates to that.

2  Okay.  3 and 4, the plaintiff deals with them
3  together.  This has to do with evidence regarding -- I'm sorry
4  I'm getting so close to the camera, but I have to squint to
5  see the little tiny half of my iPad screen that I've got the
6  papers on here -- evidence regarding data encryption and
7  reference to identity theft or data breaches.  And the
8  plaintiff is arguing in response that those are -- that that's
9  relevant on the question of recklessness or intent under BIPA
10 Section 20.  So I'd like to hear from the defendant in
11 response to what the plaintiffs said on that one.

12 MS. HERRINGTON:  Sure, your Honor.  As your Honor
13 knows, there's no data breach here.  Fortunately, the data has
14 not been compromised.  There is no 15(d) claim or 15(e) in
15 this case, 15(d) being, of course, disclosure, 15(e) being
16 encryption.  Any argument about, you know, data encryption is
17 not relevant to a 15(b) claim.  We're going to trial to
18 determine if BNSF, you know, violated BIPA under 15(b), not
19 (d) and (e).  And trying to rouse the jury up suggesting that
20 a data breach could happen or theft could happen or that it's
21 somehow reckless that this Remprex database wasn't encrypted
22 is only designed to just prejudice the jury.

23 THE COURT:  The argument that's made, at least as I
24 understand it, by the plaintiff is that in deciding the issue
25 of -- I'll just use recklessness as a placeholder for the

1   various intent levels under Section 28 BIPA.  In deciding

2   recklessness, part of the calculus is the seriousness of the

3   harm that might result if you're not careful.  And part of the

4   calculus, I suppose, would be the cost.  And part of the

5   calculus would be how difficult it is to, you know, put the

6   measures in and whatnot.

7          But why isn't -- why isn't the risks that exist if

8   the statute isn't complied with relevant it show recklessness;

9   in other words, the level of the risk that the company has to

10  deal with in order to -- in deciding how to deal with this

11  data?

12         MS. HERRINGTON:  Well, I think that we have to

13  consider the section this is brought under.  15(e) deals

14  directly with this on encryption -- not encryption -- the

15  standard of care of storing something.  The idea of whether

16  15(b) was violated recklessly has nothing to do with whether

17  or not we encrypted or that Remprex encrypted the database.

18         THE COURT:  What's the part of 5(b) that you

19  understand to be at issue here?

20         MS. HERRINGTON:  15(b) is whether or not --

21         THE COURT:  Is it collecting?  Is it capturing?  Is

22  it purchasing?  Is it receiving?  Or is it obtaining?  Or is

23  it all of the above?  As you understand it.

24         MS. HERRINGTON:  I think the plaintiffs are saying

25  "collecting," but it's kind of been a moving target.

1            THE COURT:  Let me ask.  Let me just ask the

2    plaintiff on that.  When you're arguing this case to the jury

3    at trial, what part or parts of 15(b) are you relying on?

4            MR. KANOVITZ:  Not purchasing, but the rest of that

5    phrase we think is intended to --

6            THE COURT:  Collecting, capturing, and receiving,

7    basically.

8            MR. KANOVITZ:  Expansively.

9            THE COURT:  Just so it's clear, is it only a 15(b)

10   violation that's at issue at this point?

11           MS. HERRINGTON:  Yes.

12           THE COURT:  And so if 15(b) says you can't -- I'll

13   leave out the purchase -- you can't collect, capture, or

14   receive, unless you do all of these things about informing the

15   subject and getting releases and so on.  Because that's what

16   the case is about.  The contention is is that BNSF collected,

17   captured, or received and did not give the proper disclosures

18   and warnings and get the proper releases.  Right?

19           MR. KANOVITZ:  Yes.

20           THE COURT:  Okay.  I'm just thinking here for a

21   second.

22           If I can just ask this.  What's the thrust of the

23   defense theory of the case on that going to be?  It's going to

24   be we didn't do it; we hired someone else to do it.  Or is it

25   going to be, we provided the necessary disclosures and got the

1   necessary releases?  Or is it going to be some combination?
2           MS. HERRINGTON:  Our defense, your Honor, is that we
3   did not collect by any --
4           THE COURT:  You didn't collect to begin with.
5           MS. HERRINGTON:  We didn't do anything under (b).
6           THE COURT:  The disclosure and release provisions
7   don't apply because you didn't do anything that's covered by
8   (b).
9           MS. HERRINGTON:  Right.  Because the private entity
10  that did was Remprex.
11          THE COURT:  I guess what I think about -- what I
12  think about 3 and 4 is kind of similar to what I thought about
13  the motion in limine on the other side relating to safety and
14  security.  I mean, it seems to me that there can be some, you
15  know, general references to why this stuff is all important
16  because this is data.  And if it gets breached, it can be
17  used, you know, in nefarious ways for identity theft or
18  whatever.  But it doesn't seem to me that given what's at
19  issue in this case it's something that really can
20  appropriately or should be dwelled upon.  So I guess I'm going
21  to say to you pretty much the same thing I said to the
22  defendant on that point is that, you know, get it out, get it
23  out in a relatively succinct way.  On both sides of this, you
24  can make reference to it in closing argument, but this
25  isn't -- this isn't a case about whether -- about whether

1   safety and security and data collection are good or bad ideas.

2   It's a case about whether particular provisions of the statute

3   were violated.  I guess I'm going to say that number 3 and 4

4   are granted in part to the extent stated on the record.

5         References to fingerprints, that's number 5.  So the

6   way I'm reading the response and the -- particularly the

7   reference to the plaintiffs' expert is that that expert is

8   going to say that at least some of what is collected were

9   fingerprints, quote/unquote?

10        MR. LOEVY:  Correct.

11        THE COURT:  Does the defense dispute that factual

12  proposition; in other words, that the plaintiffs' expert is

13  going to testify that some of what was collected were

14  fingerprints?

15        MS. HERRINGTON:  Some but not all.

16        THE COURT:  Okay.  So then why would it be irrelevant

17  to let in testimony about fingerprints?

18        MS. HERRINGTON:  I think it would be inaccurate to

19  say that the entire class had their fingerprints -- that there

20  were copies of it in the Remprex database.

21        THE COURT:  I'm getting from the responses that

22  nobody is going to say that each and every person had their

23  fingerprints in there.  Did I read the response wrong?

24        MR. LOEVY:  No, your Honor.

25        THE COURT:  Yeah.  So motion in limine number 5 is

1   denied for that reason.

2          Number 6, reference to the number of times biometrics
3   data was collected.  So, look, the Seventh Circuit didn't
4   decide this.  Let me repeat that.  The Seventh Circuit did not
5   decide this in the Cothron case.  They shipped it off to the
6   Illinois Supreme Court.  We're going to talk about that in a
7   second.

8          As of right now, the number of times biometric data
9   was collected is relevant for the reasons discussed in the
10  response, and we may need to, you know, come up -- we do need
11  to come up with a way to deal with, you know, what I'll call
12  the Cothron issue -- C-o-t-h-r-o-n for the court reporter's
13  benefit -- in the verdict form.  But motion in limine number 6
14  is denied because it's relevant, as the case sits right now.

15         Okay.  Now we're down to number 7, which has to do
16  with -- I think this is the same -- it's not clear to me, but
17  I think this might be the same documents that we were already
18  talking about a couple of minutes ago.

19         MR. DIAMANTATOS:  Yes, your Honor.  This is Tinos
20  Diamantatos for BNSF.  This is our motion to bar the 880
21  some-odd exhibits that your Honor addressed in --

22         THE COURT:  I mean, I ruled on that when I was ruling
23  on the corresponding motion.  I don't think we need to talk
24  about it anymore.

25         Okay.  Number 8 is to bar expert testimony on

1  ultimate issues.  So the motion doesn't say exactly what the
2  testimony is that the defendant wants to exclude.  Can you
3  please tell me.

4  　　　　　MS. HERRINGTON:  Yes, your Honor.  Exclude their
5  expert from getting up and saying that -- either that
6  fingerprints are -- you know, collecting fingerprints are in
7  violation of BIPA or that -- anything about the statute, tying
8  the expert's testimony to the statute itself, which I don't
9  believe is proper for an expert.

10  　　　　　THE COURT:  But that's why I asked you to be specific
11  because pretty much anything an expert is going to do is going
12  to tie something to the statute.  And some of that may be
13  okay, and some of it may not be okay, which is why I want to
14  know specifically.

15  　　　　　So you don't want the expert to testify that this is
16  a violation -- that A, B, and C is a violation of BIPA.  I
17  would assume that pretty much everybody on the plaintiffs'
18  side knows that and knows they can't do it, and they're not
19  even going to try to elicit.  Is there something beyond that
20  that you're concerned about here?

21  　　　　　MS. HERRINGTON:  Precisely.  Their expert shouldn't
22  be able to offer an opinion about whether information
23  collected by the Remprex AGS system should actually constitute
24  biometric identifiers or information as defined by BIPA.

