# IN THE UNITED STATES DISTRICT COURT
## FOR THE FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

RICHARD ROGERS, individually and on
behalf of similarly situated individuals,

            *Plaintiffs*,

      v.

BNSF RAILWAY COMPANY,

            *Defendant.*

No. 19-cv-03083

Hon. Matthew F. Kennelly

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL OR TO ALTER OR AMEND JUDGMENT

Plaintiff Richard Rogers and the Certified Class ("Plaintiffs"), in opposition to Defendant's Renewed Motion for JNOV (Dkt. 235, "Motion"), hereby state as follows:

## INTRODUCTION

BNSF's Motion refers to the judgment as "unprecedented." Dkt. 235 at 1. What was actually unprecedented was Defendant's decision to take the first BIPA case all the way to trial despite obvious liability, and without any good defense. Given the undisputed evidence and testimony, the result was hardly unexpected. Rather than present meritorious arguments, BNSF's Motion amounts to a request for this Court to bail it out of its litigation decisions. There is no justification for doing so, and the Motion should be denied.

## STANDARD OF REVIEW

"Attacking a jury verdict is a hard row to hoe." *Sheehan v. Donlen Corp.,* 173 F.3d 1039 (7th Cir. 1999). Judgment as a matter of law is appropriate only if no rational jury could have found in Plaintiffs' favor, and they are entitled to all inferences from the evidence. *Stragapede v. City of Evanston,* 865 F.3d 861, 865 (7th Cir. 2017).

## ARGUMENT

**I.      There Was Sufficient Evidence To Support The Jury's Finding That BNSF Violated BIPA Both Directly Itself And Indirectly Through Remprex.**

The statute (and thus the jury instructions) provided numerous alternative ways BNSF could be liable. Plaintiffs could show, for example, that BNSF collected, captured, received, or otherwise obtained Plaintiffs' biometrics without complying with BIPA. 740 ILCS 14/15(b); Dkt. 221 at 12. This list of verbs is disjunctive, meaning any of them sufficed to demonstrate liability. *Id.* Plaintiff could also prevail by showing Remprex did any of those things, provided Remprex was acting as BNSF's agent. Dkt. 221 at 12-17.

The jury's determination that BNSF did one or more of these things directly or indirectly was hardly irrational, and there is no basis to disturb the verdict.

## A.  BIPA Was Violated.

There was no dispute at trial that Plaintiffs' rights guaranteed by BIPA were being violated: biometrics were being collected; people were not receiving the written disclosures that would have permitted informed consent; no one was being told the purpose or the length of time the biometrics would be stored, including that the database would never be purged, or that the data was going to be rolled into a central database maintained off-site without encryption; and no written consent was sought or obtained. 740 ILCS 14/15(b); Tr. 207:2-208:10; 225:9-24; 233:18-235:20; 236:7-20; 469:1-21; 1233.

The only question at trial was thus whether BNSF could be found responsible for the violations. Plaintiffs offered sufficient proof to support the verdict against BNSF either through its own action directly, or vicariously through Remprex as its agent.

## B.  The Record Supported The Conclusion That BNSF Directly Violated BIPA.

First, the evidence amply supported the proposition that BNSF directly violated BIPA. As background, the collection of biometrics was *BNSF's* idea. Even before Remprex was born, BNSF sent out an RFP asking for a biometric-based system. Tr. 210:24-211:7; 475:8-10; 1084:25-1087:18; Pls.' Ex. 111. At the time, BNSF's chosen technology vendor, Nascent, did not have a biometric solution—so it had to go out and source one to accommodate BNSF's request. Tr. 1086:14-21; Pls.' Ex. 111.

BNSF then required the use of biometrics in the Remprex contract. Tr. 433:1-24; 1089:1-1090:7; Pls.' Ex. 355. The master agreement obligated Remprex to do many very specific things, including conducting the AGS driver registration biometric collections.

Pls.' Ex. 355 at 29. In fact, Remprex had to pay liquidated damages when the biometric machines were inoperable. *Id.* at 43; Tr. 511:4-512:9; Pls.' Exs. 35 at 4-5; 355 at 31-33. In that light, BNSF's argument that the matter is "controlled by the contracts" does not help its position. Dkt. 235 at 4 n.1.

The biometric collection and capture also happened on equipment that belonged to BNSF, including the fingerprint scanners and the automatic gate system itself. Tr. 233:24-235:20; 517:14-23. Remprex sold the equipment to BNSF, and BNSF bought the equipment from Remprex. *Id.*; Tr. 522-23. Plaintiffs proved that with the relevant purchase agreements and even receipts. Tr. 517:14-519:1; Def. Ex. 37. Photos depicted the driver kiosks labelled "BNSF's RailPASS." Tr. 671:2-672:2; Pls.' Ex. 389. BNSF also owned the licenses for the software that ran the system. Tr. 434:4-17; 476:9-12; 812:12-14.

Most importantly, BNSF owned the servers. The biometric data had to be physically stored somewhere. That place was on servers that belonged to BNSF, having been purchased from Remprex. Tr. 233:24-235:20; 521:23-523:3; 812:22-813:5; 1139:8-1141:24. The biometric data thus lived on BNSF's servers in BNSF server rooms located at BNSF's railyards in Illinois. Tr. 233:24-235:20; 521:23-523:3. This is all amply demonstrated by the contracts that BNSF argues should govern here. Dkt. 235 at 4 n.1.