25  　　　　　THE COURT:  Okay.  So I just got to pull up -- I had

1     it here a second ago.  I just got to pull up Section 15 again.
2     There it is.
3            Okay.  Can somebody remind me where the definition in
4     the statute of biometric identifiers is?  What section is it?
5            MS. HERRINGTON:  Yes.  It's the section before.
6     Scroll up 10, section 10, definitions.  The first one is
7     biometric identifier, and biometric information is the second
8     definition.
9            THE COURT:  Okay.  So unsurprisingly, biometric
10     identifier has sort of a laundry list of -- not terribly long
11     laundry list, actually, but a laundry list of things that
12     constitute biometric identifiers.  And then biometric
13     information has a definition too.  So I guess the issue is --
14     and this is what I want the plaintiff to address is, is your
15     expert going to say that this thing that was collected is a
16     biometric identifier, as BIPA uses that term, or is the expert
17     going to say this is a fingerprint or this is a scan of a hand
18     or it's a voice print or it's an iris scan?  Or what are they
19     going to say about that?
20            MR. KANOVITZ:  For fingerprints, they say
21     fingerprints.  For biometric information, that's more of a
22     generalized term, and they don't intend to say, therefore, you
23     should find that it's biometric information under the act.
24     But they're going to be describing, you know, mathematical
25     ways of --

1       THE COURT:  It seems to me -- so the definition of

2   biometric information, which is the second paragraph of

3   section 10, which I'm looking at, it says:  "Biometric

4   information is any information regardless of how it's

5   captured, converted, stored, or shared" -- and here's the

6   definition -- "based on an individual's biometric identifier

7   used to identify an individual."

8       So, basically, I can imagine an expert getting up

9   there saying, the information -- this particular information

10  that I'm talking to you about, ladies and gentlemen, that I

11  summarized on this PowerPoint here, constitutes information

12  that would be used to identify an individual, and it's

13  biometric because it involves a fingerprint or fingerprint

14  data.  That much -- I have a hard time seeing -- hang on a

15  second.  This is the downside of doing this at home.  They're

16  cutting grass on either side of my house.  They just drove

17  past.  I'm going to close a window or two.  Give me a second.

18      I just want to make it clear I cut my own grass.  Not

19  that there's much to cut.

20      So tell me how you expect it to come in through the

21  expert, Mr. Kanovitz.

22      MR. KANOVITZ:  So the expert is going to talk about

23  the fact that they captured fingerprints.  He's going to talk

24  about the fact that, you know, fingerprints are in the

25  database and the equipment that they use.  When he talks about

1    what is classified as biometric information there, he's going

2    to talk about mathematical templates that correspond to the

3    fingerprints, and he could use the term "mathematical."  I

4    mean, he could use the term "templates" instead of

5    "information."  But in both of the expert's depositions, in

6    both of their reports, you know, they're using biometric

7    information as information that relates back to the

8    fingerprints.

9              THE COURT:  Okay.

10             MR. KANOVITZ:  Neither of them do I understand them

11   to be saying that it's my legal opinion that this meets the

12   definition of biometric information or the statute.  He's not

13   going to say that.

14             THE COURT:  Okay.  Ms. Herrington, or whoever is

15   going to argue this, are you hearing something in there that

16   you think runs afoul of the rules?

17             MS. HERRINGTON:  No -- no.

18             THE COURT:  That's kind of the take I took on it too.

19             I mean, I will say -- and I think everyone knows --

20   that under 704, opinions on ultimate issues aren't

21   objectionable for that reason alone.  There's some exceptions.

22   They don't really apply here.  But, I mean, I think this is

23   something that if there's -- if a question gets asked that

24   runs afoul of it, then I think the time to deal with it is

25   then.  I think everybody knows what the rule is.  And it kind

1   of sounds like the way it's going to be set up, it's not

2   likely to be a problem.  So I'm going to say that motion

3   number 8 is denied without prejudice to an objection at trial.

4           Aftereffect, remedial measures.

5           Okay.  The plaintiff argues the following.  This is

6   at least the way I understood it.  BNSF, after the lawsuit was

7   filed -- or some later point in time, doesn't have to be after

8   the lawsuit was filed in 2020 whatever -- cut the system off.

9   They stopped using it.  And that's relevant, according to the

10  plaintiff, to show who was in control of this system.  That's

11  the way I understand the argument.

12          Is that a relatively fair characterization,

13  Mr. Kanovitz?

14          MR. KANOVITZ:  That's a fair summary.  That's

15  control.

16          THE COURT:  Okay.  Talk to me about why on the

17  defense side you think that would not be a proper use under

18  Rule 407.

19          MR. DIAMANTATOS:  It's not a proper use under 407,

20  your Honor, because the plaintiffs' case has ample indicia

21  that they plan on putting in as it relates to control.  The

22  issue of us turning off the biometric data and leaving it off

23  to this day, in part, fueled by this lawsuit.  As your Honor

24  mentioned, we turn it off March of 2020.  The suit is filed in

25  May 2019.

1    That speaks directly to what Rule 407 prohibits, and
2   it doesn't squarely speak to the issue of control.  Therefore,
3   the subsequent remedial measure rule applies, and the jury
4   should not hear that it was turned off in March of 2020 and
5   remains off as we sit there in trial in the Dirksen Federal
6   building.
7    THE COURT:  Was there something else that was put in
8   in its place?
9    MR. KANOVITZ:  Yes.
10    THE COURT:  I'm asking, Mr. Diamantatos, what is it
11   that was put into place?
12    MR. DIAMANTATOS:  Biometric data is not being used.
13    THE COURT:  Okay.  So I don't -- it seems to me the
14   fact that BNSF, which everybody is going to know, entered into
15   a contract with Remprex to do this to begin with, the fact
16   that they terminated the contract, that doesn't seem to me
17   that that's terribly probative of much of anything.  It's
18   marginal probative value in addition to the other evidence is
19   I think, really minimal.  And if this was a 403 question, I'd
20   exclude it that way.  It just doesn't seem to me that it's
21   significant evidence to prove control.
22    I will say this.  This is really a caveat for the
23   defendant.  I guess, you know, I'm not going to say I didn't
24   know that the system had been turned off because it's possible
25   that over the three and a half years the case has been pending

1   it's been disclosed to me at some point in time, but I didn't
2   remember it.  I'll just make this observation.  I propose
3   something we talked about maybe 20 or 25 minutes ago.  This
4   would be a really good reason for you not to go really hard
5   and heavy on the question of safety and security.  Because if
6   you took it out, I mean, if somebody gets up and talks about
7   how we needed to have this biometric system for safety and
8   security reasons, you're getting perilously close to opening
9   the door to, well, that's not really true because we don't
10  have it now.  And, you know, the terrorists haven't won yet,
11  or something along those lines.
12          MR. KANOVITZ:  Judge, I think there's a
13  misunderstanding about the facts.
14          THE COURT:  Yeah.  Okay.
15          MR. KANOVITZ:  My understanding is the contract is
16  not terminated.  They simply told Remprex that they wanted
17  them to perform the contract differently, which is an indicia
18  of control.  And what BNSF did then --
19          THE COURT:  What's the differently?  What was done
20  differently?
21          MR. KANOVITZ:  BNSF then created an app on the cell
22  phone that says, you know, BNSF RailPASS is what it's called.
23  You know how cell phones allow you to scan your fingerprint.
24  So the fingerprint scan took place on the driver's cell phone
25  at that point, so that it never comes -- never leaves the

1    possession of the driver and, therefore, doesn't trigger BIPA.

2    And then that RailPASS app generates some kind of code or bar

3    code or something that then gets scanned.  That was all BNSF's

4    doing.  And Remprex continued to perform the contract.  They

5    just used the scan from the BNSF app instead of the scan of

6    the fingerprint directly into the kiosk.

7         THE COURT:  Okay.  Does somebody want to talk about

8    this on the defense side?

9         MS. HERRINGTON:  Yes.

10        Go ahead.  Sorry.

11        MR. DIAMANTATOS:  I'll just jump in, Judge, and I'll

12   defer to my colleague, Ms. Herrington.  But, number one, the

13   issue -- just to be sure, the issue of control only comes in

14   once your Honor rules on the vicarious liability issue.

15   Obviously, depending on how your Honor rules on that, I think

16   will be illustrative of how this issue comes out.  But,

17   importantly, the way that plaintiffs' counsel laid that out,

18   that's correct.  We still have our contract with Remprex.  The

19   issue of security and implementing it and the means by which

20   that's going to be put forth, that all has stayed the same.

21   Us agreeing that Remprex should shut down the biometric data

22   was in part because of this suit.  And that's why we feel it

23   falls squarely within the --

24        THE COURT:  You know, what Mr. Kanovitz said doesn't

25   really change my ruling on this.  I will say, though, that it

1   causes me to reemphasize the caveat that I gave you a second

2   ago, which was that, you know, people on the defense side had

3   best be very, very cautious and careful about how you argue

4   the safety and security issue because if it's tied to the

5   system as it existed before the change was made and there's

6   all this stuff about how we have to have -- I won't go into it

7   in more detail.  You start skirting pretty close to doing

8   something that is going to make the availability of other

9   mechanisms for doing the same thing that you actually used

10  relevant and admissible even despite 407.

11          MR. DIAMANTATOS:  We hear you loud and clear.

12          THE COURT:  I'm not changing the ruling.  I think

13  it's the right ruling.  But just, you know, the door could get

14  open, so just be careful.

15          Number 10 is motive.  I've already dealt with that.

16  I don't need to say anything more been that.

17          Number 11 the golden rule argument.  The plaintiff

18  doesn't dispute that one; so that one's granted.