BNSF's Motion claims that Mr. Whitaker (BNSF Director of System Support) supposedly testified that BNSF did not own the "servers where it [the data] was stored," Dkt.235 at 4, but none of the four transcript citations to Mr. Whitaker's testimony support that proposition. The Court may recall Mr. Whitaker as the witness who the Court had to admonish in the strongest possible terms for his epic refusal to answer direct questions, Tr. 856-58, but even Mr. Whitaker admitted that BNSF purchased the servers. Tr. 812-13 (Q:

"On the servers. BNSF bought the servers, correct?" Whitaker: "We paid for the servers that Remprex spec-ed out, maintained, managed, refreshed, kept at the end of their useful life."). That BNSF owned the servers was corroborated by everyone else too. Tr. 235-36 (Q: "Who owns the server where the biometrics are captured, collected, and stored?" Ash: "BNSF does."); *see also* Tr. 522-23 (Q: "BNSF owns the servers where the biometric data is captured and collected, right?" Burriss: "Yes."); Tr. 528 (Q: "The biometric data is captured, and it's sitting on BNSF's server, right?" Burriss: "Yes, sir."); Pls.' Ex. 111.

Servers aside, Plaintiffs also proved that BNSF owned the biometric data itself. Tr. 435 (Q: "Who did own that biometric data?" Ash: "BNSF"); *see also* 239:19-21; 244:25-245:6; 530:21-531:5; 1234. Unsurprisingly, BNSF documents expressed its own sweeping proprietary interest vis-a-vis its contractors in all data collected on its behalf. The relevant documents, including BNSF's policies, its Code of Conduct, BNSF's contracts with Remprex and the software license with Nascent, all reserved BNSF's ownership over the biometric information at issue here. Tr. 240:4-242:15; 242:16-245:19; 1234:1-9; Pls.' Exs. 6, 7, 17, 355 at 48-50; Def.'s Ex. 2 at 53.

In addition to collecting and capturing the biometric information on its servers, BNSF also received and obtained the data from Remprex. Tr. 538-40. BNSF's corporate representative, Mr. Burriss, admitted this on the stand. *Id.* Receiving and obtaining the data without the requisite consent was independently sufficient for liability. 740 ILCS 14/15(b).

As it did unsuccessfully at trial, BNSF's Motion argues that it did not have "access" to the biometric data. Dkt. 235 at 1, 3. The term "access" is not found in the statute or jury instruction, and BNSF has yet to justify why it matters. One can obtain or possess something without access to it. For example, if I direct someone to procure stolen property

for me and put it in a storage locker I purchased, I obtained and possess it, even if I personally have no key to access the locker. The analogy is even stronger here, where BNSF owns the proverbial locker, the storage facility, and the contents of the locker. In any event, assuming the concept of "access" was relevant, the evidence at trial was that when BNSF wanted access to biometric data, all it had to do was ask Remprex. Tr. 231:20-233:11; 1082:1-18; Pls.' Ex. 220; 111.

Were there any doubt about the foregoing, BNSF cannot overcome the admissions of its own corporate representative. When first questioned, Mr. Burriss denied everything regarding BNSF's role with respect to the collection and capture of biometrics at its Illinois facilities. 472:3-18; 504:18-505:8; 506:1-3. Upon further cross-examination, however, Mr. Burriss completely flipped, changing his denials into admissions in front of the jury's eyes. As far as cross-examination goes, the result was fairly dramatic:

## COLLECT/CAPTURE

1. Collecting/Capturing Biometrics was **BNSF's IDEA**   ~~Not~~

2. **BNSF REQUIRED** the collection/capture of Driver Biometrics   ~~Not~~ Yes

3. Biometrics collected/captured by **BNSF's HARDWARE & SOFTWARE**   ~~Not~~ Yes

4. Biometric Data capture/collected on **BNSF's SERVERS**   ~~Not~~ YES

5. Biometric Data collected/captured for **BNSF's BENEFIT**   ~~Not~~ YES

6. BNSF had **CONTROL** of ongoing decision to keep collecting/capturing   Yes

7. BNSF **OWNED THE** Biometric Data   ~~Not~~ YES

Tr. 522-23 (Q: "So this answer was 'no.' We probably should change that to 'yes,' right? Captured on BNSF servers? You meant 'yes,' it is BNSF servers, right?" Burriss: "Yes"); Tr. 526 (Q: "So the answer should be 'yes,' then, right? It was captured for your benefit, for security. Are you okay with that?" Burriss: "I don't prefer the wording there, but, yes."); Tr. 526 (Q: "So if I write 'licensed software,' we can cross off 'no' and write 'yes' there?" Burriss: "Yes."); Tr. 538 (Q: "Oh and the data -- we have to change this to 'yes,' don't we? BNSF did own the biometric data. We just established that. That should be a 'yes,' right?" Burriss: "Yes."); Tr. 512:10-18 (BNSF required Remprex to collect the biometrics); Tr. 517:14-23 (BNSF purchased the servers that collected the biometrics); Tr. 519:2-5 (BNSF licensed the software that captured the biometrics); Tr. 522:21-523:3 (the biometrics were captured on BNSF's servers); Tr. (525:23-526:4 the biometrics were captured for BNSF's benefit); Tr. 526:5-15 (the biometrics were captured on BNSF's hardware with BNSF's licensed software); Tr . 530:21-531:5 (BNSF owned the biometric data).

### C. The Record Also Supports The Conclusion That BNSF Violated BIPA Indirectly Through The Actions Of Its Agent, Remprex.

It is a well-settled principle that a corporation can only act through its employees and agents. *See Black v. Peoria Marine Const. Co.,* 160 Ill. App. 3d 357, 364, 513 N.E.2d 622, 626-27 (3rd Dist. 1987). Under basic agency principals, even if the physical collection was conducted by Remprex, it was still an action of BNSF. *See, e.g., Lawlor v. N. Am. Corp. of Illinois,* 2012 IL 112530, ¶ 46, 983 N.E.2d 414, 428 (Ill. 2012) (private investigation company was acting as agent of defendant corporation while investigating corporation's former employee even though employer did not control the manner of the

investigation where employer requested that investigator obtain former employee's phone records, violating her right to privacy).[1]

The jury could have reasonably determined that there was a principal-agent relationship to provide services for compensation, and that BNSF had a right to control Remprex's actions on the relevant subject matter. Tr. 344:11-345:4; 433:1-435:6; 448:2-20; 450:7-451:15; 1229:23-1230:12. This suffices. *Lawlor,* 983 N.E.2d at 429 ("[I]t was not unreasonable for the jury to conclude that North American's conduct was consistent with a principal exercising control over its agent by directing it to obtain specific information and providing it with the necessary tools to accomplish the task.").