19          Arguments about sympathy.  Yeah.  Okay.  That's fine,

20  but I think that's better left for a specific objection to a

21  specific point; so that's denied without prejudice to making

22  an objection.

23          Legal opinions of witnesses.  So my -- I guess my

24  thought on that is that you don't really say what legal

25  opinions you want me to exclude.  So I assume it had something

1 to do with the expert, and I think, if that's the case, we

2 probably talked that through well enough.  Is there anything

3 more that you had in mind that you thought was going to come

4 in on the defense side that you're trying to preclude here?

5         MR. DIAMANTATOS:  I think it does arguably, your

6 Honor, go to a lay witness, not just expert --

7         THE COURT:  Who is the lay witness?

8         MR. DIAMANTATOS:  The plaintiff in the case.  If he

9 says that, you know, my biometric data was being collected,

10 again, that's an issue that ultimately speaks to the legal

11 definition of biometric data as it relates to the BIPA

12 statutes.  But that's the --

13         THE COURT:  What you can do is you can rest assured

14 that if something like that comes out of a lay witness' mouth,

15 the jury will get an instruction from me that basically says,

16 that's a question for you to decide, not a question for the

17 witness to decide.  He's speaking as an ordinary person.  You

18 have to decide this based on the instructions that I gave you.

19 So I wouldn't worry too much about that.

20         Number 14, policies and procedures.  So let's see

21 here.  So, yeah, on number 14, so the response basically

22 says -- policies and procedures are kind of what the case is

23 about.  So is there some specific policy or procedure that the

24 defense thinks is going to come in that you are asking me to

25 exclude?

1    MS. HERRINGTON:  Your Honor, I guess I would say that
2    there are lots of policies and procedures, but they don't have
3    anything to do --
4        THE COURT:  Time out.  This is a motion in limine.
5    The motion in limine basically says, here's some evidence.
6    Here it is right here.
7        MS. HERRINGTON:  Yes.
8        THE COURT:  You've given me something that's so broad
9    that it could basically subsume the whole case, because the
10   whole case is about BNSF's policies and procedures in some
11   general way.  So I need something more specific than that.  I
12   don't have a problem with deferring this one to, you know,
13   specific, to specific testimony or exhibits at trial.  But --
14   that might make some sense because I could see it with a
15   little bit more context that way.  But in the form in which
16   the motion was filed, it doesn't really tell me much.
17       MS. HERRINGTON:  It would be fine to defer this.  As
18   far as what the case is about, it's about whether we collected
19   biometric data in violation.
20       THE COURT:  I understand.  Whether you did that has
21   to do with your procedures.  And it has to do with your
22   policies.  So that's why the motion flipped the bread.
23       MS. HERRINGTON:  Okay.  Fair enough.
24       THE COURT:  It's denied without prejudice to making
25   objections to certain points.

1     The last thing about the number of lawyers.  First of
2   all, you're not going to be able to have 20 people up there.
3   We're going to talk about that when we talk about logistics.
4     So comment on the size of the law firms or the number
5   of lawyers is excluded for both sides.  If something
6   happens -- the plaintiff is expressing some concern in the
7   response about opening the door.  If, you know, BNSF comes in
8   and basically says, we're just a poor country railroad that
9   doesn't have any money, then, you know, maybe you can ask me
10  at sidebar, you know, to let something in, but I don't expect
11  that that's actually going to happen.
12    So that one is denied without prejudice in making
13  objections.
14    Now we're to the big Kahuna -- that would be, for the
15  court reporter's benefit, K-a-h-u-n-a, I believe is the
16  correct spelling of Kahuna.
17    So the vicarious liability thing, which is
18  defendant's motion number 1.  So let me just make a comment
19  first.  I don't agree with the proposition that vicarious
20  liability has to be alleged specifically.  So point A under
21  this, subpoint A, I just don't think carries the day.
22    As to the rest of it, based on the response, it's not
23  clear to me whether the plaintiff is actually claiming
24  something that I would categorize as vicarious liability;
25  namely, that BNSF is responsible for what Remprex did and did

1  not do because they hired Remprex.  That's the way I

2  understand vicarious liability.  Because I hired you, I'm

3  responsible for what you did.  So it's like if I'm a trucking

4  company that hires a truck driver, I'm responsible for you if

5  you drive negligently.

6        It's not clear to me that that argument is being made

7  by the plaintiff -- or is going to be made by the plaintiff.

8  Let me just ask that first to be sure.

9        Is the plaintiff going to be arguing -- is the

10  plaintiff intending to argue that because BNSF hired Remprex,

11  it's responsible for what Remprex did or didn't do?

12        MR. KANOVITZ:  There are two arguments, and that

13  would be one of them.

14        THE COURT:  All right.  So there's pretty much no

15  controlling law on this.  Right?  Nobody has suggested that

16  there's any controlling law in this.  There's a couple of

17  district court opinions that say things about it, not on

18  point.  And I'm just going to tell you that principles of

19  federal statutory interpretation -- I think the defendant

20  cites the securities cases about secondary liability.  Yeah,

21  I'm not sure that really governs here.  I will tell you that

22  I'm not terribly comfortable with making a ruling about this

23  at the moment based on the briefing I've gotten.  And I say

24  that knowing, obviously, that I limited you in pages.  And so

25  I couldn't devote unlimited space to this.

1    But I would really like to see a little bit more on

2  this, not here right now, but I'd like to see a little bit

3  more on this. We've got, you know, four weeks before the

4  trial is going to start. And so we've got a little bit of

5  time to do that.

6    The thing that came immediately to mind for me --

7  although, again, it's a federal statute, and Mr. Kanovitz

8  probably is going to have some familiarity about this. I had

9  to deal with a similar issue once a number of years ago in a

10  TCPA case that I think Mr. Kanovitz or his firm were involved

11  in. It was called -- oh, crap. I'm blanking on his name.

12  The one involving the cruise company, cruise ship.

13    MR. KANOVITZ: *Birchmeier v. Carnival Cruise.*

14    THE COURT: The correct pronunciation turned out to

15  be Birchmeier, it turns out.

16    Yeah, so I wrote something about vicarious liability

17  there. Now, I have not looked back at that opinion, but I

18  have some memory. A difference there would be that I think

19  there was some guidance, some federal regulations about what

20  might be under the general heading of vicarious liability and

21  different routes to get there. But the Seventh Circuit may

22  have eventually said something about that in the TCPA context.

23  I'm not saying it definitely would govern here, but it's

24  something that people might want to look at. I guess what I'm

25  telling you is that I would really like to see a little bit

1   more on this.

2          It's going to come up more than one place.  It's
3   going to come up in the jury instructions.  And as I'll talk
4   about in a few minutes when we get to that point, my practice,
5   as probably most of you know, is to give the jury instructions
6   at the beginning of the case about what has to be proven both
7   for the claims and defenses, not just at the end.  So it's
8   going to come up as an issue before we get all the way through
9   the trial.  And then, obviously, it's an issue on the
10  admission of evidence too to some extent, but it's mostly an
11  issue about argument.

12         So I guess I'd like to see a little bit -- here's
13  what I'm going to ask you to do.  I'm going to ask each side
14  to give me, let's say, by next Monday -- not because I want to
15  ruin your weekend, but because it just gives you a little bit
16  more time.  By next Monday, no more than ten pages just on the
17  issue of what we're generally calling vicarious liability.  So
18  Mr. Kanovitz, a second ago that's one of the two routes.  In
19  other words, A hired B; therefore A is responsible for what B
20  did.  What's the second route?

21         MR. KANOVITZ:  So I really see it as three routes,
22  and the vicarious liability is sort of the outside scope of
23  the second route, which is, under Illinois law, a corporation
24  can only act through others.  And so an act of someone that
25  you ask to do an act on your behalf is an act of BNSF itself.

1 And the Illinois legislature would have had that bottom line
2 when it passed the statute. So that's really 2/3. But I do
3 think that they're different animals.

4         THE COURT: Is there a third point too?

5         MR. KANOVITZ: Yes, there is a third point.

6         THE COURT: Go ahead with the third point.

7         MR. KANOVITZ: Which is that an entity violates the
8 statute -- it doesn't have to do all the collection itself.
9 It has to take an active step towards collection, and that's
10 the term that's used under Illinois law is "active step." And
11 hiring someone to do that thing for you, our contention is, is
12 an active step.

13         THE COURT: Got it. Okay. So here's what I want.
14 No more than ten pages by next Monday. It's not a blind
15 target for the defense at this point, so you basically just
16 heard plaintiffs' counsel kind of articulate the alternative
17 theory. So that's what I'd like to get from you by, let's
18 say, 5:00 o'clock on Monday so nobody feels compelled to wait
19 until 11:59 so they can see what the other side files. So
20 5:00 o'clock central daylight time is the cutoff.