In particular, BNSF came up with the idea to collect and capture the biometric information and required Remprex to do it via contract, all for BNSF's benefit. Tr. 433, 626-28. These were BNSF's railyards, and it was thus BNSF's decision, not Remprex's, about both whether to collect biometrics and whether to include written disclosures or driver consent on the screen flow of the AGS kiosk. *Id.*; Tr. 450-51. As the client, BNSF was making the calls and calling the shots, and Remprex was following BNSF's direction. Tr. 448-61; 1229:23-1230:12; Pls.' Exs, 146 at 1, 11; 150 at 1-2, 4, 151, 161, 299; 355 at 29. As a result, it was well within the jury's province to find that the agency test was satisfied. *McHale v. W.D. Trucking, Inc.,* 2015 IL App (1st) 132625, ¶ 96, 39 N.E.3d 595, 627 (where "there is some dispute as to the extent of the parties' relationship, the existence and scope of an agency relationship are questions of fact for the jury to determine.").

---

[1] This Court has considered and rejected BNSF's contentions that BIPA liability cannot be predicated on common law agency principles or the doctrine of ratification. Dkt. 201. BNSF's Motion simply preserves its arguments rather than re-raising them, and Plaintiffs too reincorporate their prior filings on this issue. Dkts. 183, 195.

## II.     The Recklessness/Intentional Jury Finding Was Not Irrational.

BNSF does not dispute the jury's conclusion that there were 45,600 BIPA violations, but takes issue with its determination that the violations were more than negligent. Dkt. 235 at 5-8. BNSF has fallen well short of any showing that could disturb the jury verdict. *Ruiz-Cortez v. City of Chicago,* 931 F.3d 592, 601 (7th Cir. 2019). ("Only if no rational jury could have found for the nonmovant may we disturb the jury's verdict.")

First, BNSF contends it reasonably relied on Remprex for all security procedures at the railyards. This argument was pressed vigorously at trial, but the jury rejected it. Contrary to BNSF's repeated attempts to characterize Remprex as the "industry leader" and "expert" in all things security-related, the testimony was that Remprex was a two-person startup with no legal department back when BNSF's biometric solution was implemented--and had not even been formed yet when the RFP requiring use of biometrics went out. Tr. 227:12-230:11; 825:18-25; 1087:22-24; Pls.' Ex. 111. BNSF, meanwhile, has been around for 150+ years and is one of the largest transportation companies in the world. Tr. 556:8-561:23. It was more than reasonable to conclude BNSF acted recklessly in outsourcing its responsibility to comply with the law to a couple of lawyer-less technology guys (and while it has grown, Remprex has no in-house legal department to this day, Tr. 276-77, 467). This was especially so given that BNSF took no steps whatsoever to ensure that Remprex was following the contract and/or doing everything in a legally-compliant manner. Tr. 575-77; 580:1-582:21; 850:9-24.

BNSF also claims it could not have been reckless because it supposedly never even knew of BIPA until 2019. The jury was not required, however, to accept the BNSF witnesses' testimony on that point at face value given the credibility issues identified above,[2] especially

---

[2] *Brady v. Astrue*, 08-cv-4216, 2011 WL 767881, at *3 (N.D. Ill. Feb. 28, 2011) (finding that "[a witness's] vacillations, inconsistencies, and falsehoods are factors that properly may be considered

where there was evidence from which the jury could have inferred that BNSF knew about BIPA much earlier than it claimed.

For example, Defendant's Exhibit 15 was an email dated November 1, 2016 from BNSF's Doug Gruben to various Remprex employees, including Tim Ash and Carlos Reyes. *Id.* Tr. 439:18-441:11. The email referenced "some internal inquiries on how the [AGS] biometric data is stored and what data security measures are in place to protect that data." *Id.* The email expressed urgency: "I need to have this information by the end of this week." *Id.* After Remprex responded, BNSF asked for clarification about whether the biometric data template could be read by any biometric reader, or only by proprietary technology. *Id.* All of that certainly suggests that BNSF knew of BIPA and its required protections at least three years earlier than the date posited in its post-trial motion.[3]

Even were it otherwise, there is no better argument for recklessness than BNSF's admission that it had no idea there were laws on this subject. BNSF operates in a highly regulated industry, with operations in several states and extensive operations in Illinois. Tr. 556:8-561:23. It has a fulsome legal department whose very job it is to navigate the rules, regulations, and laws of every jurisdiction in which it does business. *Id.* BNSF's claim to have been completely ignorant that there were laws covering biometrics does not preclude

---

by an ALJ (or any trier of fact) in evaluating a witness's credibility"); *Anderson v. City of Bessemer,* 470 U.S. 564, 575 (1985) ("Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it.").

[3] Shortly after this email exchange, BNSF changed its internal corporate policy to include, for the first time: "fingerprint, retinal scan, DNA profile, or biometric data" on its list of "personally identifiable information or PII." *compare* Pls.' Ex. 88 *with* Pls.' Ex.93; Tr. 831:24-834:16. This policy also acknowledges that "PII is defined and protected by federal and state law . . ." Pls.' Ex. 93. There is nothing in the record reflecting any other steps taken by BNSF upon learning this information, and it is undisputed that the violations of Plaintiffs' BIPA rights continued unabated.

a finding of recklessness, which as defined does not require knowledge of the law. Dkt. 221 at 12-13; *Murray v. New Cingular Wireless Servs., Inc.,* 523 F.3d 719, 726 (7th Cir. 2008) (the standard for recklessness is objective, and requires "more than negligence but less than knowledge of the law's requirements").