21         So we got a couple of other things to deal with, and
22 they are the motions to strike.

23         Just a passing reference, they are motions in limine,
24 and so they were subject -- I'm not going to insist on that
25 here because I'd have to deal with this anyway. It makes

1  sense to deal with it now.  It's not like I got twice the
2  length or anything like that.
3         So, basically, here -- so it breaks down into two
4  issues.  One has to do with the plaintiffs' expert.  That's
5  Mr. Caruso.  And the other has to do with these other
6  witnesses, some of which are with third parties.  I think most
7  of those are Remprex people.  And some of those are class
8  members.
9         So let's talk about the class members first, and I
10 have some questions for the plaintiff to start off with.
11        So in the response, you basically narrow it down to
12 three people.  And so here's what I want to know.  What's the
13 thrust of the direct examination on those people?
14        MR. LOEVY:  It would be limited, your Honor.  I think
15 it would be limited to the same way that Mr. Diamantatos said
16 he wants to explain what happened and show what happened.  I
17 think the plaintiffs want to, from their perspective, explain
18 what happened.
19        THE COURT:  In other words, I drove into the lot, and
20 this is what happens.  This is what I'm asked to do.  This is
21 what I'm told to do.
22        MR. LOEVY:  And this is what I wasn't told.
23        THE COURT:  Were you told that this was going to be
24 stored in fact?  Were you given a release?  Was this
25 happening?  Did that happen?  That kind of thing?

1          MR. LOEVY:  Right.

2          THE COURT:  Okay.

3          MR. LOEVY:  And I don't think we would call all

4    three, your Honor.  I think two.  And the second one is a

5    class member in the state court case.

6          THE COURT:  The court case, okay.

7          Separate question having to do with the third-party

8    people.  And I don't know if it's seven or nine, but it's

9    something in that vicinity.  And I know these are all listed

10   as "may call" witnesses, but which of those, as you sit there

11   right now, understanding we're four weeks out from the trial,

12   which of those are you actually intending to call?

13         MR. LOEVY:  Well, you hit it on the head, your Honor,

14   that we were trying to be prophylactic and protect ourselves.

15   Having been caught not ready to answer that question, you

16   know, what we would propose is that you give us a short amount

17   of time to identify two, and that we do that.  And then they

18   get deposed, if the defendants want to depose them.  Our

19   position, obviously, is that all seven are in play.

20         THE COURT:  Yeah.  And you've made arguments along

21   the lines of their identity was known, et cetera, et cetera.

22   You don't have to re-argue that.  Okay.  So I'll come back to

23   that.

24         The other question I need to ask you -- no, I don't

25   need to ask you anything about the expert.  That's something I

1    need to ask the defense.

2            Okay.  So let's break it down kind of the same way,

3    starting off with the, you know, beyond the named plaintiff in

4    this case, maybe one or two other -- hang on one second.

5            The one or two other class members that the plaintiff

6    wants to call for what's described for the purpose of

7    essentially saying, this is -- when I would go into the lot or

8    the yard or whatever you call the thing -- I guess it's the

9    yard -- this is what would happen, and I didn't get, you

10   know -- I didn't get a disclosure.  I didn't sign a release,

11   and I wasn't told that this was happening and so on.

12           And I completely get that these people aren't listed

13   in the 26(a)(1)s.  I completely get that.  So you don't have

14   to repeat that.  What I want to find out is -- it's likely to

15   be pretty straightforward testimony, particularly when there's

16   not a claim of actual damages in the case.  Nobody's going to

17   be getting up there and saying, you know, I lost my -- my

18   identity got stolen as a result of this, or I lost credit, or

19   anything like that.  It's historical testimony about what

20   happened going in and out of the yard.  So articulate for me

21   the prejudice if I let them do it now and let you take a

22   deposition.

23           MS. HERRINGTON:  Sure.  I guess I would start with

24   this is cumulative.  The reason why there's a named plaintiff

25   is because that's exactly what he's going to testify about.

1   We took his deposition.  He's going to say exactly what they

2   just described these other I guess now two people are going to

3   say.  We don't -- as you pointed out, we have not been able to

4   depose these people.  We just found out their names last week.

5   It will be cumulative.  It will be prejudicial.  If they

6   wanted to make these folks named plaintiffs, they could have.

7   They elected to have one named plaintiff, Richard --

8           THE COURT:  Right.  So there's no rule that says only

9   the named plaintiff gets to testify and none of the class

10  members can't.

11          MS. HERRINGTON:  Sure.  But there's rules that say we

12  get to know who the other people are.

13          THE COURT:  Yeah.

14          MS. HERRINGTON:  We didn't even know.

15          THE COURT:  Like I said, you don't have to repeat the

16  "I don't know" part.

17          MS. HERRINGTON:  Sorry.

18          THE COURT:  I got that part.  I'm asking about the

19  prejudice part.

20          MS. HERRINGTON:  Well, I suppose the prejudice then

21  would come to, you know, if we're then going to be deposing

22  these folks on the eve of trial, despite the fact that, you

23  know, we have lots of other things to prepare about.  And we

24  don't know exactly what these people are going to say.  Is

25  there something new that they're going to testify about that

1   leads to additional discovery we need to do?  I think it's
2   highly prejudicial to just insert two names out of 44,000.  We
3   never could have imagined that they'd pluck two out that are
4   going to say whatever they are going to say and have to depose
5   them on the eve of trial.  So I think it's prejudicial.
6           THE COURT:  Talk to me about the other third parties.
7   The argument on these folks is that they were otherwise made
8   known, admittedly not through the 26(a)(1)s, but their
9   relevance was known to everybody through other means in the
10  case.  Talk to me about that.
11          MS. HERRINGTON:  Sure.  I disagree with that.  If you
12  look at the actual factual record, these people's names and
13  the depositions that they cited were maybe named once.  A
14  couple of them were not named at all.  Teresa Runge was never
15  even discussed during a deposition.  Lucas Krawczyk was on a
16  calendar invite, and his name was read into the record.  I
17  mean, this was not -- were any of these folks --
18          THE COURT:  Who was the person you said?  Teresa
19  somebody?
20          MS. HERRINGTON:  Teresa Runge, R-u-n- --
21          THE COURT:  Okay.  I'm looking at it.
22          MS. HERRINGTON:  Okay.  We didn't find any deposition
23  citations for her.
24          Several others on this list were just -- their names
25  were mentioned.  I might add they're all Remprex folks.  So in

1    a lot of the cases they cite, you know, they cite cases where

2    somebody actually is with the party.

3           These are former Remprex and I believe one current

4    Nascent employee.  As far as the documents, if you look at the

5    BNSF documents that were produced, most of them, they weren't

6    even mentioned in the BNSF documents.  So they're now working,

7    you know, just on the eve of trial, they're looking at the

8    Remprex production, plucking names out.  I don't know where

9    these people are.  We don't know what they do.  Are they

10   within the subpoena power?  If we get to depose them, can we

11   even issue a subpoena?  I don't know.  Maybe Mr. Loevy will

12   say he's got them under his control.

13          THE COURT:  I'll ask you a specific question about

14   one of them.  So, first of all, what is Nascent, as you

15   understand it, how they fit in?

16          MS. HERRINGTON:  They are the creator of this

17   technology, and they license --

18          THE COURT:  Got it.  I have a specific question about

19   the one person from Nascent who's identified here.  Her name

20   is Lynda, with a Y, Parillo, P-a-r-i-l-l-o.

21          MS. HERRINGTON:  Yes.

22          THE COURT:  Says in the plaintiffs' response that the

23   defendant's expert interviewed her in preparing the report.

24   And so the defendant was obviously aware that she had

25   Ms. Parillo; that is, had relevant information for the

1  lawsuit.  So what about that?

2         MS. HERRINGTON:  That's fair.  That's fair.

3         THE COURT:  Do we know where Ms. Parillo is?

4         MS. HERRINGTON:  I don't know.  I believe she's out

5  east somewhere.  I think Nascent is --

6         THE COURT:  Here's my question for plaintiffs'

7  counsel, not about Ms. Parillo but about the Remprex people.

8  What are we talking about here?  Are we talking about you're

9  actually planning to bring somebody in at the trial?  Are

10 these people within the subpoena power?  Are any of them?

11        MR. LOEVY:  And my co-counsel is -- correct me if I'm

12 wrong.  But I believe the people we listed are Illinois based,

13 to the best of our understanding.  They are within the

14 subpoena power of the Court.

15        THE COURT:  I'll give whoever co-counsel you are

16 referring to as a chance to correct you if you're wrong.

17        MR. GERBIE:  Your Honor, I believe counsel is right

18 that the Remprex employees are Illinois based, within

19 100 miles of the courthouse.

20        THE COURT:  So I'm just going to ask this.  And I

21 don't care who answers it on the plaintiff side.  Why didn't

22 somebody take any of these depositions before?  Or why didn't

23 you disclose these people?  It's not about taking the

24 depositions.  You want to disclose the witnesses.  How come

25 they weren't disclosed before?

1    MR. LOEVY:  I think we'd have to concede, your Honor,
2  that they should have been.  I will say, in answer to your
3  question, if you look at Exhibit G, for example, counsel
4  mentioned Runge.  Exhibit G is an email exchange where they're
5  talking about deposing Runge.  So her name had come up in the
6  context of counsel.  So in that context, it's a little bit of
7  a formality to say, well, she wasn't on our Rule 26 disclosure
8  if she was discussed between counsel as a witness in the case.
9  It's form over substance.
10    MS. HERRINGTON:  I'm sorry.  I don't want it to sound
11  like I was misrepresenting.  To be clear, she's not mentioned
12  in any depositions.  And that Exhibit G, we asked plaintiff --
13    THE COURT:  That's what I understood you to say.
14  That's what I got.
15    MS. HERRINGTON:  Okay.
16    THE COURT:  Okay.  And so what are you intending to
17  try to elicit from these Remprex folks?
18    MR. LOEVY:  Their names are on some of the documents
19  that are our exhibits.  You know, to tell you the truth, your
20  Honor, I don't think this is going to be necessarily an
21  important issue because I think there's -- you know, we'll be
22  able to establish the foundation through a record keeper,
23  et cetera.  But their names are on some of the documents.  We
24  don't want to be boxed out.  As usual, this might be a lot of
25  to do about nothing.