Nor are the BIPA protections some unusual outlier. The jury heard that there are biometrics laws in other states in which BNSF operates large yards and ports, including California, Washington, New York, and Texas (BNSF's home state). Tr. 562:5-563:16. If BNSF was truly as ignorant as it claimed to be about the need to be aware of legislation protecting biometric information, it was willfully blind in a way that readily supports the recklessness finding. Dkt. 221 at 12 (the Court jury instruction, stating that "BNSF acted recklessly if it consciously disregarded or was utterly indifferent to the plaintiffs' rights"). Moreover, it was undisputed at trial that BIPA was enacted all the way back in 2008, which also could support a reasonable inference of recklessness, as the Court held at the motion to dismiss stage. Tr. 181:3-6; 184:6; Dkt. 31 at 9; *Marsh v. CSL Plasma Inc.,* 503 F. Supp. 3d 677, 685–86 (N.D. Ill. 2020) (finding allegations of recklessness plausible where Defendant failed to comply with BIPA more than a decade after its passage and despite having multiple facilities in Illinois.); *Neals v. PAR Tech. Corp.,* 419 F. Supp. 3d 1088, 1093 (N.D. Ill. 2019) (same, citing Dkt. 31.).

Taking a step back, BNSF's suggestion that it would have complied if only it knew about BIPA was not very persuasive given that BNSF did not comply even after it did. Perhaps Plaintiffs' best evidence that the problem was callous refusal to respect the law as opposed to mere lack of notice was how BNSF responded to this lawsuit. BNSF was sued in April 2019, after which it could no longer claim to have never heard of BIPA. Tr. 577-78. Despite

unambiguous notice about what the law required, BNSF declined to instruct Remprex to provide written disclosures, seek consent, or take any other steps to ameliorate the violations. *Id.*; Tr. 1237-38. BNSF did not make the problem stop, even though it admits that it could have. Tr. 581, 1238-39. In fact, *eight full months went by* without any changes, whereupon the violations finally stopped only because of an act of God outside of BNSF's control; when the COVID pandemic struck, drivers stopped putting their fingers on the scanner, and other solutions had to be devised. Tr. 605:19-606. Tr. 610:15-612:22; Pls.' Ex. 259.

Given the foregoing, there was a strong inference that BNSF's failure to comply with the law after receiving notice was emblematic of BNSF's state of mind throughout the class period. The jury could have reasonably concluded that BNSF's benign explanation for its violations in the earlier years (that they were based on ignorance, and thus merely negligent) was unworthy of belief because once BNSF did learn, it took no steps to solve the problem. *H-D U.S.A., LLC v. SunFrog, LLC,* 311 F. Supp. 3d 1000, 1045–46 (E.D. Wis. 2018) (post-suit conduct can inform a fact-finder's inquiry regarding the defendant's state-of-mind.)

As it did at trial, BNSF argues that "post-litigation conduct" is inadmissible as a subsequent remedial measure under FRE 407. The Court already rejected this argument, and properly so: "So where does Rule 407 say anything about post-lawsuit conduct? That's not a remedial measure." Tr. 320 ("The argument that the plaintiff made is that you didn't change it"). The Court analogized to evidence in a trademark or patent case where someone keeps infringing after a cease and desist letter: "That's pretty standard operating procedure. It's not a remedial measure. The whole point of the argument is that there wasn't any remedy." Tr. 321. *See also* Tr. 486 ("It bears on intent, and awareness of the law."); *id.* at 484-91 (additional analysis by the Court).

BNSF's motion further claims that its decision not to comply with BIPA was made in good faith on account of uncertainty over the law's applicability and the possibility of preemption. The failure of BNSF's motion to cite to any supporting testimony in the trial record is telling. No BNSF witness claimed to have intentionally decided not to follow BIPA based on any understanding (or misunderstanding) of the law. To the best that Plaintiffs' counsel can tell, preemption came up in trial testimony one time. In response to a question about whether BNSF was knowingly violating the law after being sued, Mr. Burriss answered: "Again, I believe you would need to talk to our attorneys, given some discussion about preemption and if this law applied to railroads." Tr. 582.[4]

That testimony falls well short of supporting BNSF's argument that BIPA was violated in good faith. For one thing, advice of counsel is an affirmative defense with elements to prove that must be pled, which it was not here. *Hanania v. Loren-Maltese,* 319 F. Supp. 2d 814, 839 (N.D. Ill. 2004), citing *United States v. Cheek*, 3 F.3d 1057, 1061 (7th Cir.1993). Regardless, no BNSF witness ever testified to any specific attorney advice, nor ever explained to the jury what preemption even meant, much less how it supposedly excused the BIPA violations.

Independently relevant to BNSF's state of mind, BNSF did not adequately encrypt the biometric data that it collected from the drivers. Tr. 714:5-20; 720:12-21; 726:7-728:25; Pls.' Ex. 183-A. That too was reckless. *Id.* Evidence demonstrated it would have been quite easy to protect the Plaintiffs' biometrics through encryption had BNSF cared enough to do it. Tr. 730:17- 732:12. By failing to take some very basic protections, BNSF recklessly exposed the

---

[4] None of the other transcript cites on which BNSF relies supports the preemption proposition either. Dkt. 235 at 7. The few oblique attempts to invoke attorney advice at trial were in the context of suing Remprex to hold Remprex responsible, not about whether or not BIPA had been violated. Tr. 599-601.

Plaintiffs' data to hackers, especially after BNSF exported the data from the localized servers and rolled it into a national database (which would become a prime target for hackers). Tr. 425:8-21; 444:2-25; 1205:15-1206:8; 1104:24-1105:5.

As a final note on sufficiency of the evidence, the jury was also permitted to consider witness demeanor, a factor this Court had an opportunity to observe for itself. The BNSF witnesses did themselves no favors with their evasiveness and non-responsiveness. This Court at one point excused the jury to admonish Mr. Whitaker, for example, for refusing to answer questions. Tr. 856-57. *See also* Tr. 486. The Remprex witnesses, by contrast, were all very credible, admitting that mistakes were made and even taking responsibility for their role where warranted. *E.g.,* Tr. 1237. For all of the foregoing reasons, the jury's determination was amply supported and hardly so irrational as to warrant a new trial.