1    THE COURT:  If what we're talking about here is
2  needing foundations laid for exhibits for business records, I
3  just want to be -- to kind of put a marker down on that one.
4  I'm going to venture a guess -- and it's not really a guess;
5  it's a highly educated guess -- that pretty much everything
6  that got produced in this case was a business record within
7  the meaning 803(6) of somebody.  And I haven't gone through,
8  because I don't typically before the trial go through all of
9  the exhibit lists, because usually they're way too long and
10  include stuff that people aren't going to put in.  I haven't
11  looked through there to see if there are foundational
12  objections to exhibits.

13    Has the defense made foundational objections to any
14  of the Remprex-related exhibits?

15    MS. HERRINGTON:  I believe there are some, yes.

16    THE COURT:  Why?

17    MS. HERRINGTON:  Well, because the people are not
18  going to be -- well, we didn't think are going to be
19  witnesses.  And if they authored something, there is no
20  foundation.

21    THE COURT:  Okay.  And how did the documents get into
22  the case?

23    MS. HERRINGTON:  Sure.  They were subpoenaed by
24  plaintiff.  So if there's internal documents between Remprex
25  folks, we can't possibly say there's a foundation.

1    THE COURT:  Come on, seriously, Ms. Herrington.

2   You've tried more than one trial in your life.

3    MS. HERRINGTON:  Sure.  But they're third-party

4   documents.

5    THE COURT:  Fine.  Here's the ruling.  If all we're

6   talking about is foundation stuff, and that's kind of the --

7   as it relates to the Remprex people, and it's kind of the gist

8   of what I got from Mr. Loevy, it would be virtually impossible

9   for me to determine that there is any cognizable harm to the

10   defendant from the late disclosure.

11    So here's what you're going to do.  And "going to,"

12   it means going to.  You're going to either find a way to deal

13   with the foundational objections to the Remprex exhibits, if

14   plaintiff wants to call these people in order to lay the

15   foundation for or I'm going to let them call some record

16   keeper or record keepers from Remprex that can lay the

17   foundation.  And any of these people could qualify as a record

18   keeper.  There's no formal title that's required in that

19   regard.  We all know what's going to happen if that happens.

20   It's going to be a complete waste of the jury's time and

21   effort, and it's going to be a complete waste of your time.

22   So figure out a way to deal with the foundational objections.

23    My ruling on the class members is that given the

24   nature of the testimony, I think with a deposition, I'm going

25   to let you call up to two people in addition to the named

1  plaintiff, but only if that person is presented for a

2  deposition, which is not to exceed 90 minutes.  And if you use

3  the whole 90, that means you've probably wasted 45.  By next

4  Wednesday, next Wednesday being the -- whatever that is, the

5  13th.  Next Wednesday, it's the 14th.

6  Then if what happens is that if the defendant can

7  come back to me with a straight-faced legitimate motion or

8  argument saying, well, now based on what we've heard in this

9  deposition, if we had known this person was going to be

10  called, we would have done A, B, and C, and you convince me

11  that it's actually on square, then I'll consider excluding

12  them.  But I wouldn't put any -- you know, I wouldn't bet the

13  ranch on that one.  But I'll leave that open as a possibility.

14  So that's -- the only thing we got to talk about is

15  Caruso, and my question is for the defendant on that.  Let me

16  just get back to that part of my notes.

17  Okay.  So the argument on Caruso -- oh, and by the

18  way, the plaintiff can call the person that the defendant's

19  expert interviewed.  I forget her name.

20  MS. HERRINGTON:  Yeah.  Okay.

21  MR. LOEVY:  Your Honor, we may have to call that

22  person by video.  My understanding is she's out of the

23  jurisdiction.

24  THE COURT:  Okay.  You just figure out if you really,

25  really need her.  We can do all that kind of stuff these days

1  without too much trouble.  Let's not do it unless it's really,
2  really needed.

3       Okay.  So on Caruso, the plaintiffs' argument in
4  response to the motion to strike, just in very 30,000-foot
5  terms, is that the material, the information in question was
6  all disclosed in substance within the confines of his report
7  and his deposition.  So address that, if you would, on the
8  defense side.

9       MS. HERRINGTON:  Absolutely, your Honor.  That is
10 absolutely inaccurate.  Sitting here right now, they've got
11 this new theory where they're talking about biometric
12 captures.  That was not the subject of the plaintiffs' expert
13 report, his deposition, or the declaration in class
14 certification.  Yes, he mentioned biometric captures, but the
15 testimony he gave, he gave an expert report that said there
16 were 54,000 class members.  He was wrong about that.  After
17 our expert came in, gave him a revised number, he accepted the
18 revised number.  As far as the number, it's 44,000 class
19 members.  And that's what your Honor certified.  They've got
20 this new theory, this biometric captures, that they're going
21 to say, well, you know, here is this number.

22       But I have to tell you, I don't know what that number
23 is.

24       THE COURT:  I was just going to ask.  What's the
25 number?

1      MS. HERRINGTON:  No one knows.  And you know what?

2  It changes the complexity of this case dramatically for the

3  client, dramatically.  So we go from 44,000 folks to we're

4  going to have him come up with some number.  I mean, we would

5  need an expert report --

6      THE COURT:  Slow down, slow down, slow down.  Time

7  out a second.  I want to make sure I'm following you.

8      So there's 44,000 class members.  And what you're

9  saying is that your understanding was that the damages that

10  are sought are going to be 44,000 times whatever the number

11  is.  So far right?

12      MS. HERRINGTON:  If we're found liable, that is.

13      THE COURT:  Right.  You heard the argument.

14      MS. HERRINGTON:  Yes.

15      THE COURT:  Now what you think you're being told is

16  the number is not 44,000; it's a higher number based not on

17  individuals but on number of times their data was captured.

18  Am I understanding you right?

19      MS. HERRINGTON:  Precisely.

20      THE COURT:  And you're telling me you don't know what

21  that number is.

22      MS. HERRINGTON:  Precisely.  That was never part of

23  the expert --

24      THE COURT:  "Precisely" is the equivalent of yes,

25  which is all I was looking for there.

1        And you can't derive it from anything that's in

2  Mr. Caruso's report.  In other words, you can't take this

3  number over here and multiply it by this number over here or

4  back out that number over there and figure out what it is.

5        MS. HERRINGTON:  We cannot.

6        THE COURT:  As far as you know, at least.

7        MS. HERRINGTON:  We cannot.

8        THE COURT:  Okay.  Stop right there.  That's the

9  point I want the plaintiff to respond to.

10        MR. KANOVITZ:  Judge, first of all, the 44,000 number

11  is his extraction of the unique number of people who were --

12  had their biometrics extracted.  He described the process of

13  reaching that number, which included the fact that people were

14  fingerprinted at different locations at multiple times.

15  Our --

16        THE COURT:  Basically, that's what you put in your

17  response.  He basically deduplicated the data.

18        MR. KANOVITZ:  That's correct.  So he's made clear

19  that the data is the data and that the database itself records

20  every single time that fingerprint was captured at

21  registration.  Now, so we disagree with their criticism of

22  Caruso.

23        We also disagree with their attempt to limit us to

24  proving the number of violations only through Caruso.  There

25  will be other witnesses.

1      THE COURT:  I don't think that's the argument here.
2   The argument that's before me is a motion to strike testimony
3   from Caruso.  Okay?  There's no motion in front of me, that
4   I'm seeing at least, that says limit the plaintiff to 44,000
5   times X.  And in any event, that's not what I'm dealing with
6   right now.  I'm just dealing with Caruso.

7      So here's my question for you.  Can you find in
8   Mr. Caruso's report somewhere the bigger number that he
9   started off with before he deduplicated?

10     MR. KANOVITZ:  In his original report, you can find
11  it -- I don't remember the exact number, but it's in the 50s.
12  It's 56- or --

13     THE COURT:  The number Ms. Herrington referred to
14  herself a couple minutes ago.

15     MR. KANOVITZ:  Which she said he admitted he was
16  mistaken.  He did not say he was mistaken.  What happened was
17  their expert came in and said, I used a different
18  deduplication procedure.  So then Mr. Caruso said, if I use
19  their expert's deduplication procedure, here's what I get to.
20  But that 56- or 58- or whatever it is, that represents
21  individual scans.

22     THE COURT:  So that number is still out there.  The
23  56K is still out there somewhere.

24     MR. KANOVITZ:  Yes.

25     THE COURT:  Okay.  Whatever that is, it sounds like

1    what we're talking about now is a bigger number than either

2    one of those.  Is there something in Mr. Caruso's report or in

3    his deposition from which somebody could figure out what the

4    bigger number was that he deduplicated from either to get down

5    to 56,000 or to 44,000?