## III. The Court's Damages Award Is Constitutional.

### A. The Liquidated Damage Award Is Not Excessive, Much Less Unconstitutionally So.

The crux of BNSF's argument is that there are no actual damages that could support a $5,000 penalty for each Class member, and that the resulting amount violates the Constitution's Excessive Fines Clause. Every assumption in that argument is incorrect.

First, the Excessive Fines Clause, and the associated cases cited by BNSF, do not apply. The Excessive Fines Clause is grounded in the Eighth Amendment, which governs the criminal process and direct actions initiated by the government. *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 260 (1989). BIPA's liquidated damages provision does not amount to a "fine" under the Eighth Amendment. *See Green v. Anthony Clark Int'l Ins. Brokers,* Ltd., 09 C 1541, 2010 WL 431673, at *5 (N.D. Ill. Feb. 1, 2010) (finding that the TCPA's damages provision is not a fine under the Eighth Amendment).

Second, the BIPA award here is not based on a penalty. The remedy created by the legislature here is one for "liquidated damages," which are designed—unlike a penalty—to provide compensation for actual harms that are compensable but difficult to quantify. *H & M Commercial Driver Leasing, Inc. v. Fox Valley Containers, Inc.,* 209 Ill.2d 52, 71, 282 Ill.Dec. 160, 805 N.E.2d 1177 (2004) ("Damages . . . may be liquidated . . . at an amount that is reasonable in light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss.") quoting Restatement (Second) of Contracts § 356 (1981).

Third, BNSF's contention that there are no damages is also wrong. Because Plaintiffs invoked their statutory right to pursue liquidated damages rather than proving individual injuries, there was no occasion to introduce evidence of actual damages at trial. But that does not mean there are no damages. Contrary to BNSF's unproven *ipse dixit,* this is not a victimless, meaningless injury. A person's biometric information is unique, and in this case was linked in the BNSF database to that person's driver's license and photo. The damage caused by losing control of this information is real, even if difficult to liquidate. *See* 740 ILCS 14/5(c) ("Biometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions.").

Moreover, BIPA was enacted with the understanding that "the full ramifications of biometric technology are not fully known." 740 ILCS 14/5(f). The legislature specifically found that persons who have their biometrics taken unlawfully are at increased risk of future injury. *Id.* The record established that BNSF still has not mitigated the risks by purging the

data, destroying the database, or even encrypting it, which means the risk keeps growing. Tr. 225; 262-263; 1233. There was also testimony at trial that the Plaintiffs' unprotected biometric data might well already have been hacked without anyone yet knowing it. Tr. 719; 732.

This lawsuit constitutes Plaintiffs' one and only chance at compensation for Defendant's violations of Section 15(b). Depending on how technology evolves years into the future, losing control of and ownership over very personal identifiers could have untold harmful consequences. The legislature concluded that the increased risk of future harm is a compensable loss under BIPA, which is its right. *Rosenbach v. Six Flags Entm't Corp.,* 2019 IL 123186, ¶ 35, 129 N.E.3d 1197, 1206 citing 740 ILCS 14/5(c) (noting increased risk of identity theft should biometrics be compromised); *Dillon v. Evanston Hosp.,* 199 Ill. 2d 483, 507, 771 N.E.2d 357, 372 (2002) (Illinois Supreme Court finding risk of future injury compensable as an element of damages in medical malpractice case).[5] Given that this harm is difficult to quantify, assignment of liquidated damages was appropriate.

Additionally, the legislature was entitled to choose an amount that reflects the injury to the public, as well as to the individual. *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.,* 545 F. Supp. 2d 768, 777 (N.D. Ill. 2008), citing *Williams,* 251 U.S. at 66. In that respect, BIPA's liquidated damages provision compares favorably with the similar provision in the TCPA. The TCPA was designed to protect individuals from nominal damages and annoyance stemming from unwanted phone calls and faxes, and deter businesses from making unwanted solicitations. *Green v. Anthony Clark Int'l Ins. Brokers, Ltd.,* No. 09 C 1541, 2010 WL 431673, at *6 (N.D. Ill. Feb. 1, 2010) (Kennelly, J.). The "public harm" that BIPA protects

---

[5] The legislature's decision is particularly reasonable given that the statute of limitations on BIPA claims presumably runs from the date of the collection of biometrics, whereas the future injury may not occur until after the statute has run.

against is actually far more serious, as biometrics are irreplaceable and unchangeable once stolen. 740 ILCS 14/5(c). The TCPA allows damages of $500 on a per-call basis with treble damages ($1,500) for willful violations. By comparison, the ratio of dollars to potential harm here is imminently appropriate.

The Illinois Supreme Court has made clear that the General Assembly intentionally allowed victims to seek this enumerated amount of liquidated damages without proving actual damages because doing so was the best means to promote compliance with the statute; it is clear that the legislature intended for this provision to have substantial force. As the Illinois Supreme Court recognized in its seminal decision regarding BIPA:

> "When private entities face liability for failure to comply with the law's requirements without requiring affected individuals or customers to show some injury beyond violation of their statutory rights, those entities have the strongest possible incentive to conform to the law and prevent problems before they occur and cannot be undone. Compliance should not be difficult; whatever expenses a business might incur to meet the law's requirements are likely to be insignificant compared to the substantial and irreversible harm that could result if biometric identifiers and information are not properly safeguarded; and the public welfare, security, and safety will be advanced. That is the point of the law. To require individuals to wait until they have sustained some compensable injury beyond violation of their statutory rights before they may seek recourse, as defendants urge, would be completely antithetical to the Act's preventative and deterrent purposes. In sum, defendants' contention that redress under the Act should be limited to those who can plead and prove that they sustained some actual injury or damage beyond infringement of the rights afforded them under the law would require that we disregard the commonly understood and accepted meaning of the term "aggrieved," depart from the plain and, we believe, unambiguous language of the law, read into the statute conditions or limitations the legislature did not express, and interpret the law in a way that is inconsistent with the objectives and purposes the legislature sought to achieve. That, of course, is something we may not and will not do."