6                MR. KANOVITZ:  Yes.  He describes the databases that

7    he received, which both sides' experts used.  He describes

8    what the contents of those are, and he describes that -- and I

9    don't remember which particular database it was -- that this

10   database has a list of each scan that was taken.

11               THE COURT:  Okay.  So let's kind of get down to the

12   nitty-gritty here.  So, look, if the number -- if the number

13   he's going to say is 57,000, it might mean one thing.  If the

14   number is 157,000 or 257,000 or 357,000, it might mean

15   something else.  Altogether, so what's the number he's going

16   to say?

17               MR. KANOVITZ:  He's going to say the 56 as a number.

18               THE COURT:  I get that.  What's the bigger number

19   he's going to say, the non-deduplicated number?

20               MR. KANOVITZ:  I don't know the answer to that,

21   Judge.

22               THE COURT:  How can you not know the answer to that?

23   Ask him --

24               MR. KANOVITZ:  I'm not prepared --

25               THE COURT:  Do you have a sense what multiple it is?

1  Is it twice as much?  Is it five times as much?  Is it ten

2  times as much?

3          MR. KANOVITZ:  Can I let other counsel answer --

4          THE COURT:  I don't care who answers it.  It doesn't

5  matter.  Fine.

6          MR. KANOVITZ:  David, are you able to?

7          MR. GERBIE:  Yeah.

8          Your Honor, our expert is prepared to testify as to

9  the total number of biometric captures for the specific class

10  in this case that was certified.  His report also does

11  specifically identify that for each driver, three fingerprints

12  at a minimum were taken from each driver.  So at a minimum --

13          THE COURT:  Time out.  Is the testimony going to be

14  it's not 40- -- let's just take the 44- as a placeholder --

15  it's not going to be 44-; it's going to be 44- times the index

16  finger, the middle finger, and whatever the third one is

17  called?

18          MR. GERBIE:  Yes, your Honor.

19          THE COURT:  The ring finger.  That's what that one is

20  called.  Okay.

21          MR. GERBIE:  I expect that he'll testify that for

22  each driver, there's at least three fingerprint captures in

23  associated biometrics.

24          THE COURT:  Is that in his report?

25          MR. GERBIE:  Yes, your Honor.

1      THE COURT:  Okay.  So, Ms. Herrington, you're shaking
2   your head.  Is it in his report that for each driver, three
3   fingerprints are captured.
4      MS. HERRINGTON:  I'll go back --
5      THE COURT:  I'll just tell everybody.  This is a
6   question with an answer.  I don't necessarily expect everybody
7   to have the entire report committed to memory, but it's a
8   question with an answer.
9      So, Mr. Gerbie, do you know what the big number is
10  going to be, the one that we're talking about here now that
11  the defense wants to exclude that you want to put in and
12  nobody seems to know what it is?
13     MR. GERBIE:  Well, it will depend on how the Court
14  interprets this question of biometric identifier, meaning
15  fingerprint versus biometric information, meaning
16  mathematical --
17     THE COURT:  You want the biggest possible.  There's
18  all sorts of permutations.  I get that.  What's the high end?
19     Ms. Herrington, stop shaking your head.  It's
20  distracting.
21     MS. HERRINGTON:  Sorry.  Sorry.
22     MR. GERBIE:  As I understand, the biggest possible,
23  somewhere in the neighborhood of 300- to 600,000.
24     THE COURT:  Okay.  So look -- let's just kind of talk
25  about this in kind of very realistic terms.  So, first of all,

1  I'm not going to -- nobody's asked me to make a ruling that
2  Mr. Caruso was tied to the 44,000 figure as opposed to the
3  56,000 if the 56,000 was in his report.  That's a subject for
4  cross-examination.  If he goes with the 56, the defense can
5  cross-examine him, you know, about how, you know, you backed
6  off that number.  Your methodology was wrong or whatever.
7  That's not what we're talking about here.  We're talking about
8  something different.
9       The way as I understand it the plaintiff is going to
10  argue this case is that whatever the number is of captures,
11  we'll just call it captures, you multiply that by either a
12  thousand if it's negligent or 5,000 if it's reckless.  Okay.
13  So if the number goes up, as Mr. Gerbie said a minute ago --
14  and I recognize that there are some intervening issues in
15  there that might have to be decided that might affect the
16  bottom line number.  But if the number goes up in the way that
17  Mr. Gerbie suggested a second ago -- hang on a second.  I just
18  want to make sure I'm getting it right.  Oh, I lost the feed.
19  Dang.  Okay.  There it is.
20       300- to 600,000 is what the court reporter wrote
21  down.
22       So we've now multiplied -- let's just talk 44,000 --
23  let's say 56,000 and multiply it by a thousand.  That's an
24  easy one.  It's 56 million.  That's an easy one.  If we now
25  are talking about not 56,000 but five or six or ten times

1   that, it's not 56 million.  It's potentially 560 million.

2   That's a big deal.  And even if it's -- even if it's near

3   200 million, that's a big deal.  That's a big difference.

4          And when Ms. Herrington says that this has a very

5   significant impact on, you know, how the case gets approached,

6   that's -- that's a pretty solid argument.  Of course it does.

7   I mean, you know, $40 million is not walking around money.  Or

8   $56 million is not walking around money.  But sure as heck

9   $560 million is anything but walking around money, even for a

10  railroad.

11         So I guess I see a problem if what we're talking

12  about here is Mr. Caruso is not -- it's not that Mr. Caruso

13  did this math or said this is how the math gets done, but

14  rather he's now going to say this is how the math gets done.

15  And the way you can figure out those numbers is you dig into

16  the bowels of his report and the data that accompanied his

17  report and the data that he relies on, and you can figure it

18  out too.  That's not really the way it's supposed to work.

19         It's not supposed to happen that an expert says that

20  the number of violations of the law was 56,000 in his report

21  and in his deposition, and then he comes in at trial and says

22  it's 560,000.  And it's not supposed to happen that way, and

23  it's not going to happen that way.  That's the bottom line.

24         MR. GERBIE:  Your Honor, may I be heard on this

25  briefly?

1     THE COURT:  I read a whole motion in limine, and I
2   heard arguments from three lawyers, maybe two on this.  So you
3   have been heard more than briefly.  If you have one more
4   comment to make, go ahead.
5     MR. GERBIE:  I do.  Your Honor, this is data that's
6   been in defendant's possession.  It's been in their possession
7   for years.  It's been in their possession --
8     THE COURT:  Why even bother with the report, then?
9     MR. LOEVY:  Our point, your Honor, is that, you know,
10   we're arguing whether Caruso can say it or not.  Our point is
11   this is objective fact, and we're going to prove it at trial
12   when Caruso --
13     THE COURT:  I'm talking about Caruso's testimony.
14   I'm talking about Caruso's testimony.  I made that clear at
15   the beginning.  The motion I have is a motion to strike
16   testimony from Caruso.  Okay?  So if you want to not go with
17   what Caruso says on this and take this bit of evidence
18   combined with this bit of evidence combined with this bit of
19   evidence combined with your legal theory and argue that it's a
20   different number, I haven't been asked to preclude you from
21   doing that -- okay? -- in this motion.
22     I am looking at a motion that says, in its title and
23   in its body, "strike plaintiffs' expert from offering
24   undisclosed expert opinions at trial."  And that motion is
25   granted on this.  Okay?  I'm granting it because it's not

1  justified for the reasons that I just described.  I'm not
2  dealing with some other motions at this point.
3          Okay.  I think I've now dealt with all the motions.
4          So we're going to talk about other stuff.  Carolyn,
5  would you like five minutes?
6          THE REPORTER:  Sure.
7          THE COURT:  She said sure.  She typed "sure."
8          Everybody take five minutes.
9    (Short break.)
10          THE COURT:  So there's one part of the motion
11  relating to Mr. Caruso -- whoops.  There we go.  There we go.
12          There's one part of the motion relating to Mr. Caruso
13  that I did not deal with.  It's the other part.  It has to do
14  with -- let me just make sure that Carolyn is back on.  Yeah,
15  she is.
16          It has to do with his testimony -- the heading is
17  "Testimony about BNSF's use of the database."  And the
18  response basically says that -- this is page 7 and the top of
19  page 8 of the response.  And, first of all, it says, well,
20  you're misinterpreting the testimony.  He's not saying what
21  you say he's going to say.  And what he is going to say is all
22  in his report.
23          So I need somebody on the defense side to deal with
24  that.  Sorry for not picking that up before we took the break.
25          MS. HERRINGTON:  No problem.  And if their position

1    is he's not going to testify about anything beyond what he

2    said in his report, that is fine.  The way that the pretrial

3    disclosure or the pretrial order draft read, it was that he

4    was going to opine about how BNSF had access, which was not in

5    his report.  Rather, in his report he talks about the fact

6    that there are some BNSF email addresses that he located, but

7    nothing about whether or not someone from BNSF actually ever

8    did access the Remprex database.

9           THE COURT:  Okay.  Can somebody on the plaintiffs'

10   side respond to what Ms. Herrington just said?

11          MR. LOEVY:  It sounds like a misunderstanding, your

12   Honor.  We stand on what we wrote.  That's not what he's

13   trying to do.

14          THE COURT:  Okay.  What is it that he is trying to

15   do?