*Rosenbach,* 2019 IL 123186, ¶¶ 37-38.

Here, Plaintiffs were awarded exactly what the statute proscribes—no more and no less. Given the foregoing, Plaintiffs' claims could thus actually be worth more. If this had

been a single-plaintiff case, it is likely no one would question $5000 in the damages, much less argue that it was so egregious as to implicate the Constitution. BNSF does not "get out of jail free" just because it violated the rights of 45,600 people rather than just one. As the Seventh Circuit recently observed in affirming a $280 million damage award in a TCPA case, "[s]omeone whose maximum penalty reaches the mesosphere only because the number of violations reaches the stratosphere can't complain about the consequences of its own extensive misconduct." *United States v. Dish Network L.L.C.,* 954 F.3d 970, 980 (7th Cir. 2020) (Easterbrook, J.)

> **B.     Even Assuming *Arguendo* The Award Was A Punitive Penalty, It Is Not So High As To Be Unconstitutional.**

Under the Due Process Clause, state legislatures to enjoy a "wide latitude of discretion" to set civil penalties. *Dish Network L.L.C.,* 954 F.3d 970, 980 (7th Cir. 2020) (declining to reduce $280 million in penalty damages in a TCPA case)*, citing St. Louis, Iron Mountain & Southern Ry. v. Williams,* 251 U.S. 63, 66 (1919) (*"Williams"*). Legislatures get to decide how civil penalties will be enforced, which can include creation of a private right of action and distribution of civil penalties to aggrieved parties rather than the state. *Williams,* 251 U.S. at 66-67. Moreover, these civil penalties do not have to reflect the amount of any private injury, but can instead be tethered to a "public wrong" that the legislature seeks to address, and can have deterrent (rather than simply remedial) purposes. *Id.* at 66.[6]

Civil penalties awarded pursuant to a statute violate due process only if the award is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *Williams,* 251 U.S. at 67, 40 S.Ct. 71. As set forth below, it is within this long

---

[6] The Supreme Court has long upheld statutory provisions imposing double or triple damages. *See, e.g., Overnight Motor Trans. Co. v. Missel,* 316 U.S. 572, 584 (1942).

recognized "wide latitude of discretion" that the Illinois Legislature enacted BIPA, which includes a private right of action and a liquidated damages clause designed to address and deter a public wrong that the Illinois Legislature saw as a grave threat to Illinois citizens.

In its seminal *Rosenbach* decision, the Illinois Supreme Court recognized that the General Assembly enacted BIPA to try to "head off" problems before they occur, by ensuring that individuals' privacy rights are honored and protected before biometrics are compromised, and incentivizing compliance by subjecting violators to "substantial potential liability." *Rosenbach v. Six Flags Entm't Corp.,* 2019 IL 123186, ¶ 36. The Illinois Legislature recognized that national corporations were piloting new, not-yet-understood technology capturing sensitive and immutable information, and sought to deter misuse of such information. 740 ILCS 14/5(a)-(b). And the method of deterrence, namely subjecting violators to "substantial potential liability," was carefully chosen with an eye toward some of the expected violators—behemoths like BNSF who may be motivated by money rather than benevolent compliance with the law. The damages award here is faithful to that purpose and is thus not the result of crazy runaway mathematics. Were the price more modest, companies as rich as BNSF could violate protected rights to make profits, and then simply "pay the tax" for having done so. This award is exactly how the Illinois Legislature intended to influence national corporations who collect biometrics, and Illinois had every right to ensure that its statute was taken seriously.

Lastly, the Court should reject Defendant's invitation to analyze the aggregate award of $228 million rather than the individual awards of $5,000. BNSF's argument was so cursory and conclusory—a single sentence in the text, R. 235 at 9—that the Court could find it forfeited. *Rainey v. United Parcel Serv., Inc.,* 466 Fed. Appx. 542, 545 (7th Cir. 2012).

Regardless, Defendant's out-of-circuit authority does not square with the Seventh Circuit's decision in *United States v. Dish Network L.L.C.,* where it refused to consider the aggregate award apart from the individual award, and affirmed a $280mm award. 954 F.3d at 979 ("The maximum penalty is $10,000 per violation. Multiply this by the 66 million violations the district judge found and you get $660 billion. That's a huge number, but it is not possible to evaluate it separately from the penalty per violation, which is a normal number for an intentional wrong.") (internal citations omitted).

## IV.    BNSF's Re-Raised Preemption Arguments Do Not Justify Judgment As a Matter Of Law.

At the summary judgment stage, the Court carefully considered and rejected each basis for BNSF's preemption arguments, including the FAAAA, FRSA, and the ICCTA. Dkt. 235 at 10-13. Those conclusions were sound, and reconsideration is thus inappropriate.

BNSF's post-trial Motion relies almost exclusively on an offer of proof that it is treating as part of the record. Dkt. 235, citing Dkt. 217. In a footnote, BNSF states that it made this offer of proof describing evidence it would have offered to support its preemption defenses, evidence it claims it was "improperly prevented" from introducing. Dkt. 235 at 10 n.7. That is an inaccurate characterization, and reliance on this offer of proof is inappropriate.

Here is what actually happened. At the very end of the last full trial day, and after the very last witness at trial finished testifying, the Court had the opportunity to address BNSF's offer of proof. It had been filed earlier that day, after the proceedings had already begun. Tr. 1242. The proffer consisted of deposition testimony, declarations, and summary references to would-be trial testimony, citing to six exhibits in all. Dkt. 217 at Exs. 1-6.

When considering this proffer, the Court first asked BNSF's counsel for its position on whether preemption was an issue for the jury. Tr. 1241. Counsel for BNSF stated: "No."