16          MR. LOEVY:  He had access.  And maybe I'll let Mike

17   or Mr. Gerbie --

18          THE COURT:  Go ahead.

19          MR. GERBIE:  Yes, your Honor.  His report does

20   address BNSF's access to the data.  And that is relevant

21   because the emails identified that were BNSF employee email

22   addresses were in a table within the database which identified

23   them as auto gate system users.  Meaning these are BNSF

24   employees --

25          THE COURT:  What's he going to say about this?

1          MR. GERBIE:  He's going to say that these BNSF
2    employees, people with these BNSF email addresses, were
3    registered users of the system.
4          THE COURT:  Okay.  Now you've heard it,
5    Ms. Herrington.  Problem from your perspective or not?
6          MS. HERRINGTON:  I don't recall Mr. Caruso's report,
7    but if that is what it said, we are fine with him testifying
8    consistent with his report.  I don't recall it saying that,
9    but I would like a chance to go back and look now that I heard
10   what Mr. Gerbie is saying.
11         THE COURT:  Okay.  I mean, I'm looking.  What he said
12   is pretty much what's said on page 7 of the response that was
13   filed, you know, last week.
14         MS. HERRINGTON:  Let me just pull that up.
15         I just -- honestly, without going to the expert
16   report, I don't recall if he said --
17         THE COURT:  The second part of the motion is denied.
18   If I've just done something wildly wrong, then I'll get a
19   motion to reconsider.  Okay.
20         MS. HERRINGTON:  Thank you.
21         THE COURT:  Let's talk about other stuff.  So, first
22   of all, our start date, as I said, is going to be next -- not
23   next -- October the 4th, which is a Tuesday.
24         So the way that this will work is that I will get to
25   you, probably about a week before that, a draft of the written

1   questionnaire, maybe a little bit more than a week before
2   that, a draft of the written questionnaire that the jurors
3   will fill out.  And if you've tried a case in front of me
4   before, which I know some of you have, you'll know what this
5   looks like.  Basically, it's two sides of a page.  The front
6   side is essentially basic background information about the
7   person, where they live, where they work, and people that live
8   in their household, what their hobbies are, and so on.

9           The backside tends to be more pointed questions.  I
10  mean, it might be have you ever had your fingerprints scanned?
11  Or it might be have you worked for any of the companies
12  involved in this case, other things like that.  I'll get those
13  largely from your submitted voir dire questions.  Those are
14  just yeses and nos for the most part, and they're used as a
15  basis for oral voir dire.

16          We'll have the jurors -- because we're still in the
17  mode where the jurors are coming in two days early to get
18  COVID tested, they fill out the questionnaires then.  And so
19  we'll have the jurors -- just be ready to go at 9:00 o'clock
20  in the morning on the day we start.  And the jurors will be
21  literally sitting down the hall in the courtroom that they'll
22  be using as the deliberation and break room.

23          They'll come in.  I'll give them -- we should be able
24  to get the whole venire in there.  But here's what that means.
25  Okay?  This is on the assumption that we use my regular

1  courtroom, which is 2103.

2        We are still keeping jurors spaced out.  I can get

3  eight in the jury box.  I can get -- if I use one side of the

4  courtroom, I can get another approximately 12 or so over

5  there.  But in order to get the whole venire in there, which

6  is about 30, I got to use both sides.  So during voir dire,

7  there's not going to be any space for anybody to sit in the

8  gallery.  It will just be the people who are sitting at

9  counsel table.  We'll talk about people sitting at counsel

10  table in a second.  So the whole room will be occupied.

11        There will be an overflow room that people can

12  observe from by video, but that will just be for the first day

13  and basically during voir dire.

14        So they'll come in.  They'll sit in sequence.  You'll

15  have all their questionnaires.  You'll have the list that

16  tells what order they're going to be questioned in.  We have

17  them come up one at a time.  When you get in there, if you

18  haven't tried a case since COVID, the way the courtrooms are

19  set up is there's -- we don't do sidebars anymore.  The way

20  that sidebars work is I turn on white noise.  The lawyers and

21  the court reporter and me put on little headphones, and we

22  talk into microphones.  And we can hear each other, but others

23  can't hear us.  There's only three sets of headphones at each

24  counsel table.  So a variation of that will be done for any

25  private questioning that has to happen during voir dire,

1   which, quite honestly, in a case like this, there's not likely
2   to be much of.

3       But in any event, the jurors will come up one at a
4   time over to where you would have expected there to be a
5   sidebar in the old days.  There's a little kind of music stand
6   over there that has a iPad on it.  The reason the iPad is on
7   it is if I have to ask the jurors a private question, we don't
8   have headphones over there.  So we turn on the white noise,
9   and we see the realtime on the iPad.  But we have them do all
10  the questioning over there.

11      So, basically, they'll come up.  I'll ask them
12  whatever follow-up questions have to be asked.  They'll go
13  back to their seat.  Rinse and repeat for, you know, however
14  many jurors we think we need to talk to.

15      At the end of that process, I'll -- at sidebar again,
16  which means headphones on and white noise, I'll ask you
17  whether there's follow-up questions that you want me to ask to
18  any particular jurors.  Once all the questioning is done,
19  we'll send the jurors out.  I'm going to ask for challenges
20  for cause right then.  I'll hear argument on it, and I'll rule
21  on them.  Then you'll know who's left.

22      And then I'll give you a break, 15 or 20 minutes or
23  something like that, to talk about peremptories.  It's three a
24  side.  We're going to probably pick -- since the trial is
25  going to span over -- probably span over parts of two weeks,

1  we'll probably pick ten jurors.  So the first ten people on
2  the list who aren't struck are the jurors.

3          There's no -- there's no rules on what sequence you
4  do the peremptories on.  In other words, you can strike Juror
5  Number 21 first and Juror Number 2 second.  And it's just the
6  first ten people who aren't struck, either for cause or on a
7  peremptory, that are the jurors.

8          We will have a jury before the lunch break.
9  Absolutely, without question, we will have a jury before the
10  lunch break.  And in a case like this -- I mean, it's not a
11  police misconduct case where you have to ask all sorts of
12  extra questions -- there's a good chance we'll have the jury
13  enough before the lunch break that somebody's going to be
14  doing an opening statement before the lunch break, and maybe
15  both sides.  So just be prepared to do that.

16          I don't need to ask you now because it's too far in
17  advance, but I'll ask you then how long the openings are.  And
18  we'll figure that all out at that point.

19          The jurors during trial, there will be eight of them
20  in the jury box kind of spaced out, and there will be two kind
21  of in the second row -- if you can imagine what the pews look
22  like on the jury box side of the courtroom, there will be two
23  of them out there.  And they'll be able to look off the big
24  screen that will be adjacent to them to see any exhibits.  The
25  jurors in the jury box will all have screens in front of them.

1    The way the tables are set up, with jurors in the
2  gallery, what you would imagine, if you can, again, visualize
3  what my courtroom looks like, the plaintiffs' table -- do I
4  have -- I might have something like this I can share with you
5  on my iPad.  Let me see if I can find something here real
6  quick.  I'm closing in on it.  Just give me a second.

7    Yeah.  Okay.  I'm going to -- I think I can share the
8  screen on my iPad.  Let me see.  I haven't tried to do that
9  before.  Let me see if I can do it.

10    I got to go back and find this picture again.  It's
11  not going to let me do it.  Never mind.  Sorry about that.

12    Anyway, if you can imagine what the plaintiffs' or
13  the prosecution counsel table would look like, we don't use
14  that one because it would cut the sight lines of the jurors
15  who are sitting in the gallery.  So there's going to be two
16  counsel tables over at the other side.  There's enough space
17  at each of them for three or maybe four people, if you're
18  squeezed in, but not for more than that.

19    Once we get the jury selected, the whole side of the
20  courtroom that no jurors are sitting on will be open.  You can
21  have people going in and out of there.  You can have people
22  moving in and out of the counsel table, if there's not enough
23  room there and people need to move in and out.

24    If you're going to have tech people, the advice is
25  get them in there ahead of time so they make sure they're all

1   set up and know what they're doing.  You can run the tech
2   either from counsel table or from the podium.

3          And that's pretty much it.  I mean, in terms of
4   logistics.  It's easier if you can see the stuff, so we'll
5   come up with a date for people to come over and look.  But
6   that's basically how that all works.

7          Anyway, as I told you before, I give jury
8   instructions at the beginning of the case before openings that
9   describe not just the general stuff that jurors do but also
10  what has to be proven.  The jurors don't get copies of that,
11  but they see them on screens.  I will send you a draft of
12  those probably also a week or a little bit less than a week
13  before the trial.  I'll ask for comments back just like I will
14  on the questionnaires.  I'll make adjustments.  And then I'll
15  give everybody a chance to make objections to the final
16  version before opening statements.  I give those before
17  opening statements, and then, skipping ahead to the end of the
18  case, I give the final instructions before closing arguments.
19  And the jurors all have copies.

20         I allow jurors to ask questions.  And there's a
21  process for that.  The jurors, you know, they have to write
22  them out.  They pass them up.  They discuss them with you at
23  sidebar.  You can object to jurors' questions.  They won't
24  hear you object to them.  I modify them as needed.  I ask the
25  questions to the witnesses, and then I give each side a chance

1    to follow up.

2          So as you sit there, do we think that we're going to

3    need to take off the 5th for Yom Kippur?