*Id.* The Court then asked counsel for BNSF: "So then on what theory would I be letting in, in front of the jury, evidence relating to an issue that they're not deciding?" Tr. 1241. There was some colloquy, during which the Court repeatedly insisted on a direct answer to the question about what theory BNSF was proposing to present the evidence to the jury. *Id.* at 1243-44. After BNSF's counsel repeatedly (four times) had no answer to that very straightforward question, the Court held that the offer of proof was forfeited. *Id.* The Court added: "Number one, none of this was presented in the motion *in limine* . . . What's happening is this is being shoveled in a couple of hours before the trial is over. It's forfeited." *Id.* at 1244.[7]

Preemption is "an affirmative defense on which the Defendants bear the burden of proof." *Karling v. Samsara Inc.,* 2020 U.S. Dist. LEXIS, 121318, *8 (N.D. Ill. July 11, 2022). The reason why BNSF's Motion relies primarily on its failed/forfeited offer of proof is because BNSF knows that it completely failed to develop the factual record during discovery or trial to support the point that BIPA compliance would have any impact (let alone significant impact) on carrier rates, routes, services, or anything else. Dkt. 142 at 14.

It is also worth noting that BNSF's preemption argument keeps ignoring the reality that no one is suggesting that BNSF cannot use biometric information to control access to its railyards, and do so on a mandatory basis. The only point of this lawsuit was to ensure that if BNSF does choose to collect and maintain biometrics, it should do so in manner consistent with Illinois law. *See* Tr. 1355 (Plaintiffs' closing argument: "[Y]ou don't have to pick between biometrics and safety. ... You can have a safe automated system and use biometrics and comply with the law.").

---

[7] There is no reason justifying BNSF's delay in making its offer of proof, as BNSF was on notice that Plaintiffs would move *in limine* to bar testimony related to preemption on August 25, 2022, well before the pretrial hearing and over a month before Defendant filed its belated offer of proof. *See* Dkt. 178-10.

As for enhancing security, it turned out that use of fingerprint scanners sounds far more secure than it really was in practice. For one thing, every driver was allowed into the yard on a first visit *without* any fingerprint scan. Tr. 258:7-260:11. As Plaintiffs' counsel pointed out during closing, Saddam Hussein could have showed up on a first visit with 10,000 tons of TNT in a truck; the gate would have opened, and he would have been asked to enter and drive around, unescorted, to find the registration building. Tr. 1355.

Also, the fingerprint scanners failed to recognize drivers as often as 10% of the time. Tr. 1090:21-1092:18; Pls.' Ex. 223. This could have been because drivers did not press hard enough, and sometimes they put gloved fingers on the scanner. *Id.;* Trial Tr. 259:16-260:11. In order to keep the line moving, when no match was detected, the gate still went up. Drivers were still allowed into the yard, and were asked to go find someone at the drivers' assistance building to check in. Tr. 218:20-219:22. The fingerprint system, in other words, would not impede anyone intent on sabotage. Furthermore, when traffic backed up, the yards turned off the scanners altogether and just waived the trucks through. Tr. 261:5-15; 1095:3-1096:4; Def.'s Trial Ex. 21; Pls.' Trial Ex. 245. Bad actors thus need only wait for busy days.[8]

In sum, BNSF fell well short of creating a record that could meet its burden to establish preemption. BNSF offers no reason to revisit the Court's summary judgment decision.

## V.     The Court Properly Determined The Liquidated Damage Award Under BIPA As A Matter Of Law, As Opposed To Allowing The Jury To Assess Liquidated Damages.

The Illinois General Assembly chose to include liquidated damages as one of the available remedies under BIPA. *See* 740 ILCS 14/20 (allowing the greater of actual damages

---

[8] There was also testimony that biometric registration was optional, and thus not required for every driver or critical for security. Trial Tr. 964:14-965:21; 1222:17-1223:13.

or the liquidated amounts set by statute). Owing to the amorphous and difficult-to-quantify nature of the injury associated with losing control over one's biometrics, the Illinois Supreme Court deemed BIPA's liquidated damages provision integral to the General Assembly's policy goals and private enforcement scheme. *Rosenbach v. Six Flags Ent. Corp.,* 2019 IL 123186, ¶ 36, 129 N.E.3d 1197, 1207 (2019) ("[T[he legislature intended [to] prevent problems before they occur and cannot be undone. . . .To require individuals to wait until they have sustained some compensable injury beyond violation of their statutory rights before they may seek recourse, as defendants urge, would be completely antithetical to the Act's preventative and deterrent purposes."). *See also* 740 ILCS 14/5(c) ("Biometrics are unlike other unique identifiers . . . .[because] once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions.").

In this case, Plaintiffs opted for the liquidated damages remedy instead of seeking to prove higher actual damages. This made practical sense, given the individualized proof problems for a 45,000+ member class. By definition, liquidated damages flow as a matter of law. The only question for a jury to decide is the number of violations in each culpability category. The Court thus correctly determined there was no occasion for the jury to assess and award liquidated damages—those damages are already decided. Dkt. 229 at 13:24-14:8. Asking the jury to redundantly assess damages when the amount of liquidated damages flow as a matter of law improperly assigns the jury a question of law. Doing so would have risked confusing the jury, potentially prejudicing the jury, and the possibility of a calculation error that creates an inconsistent verdict.