4          MR. GERBIE:  Yes, your Honor.  There's at least a

5    couple of folks from our side who will not be working.

6          THE COURT:  Let's just figure we're going to do what

7    we can on the 4th, which is going to include witnesses.  So

8    just have witnesses ready.  The day is basically going to be

9    9:00 to about 5:00 or 5:15.  So just make sure we don't run

10   short.  We'll just tell the jury that we're recessing until

11   Thursday for the religious holiday.

12         The following Monday, as you probably know, is

13   Columbus day.  So the Court is closed on that day.  I had told

14   you in the past, I think, that I had a trial following this

15   one.  That has now gone away.  It was supposed to be out in

16   Rockford.  It's on the way to going away.  I'll have time that

17   following week, even though we'll only have three days the

18   first week.

19         The next question I'm going to ask you is

20   preliminarily to deciding whether I need to give you time

21   limits or not.  So as you sit there right now, what do we

22   think in terms of how long it's going to take to try the case,

23   given what I've told you about the length of the day and how

24   long it will take to pick a jury and so on?

25         MR. LOEVY:  Your Honor, speaking with some

1  uncertainty, I think it fits in a week. I do. Not a calendar
2  week, because we're --
3          THE COURT: I understand. Five days, in other words.
4          MR. LOEVY: That's my guess, your Honor, in fairness
5  and candor.
6          THE COURT: Anybody think that's off?
7          MS. HERRINGTON: No, I don't think that's off. Five
8  or six days.
9          THE COURT: I'm probably going to give you time
10 limits anyway. Part of the reason for that is that we don't
11 own our courtrooms as judges, and there are certain courtrooms
12 that are set up with all the sidebar stuff. And those are the
13 ones that get used for trial. So I get basically pushed aside
14 for that courtroom when somebody has to try a case. And I
15 have this kind of for a set period of time. And so I'm going
16 to -- I'll enter an order probably later this week that talks
17 about time limits and how they get calculated and so on.
18          And if it looks like it's going to be a squeeze, I
19 can always drop the juror questions part of it, which,
20 honestly, doesn't take up that much time anyway, but people
21 kind of feel like it does, so I wouldn't have a problem
22 dropping that. That's about it from my end.
23          Anything anybody wants to bring up or ask or whatnot?
24          MR. LOEVY: Your Honor, it sounds like the attorneys
25 don't speak to the jurors at all during jury selection?

1          THE COURT:  Sadly, no.

2          MR. LOEVY:  Or happily.

3          THE COURT:  You get to tell them your names, so,

4    yeah, to that extent.

5          MS. HERRINGTON:  I'm sorry.  I missed this.  I think

6    you said you'd tell us later about the length of opening

7    statement.

8          THE COURT:  Oh, no, I ask you how long they are at

9    some point, but I don't need to ask that now.  If you've

10   already written the opening statement, I don't even want to

11   know that because it's way too early.  I'll ask you that

12   closer to the trial.

13         MS. HERRINGTON:  Okay.

14         THE COURT:  Morning of trial.  It's really just going

15   to -- the only thing that's really going to influence is if we

16   get the jury selection done at some reasonable point before

17   the lunch, the question will be, how long are the openings

18   going to take and should we do them before lunch or after

19   lunch.  That's basically all that's going to influence.

20         MS. HERRINGTON:  Sure.

21         MR. LOEVY:  Will all the trial days go until 5:15 and

22   start at 9:00?

23         THE COURT:  Yes.

24         MR. LOEVY:  Those are big, full days.  9:00 to 5:00.

25         THE COURT:  They are.  Yes, indeed, they are.  Yeah.

1   Sorry.  I just have to show up.  You guys have to work.  So it
2   goes.

3          Okay.  Let me think if there's anything else.

4          I mean, I know because I play a game that involves a
5   little white ball where I happen to play with people who have
6   had contact with all of you recently.  I know that there are
7   discussions going on.  I guess the thing that I would ask --
8   what I mean by that is settlement discussions.  And I don't
9   know anything about the details.  I just know there's been
10  discussions.  And everybody gets very high marks from those
11  people, by the way.  I'll just add that.

12         All I ask is that, you know, if you look like -- if
13  you feel like you're getting really close, just find a way of
14  letting me know that.  You know, call the courtroom deputy
15  clerk and say, hey, we need a call with the judge.  Because at
16  some point, as we get closer, I'm going to have to be doing
17  work on the jury instructions.  And if I don't have to do it,
18  I would prefer not to, in my dotage.  So just let me know if
19  you're getting in a range where you think it's likely to
20  settle.

21         So in terms of coming over -- so is there anybody out
22  of town that's going to be trial counsel in the case?  I saw
23  some appearances from some folks who were out of town, but I
24  couldn't tell the extent to which they're going to be involved
25  in the trial.

1    MR. LOEVY:  Not from plaintiff.

2    MS. HERRINGTON:  There will be a couple firm members

3  that are from out of town, yes.

4    THE COURT:  But, I mean, just in terms of having this

5  meeting where I show you how the setup works.

6    Hey, Melissa, am I right that it looked like that

7  that bench trial that was going to happen in there this week

8  has now gotten moved?

9    THE CLERK:  That's correct, Judge.

10    THE COURT:  Okay.  So here's what I would propose.

11  That folks maybe come by -- to 2103, that is -- on Thursday.

12  Let's say maybe something like 10:30 or so.  It doesn't have

13  to be everybody.  Just enough people to just kind of get a

14  feel for the layout.  We're talking about 10 or 15 minutes

15  max, just so I can show you how it's set up.

16    Does that work all right?

17    MS. HERRINGTON:  That's great.

18    THE COURT:  Let's just plan on that.

19    Then you're going to get me this additional brief on

20  next Monday over what we're generically calling the vicarious

21  liability issue, and I think that's about it.

22    Anything anybody can think of that we need to talk

23  about?

24    MR. LOEVY:  Judge, how many trial lawyers are you

25  going to allow in the court at the table?

1        THE COURT:  Well, so here's basically how that works.

2  I mean, it's a long-winded answer.  So, first of all, as of

3  right now -- and this is going to be the case when this

4  lawsuit goes to trial -- we're still having jurors spaced

5  apart, and we're still having jurors and other trial

6  participants wear face masks.  Okay?  So I'm going to tell you

7  why that is.

8        First of all, it's roughly because it's the

9  equivalent of a congregate setting, people don't get to

10  volunteer to come in as jurors, and they're sitting 3 or

11  4 feet from each other.  We don't have them spaced 6 feet

12  apart anymore.  And it's part of trying to let people know

13  that we're concerned about their safety.

14        So -- and I'm going to get to your question.  The

15  rule for trial participants is going to be when you're

16  talking, you don't have to wear a face mask; otherwise, you

17  do.  Part of the reason for that, honestly, is it's in your

18  interest not to be perceived as being treated differently from

19  the jurors.  I will tell the jurors why it is that you get --

20  people, when they're testifying or questioning or arguing,

21  don't have to wear face masks.  That will be explained.

22        So now we're to your question.  And so if the jurors

23  perceive that they're being forced, as some of them will

24  think, to sit 3 or 4 feet apart and other people aren't, then

25  there's a chance that they're going to wonder about that and

1  might take umbrage at it.

2      So now I can explain some of it, but I'd have to ask

3  as you a couple questions.  Let me start with, how many people

4  do you want to have at counsel table?

5      MR. LOEVY:  I would defer to the defense side.  They

6  seem to have more.  There are five total plaintiff lawyers.  I

7  don't think all five need to be at the table.

8      THE COURT:  On the defense side, how many do you want

9  to have at the table at any one point in time, understanding

10  that people can switch in and out.

11      MS. HERRINGTON:  Sure.  I think two is fine.  I don't

12  know that we have more lawyers on our side.

13      THE COURT:  What I would say is you can -- I think

14  you can have four people at these tables, if they're spaced

15  far enough apart, and it's not going to look like you're being

16  treated differently from the jurors.  That ought to

17  accommodate people well enough.  Like I say, it doesn't have

18  to be the same people all the time.

19      Any other questions anybody has or points?

20      MR. LOEVY:  Not from the plaintiff.

21      MS. HERRINGTON:  Not for the defense.

22      THE COURT:  Okay.  So I want to have a check date

23  with you.  So I'm getting these briefs next Monday or next

24  Tuesday.  I'm going to be out of town.  So I'm going to have

25  you call in on Monday the 19th at, let's say, 9:45.  My goal

1    is to be able to rule on the one last motion in limine by

2    then.  It's not a hard-and-fast ruling, but it's also just to

3    kind of check in with you about any issues that people have.

4    Okay.  I think that does it then.

5              So thanks to everybody.  And thanks, obviously, to

6    Carolyn for -- Carolyn is my court reporter -- for sticking it

7    out for two and a half hours.

8              All right.  Everybody take care.  Thanks.

9              MR. LOEVY:  Thank you, your Honor.

10             MS. HERRINGTON:  Thanks, Judge.

11             MR. GERBIE:  Thanks, Judge.

12      (Which were all the proceedings had in the above-entitled

13   cause on the day and date aforesaid.)

14      I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.
15

16   Carolyn R. Cox                          Date
     Official Court Reporter
17   Northern District of Illinois
     /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR
18

19

20

21

22

23

24

25