In response, BNSF's Seventh Amendment objection has no merit. Dkt. 229 at 13:24-14:8. While every Defendant has a Seventh Amendment right to a jury trial on liability for the statutorily-set damages, there was no question of fact for the jury to decide on damages here. That is because the jury cannot overturn the legislature's policy decision by changing the amount of liquidated damages per violation. *Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, 354, 118 S. Ct. 1279, 1287, 140 L. Ed. 2d 438 (1998) ("In *Tull,* we held that the Seventh Amendment grants a right to a jury trial on all issues relating to liability for civil penalties under the Clean Water Act, but then went on to decide that Congress could constitutionally authorize trial judges to assess the amount of the civil penalties") (citations omitted); *Tull v. United States,* 481 U.S. 412, 425, 107 S. Ct. 1831, 1839 (1987).[9]

Defendant also misapplies the jurisprudence requiring proportionality in cases where juries use their discretion to award punitive damages. In that circumstance, due process requires that the punitive damages award be proportional to the actual damages award in order to cabin the jury's discretion and prevent unfair prejudice. *See State Farm v. Campbell,* 538 U.S. 408, 416, 123 S. Ct. 1513, 155 L.Ed.2d 585 (2003). That rule is inapplicable when a legislature has already mandated a preset amount for the statutory violation. *United States v. Dish Network L.L.C.,* 954 F.3d 970, 979 (7th Cir. 2020), *cert. dismissed,* 141 S. Ct. 729, 208 L. Ed. 2d 508 (2021) ("'Legislatures have 'a wide latitude of discretion' to set civil penalties") quoting *St. Louis, Iron Mountain & Southern Ry. v. Williams,* 251 U.S. 63, 66, 40 S.Ct. 71 (1919) ("Nor does giving the penalty to the aggrieved passenger require that it be confined or

---

[9] Defendant's reliance on *Feltner* is misplaced. That court found a Seventh Amendment right to a jury assessment of damages based on an historical interpretation of copyright law, which permits a range of statutory damages. *Feltner,* at 352; 17 U.S.C.A. § 504. By contrast, when the damages are liquidated and there is no range, the Seventh Amendment only applies to the determination of liability. *Tull v. United States,* 481 U.S. 412, 425 (1987).

proportioned to his loss or damages; for, as it is imposed as a punishment for the violation of a public law, the Legislature may adjust its amount to the public wrong rather than the private injury, just as if it were going to the state."). Any proportionality challenge in this context is thus confined to the statute and is a question of law for the court. As Judge Kocoras explained in determining proportionality as a matter of law in a TCPA case:

> [C]onsiderations pertinent to the validity of jury awards are not the same as those attendant to damage amounts set by statutes. Rather than looking retrospectively at a particular and established fact situation, the legislature must choose a benchmark that will be appropriate to many different situations, as well as taking into account considerations such as the public interest. When, as in this case, there are 'numberless opportunities for committing the offense,' the legislature is justified in establishing an amount of damages that could be oppressive in other settings.

*See Phillips Randolph Enterprises, LLC v. Rice Fields,* No., 06 C 4968, 2007 WL 129052, at *2 (N.D. Ill. Jan. 11, 2007) (Kocoras, J.) (citing *Williams*).

BNSF also relies on an incorrect reading of the word "may" in section 14/20. The inclusion of that term refers back to the fact that "other relief" (including injunctive relief) under section 14/20(4) may or may not be awarded, depending on whether the court finds such relief appropriate. It does not give discretion to award zero damages. Rather, the plain language of the statute shows that the General Assembly intended to relieve plaintiffs of the burden to prove actual damages given the uncertainty with how biometrics could be misused in the future, and therefore expressly included "liquidated damages" and allowed "the greater of" actual or liquidated damages. BNSF's argument reads that language out of the statute, and thus cannot be right and must be rejected.

## VI. Plaintiff Rogers's Claims Are Not Time-Barred.

This issue has already been adjudicated, and there is no justification to reach a different conclusion absent further guidance from the Illinois Supreme Court.

Notably, BNSF continues to ignore the reality that the facts of this case do not square with the "one and done" accrual rule offered by the *Cothron* defendant. The factual record in *Cothron* (an appeal from a motion to dismiss) is quite limited, but the employees there registered their fingerprints one time using one computer and then subsequently scanned their fingerprints to clock in and out of work. By contrast, here, Plaintiffs had their fingerprints registered and stored at one or more of BNSF's four yards in Illinois, then compiled in a national database, thus increasing the threat to Plaintiffs' identities. Each registration (not merely a subsequent "scan") constituted a separate and unique opportunity for Defendant to gain Plaintiffs' consent to capture their biometrics. Each new location the Class members' biometrics were stored at increased the risk of theft. Accordingly, above and beyond the lack of any justification for overturning or upsetting the judgment based on a potential future ruling, even if the appeal pending in *Cothron* goes against the plaintiff there, the facts in this case are readily distinguishable.[10]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny BNSF's Motion in its entirety.

---

[10] Lastly, as it did at the class certification stage, BNSF promotes the incorrect standard for assessing the adequacy of a class representative in the context of individual defenses. Dkt. 235 at 15. The proper standard is not mere "arguability." Rather, to render a class representative inadequate, an individual defense must be both "arguable" and "substantial." *See Beaton, v. SpeedyPC Software,* 907 F.3d 1018, 1027 (7th Cir. 2018). At the class certification stage, the Court found the supposed "individual defense" to be neither. Dkt. 143 at 6. There is no reason to revisit that decision.

Dated: January 27, 2023

Respectfully submitted,

RICHARD ROGERS, individually and on
behalf of a class of similarly situated
individuals

By:  /s/ Jon Loevy
*One of Plaintiff's Attorneys*

Myles McGuire                          Jon Loevy
Evan M. Meyers                         Michael I. Kanovitz
David L. Gerbie                        LOEVY & LOEVY
Brendan Duffner                        311 N. Aberdeen St., 3rd Floor
MCGUIRE LAW, P.C.                      Chicago, Illinois 60607
55 W. Wacker Drive, 9th Fl.            Tel: (312) 243-5900
Chicago, IL 60601                      jon@loevy.com
Tel: (312) 893-7002                    mike@loevy.com
mmcguire@mcgpc.com
emeyers@mcgpc.com
dgerbie@mcgpc.com
bduffner@mcgpc.com

*Attorneys for Plaintiff and the Class*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on January 27, 2023, I caused the foregoing *Plaintiff's Response in Opposition to Defendant's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial or to Alter and Amend Judgment* to be electronically filed with the Clerk of the Court using the CM/ECF system. A copy of said document will be electronically transmitted to all counsel of record:

/s/     Brendan Duffner