**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RICHARD ROGERS, individually and on behalf of similarly situated individuals,** | ) ) ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 19 C 3083** |
| | ) | |
| **BNSF RAILWAY COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Richard Rogers, a truck driver who was required to scan a biometric identifier into identity verification devices to enter BNSF railyards, sued BNSF Railway Company on behalf of a class of similarly situated persons for violations of the Illinois Biometric Information Privacy Act (BIPA). After the Court granted Rogers's motion to remand his BIPA section 15(a) claim to the Circuit Court of Cook County, Rogers amended his complaint to remove his section 15(a) and 15(d) claims and proceed with only his section 15(b) claim. The Court denied BNSF's motion for summary judgment and granted Rogers's motion to certify a class of "[a]ll individuals whose fingerprint information was registered using an Auto-Gate System at one of BNSF's four Illinois facilities at any time between April 4, 2014 and January 25, 2020." *Rogers v. BNSF Ry.*, No. 19 C 3083, 2022 WL 854348 (N.D. Ill. Mar. 22, 2022). The Court denied BNSF's motion to certify an interlocutory appeal of the denial of summary judgment, and

the case went to trial in October 2022.  Before trial, the Court determined that damages under BIPA consisted of a liquidated per-violation amount that would depend on the jury's findings regarding BNSF's intent.  The jury returned a verdict in favor of the class, finding that BNSF had recklessly or intentionally committed 45,600 violations of BIPA.  Based on this finding, the Court entered judgment in favor of the plaintiff class in the amount of $228 million (45,600 times $5,000).

Both parties have filed motions regarding the judgment.  BNSF has moved under Federal Rule of Civil Procedure 50(b) for entry of judgment in its favor as a matter of law.  In the alternative, BNSF has moved under Rule 59(a) and (e) for a new trial or to alter or amend the damages award.  Rogers, for his part, has also moved under Rule 59 to amend the judgment and for a partial new trial.  For the reasons below, the Court grants BNSF's motion for a new trial on damages but otherwise denies both parties' motions.

## Background

The Court assumes familiarity with this case's factual and procedural background, which this Court has discussed in prior written opinions.  *See, e.g.*, *Rogers v. BNSF Ry.*, No. 19 C 3083, 2022 WL 787955 (N.D. Ill. Mar. 15, 2022) ("*Summary Judgment Decision*"); *Rogers v. BNSF Ry.*, No. 19 C 3083, 2019 WL 5635180 (N.D. Ill. Oct. 31, 2019) ("*Motion to Dismiss Decision*").  The following background is relevant to the post-trial motions and largely is taken from the Court's summary judgment decision, *see Summary Judgment Decision*, 2022 WL 787955, at *1–2, and the trial record.

The parties do not dispute that BNSF contracted with a third-party company named Remprex to install and manage an Auto-Gate System (AGS) to control the entry

and exit of truck drivers at four of BNSF's Illinois facilities.  At trial, various employees of both BNSF and Remprex testified regarding the companies' history and relationship.

Remprex CEO Remy Diebes stated that he understood BNSF had circulated a request for proposal (RFP) for an AGS in or around 2006 and that "[b]iometrics was the requirement within the RFP."  Trial Tr. 1084:25–1085:17.  Similarly, BNSF employee Chuck Burris did not dispute that BNSF entered into a contract with a third-party company named Nascent in November 2006 to install an AGS at one of BNSF's Illinois facilities.  Nascent did not have an AGS that captured biometric information at the time, so it "went out and sourced it" to satisfy the requirements of BNSF's RFP.  *Id.* 1086:15–16.

Remprex was founded in 2007 as "an extension of Nascent," *id*. 475:8–10, and shortly afterwards it entered into a contract with BNSF to provide an AGS at various BNSF facilities.  At the time it began doing business with BNSF, Remprex consisted of two employees:  Timothy Ash and James Shondel.  Ash testified that that he was not an expert in the laws and regulations governing the railroad transportation industry, but he had "been in the railroad servicing industry for [his] whole career," and "[a] substantial part of [his] expertise is the gating process of a railyard."  *Id.* 226:13–227:3.  He also stated that Remprex has never had an internal legal department, but it engaged with outside counsel on legal questions.

BNSF's agreement with Remprex required Remprex to operate and maintain the AGS at BNSF's four intermodal facilities in Illinois. The agreement described Remprex as an independent contractor, stated that Remprex "shall complete all Services . . . according to [its] own manner and methods," and obligated Remprex to "keep abreast

3

of current and new laws, rules, regulations, and ordinances that affect operations at the terminal" and "promptly advise [BNSF] of any significant changes or developments therein." *Id.* 344:3–5, 873:20–24. BNSF licensed the "on-site AGS" software from Nascent and purchased "the hardware, the kiosks, the intermodal gate arms, and the fingerprint scanners" from Remprex. *Id.* 530:13, 518:14–16. The agreement also obligated Remprex to pay BNSF liquidated damages if a component of the AGS malfunctioned and was not fixed within a certain time period.

Remprex employees were responsible for collecting the truck drivers' biometric information. When drivers who were not registered in the AGS arrived at one of BNSF's facilities, they were directed to a "driver's assistance building" where Remprex employees registered them into the system. Ash testified that the registration process involved scanning "the right thumb, left thumb, and left index finger" of each driver and storing those fingerprints in a database but that it did not include obtaining written consent or informing the drivers "of the specific purpose for which [their fingerprints] were being collected . . . and for how long [those fingerprints] would be kept." *Id.* 220:23–24, 207:17–24. After the drivers were registered, they entered BNSF facilities on subsequent visits by scanning at least one finger on a kiosk, which then captured and compared those scans to the fingerprint database. Rogers's expert stated that there were approximately 44,139 individuals whose fingerprints were registered at one of BNSF's Illinois facilities between April 4, 2014 and January 25, 2020. BNSF's expert testified that there were approximately 45,600 such individuals.

The jury also heard conflicting testimony regarding BNSF's control over the operations of the AGS. Burris stated that BNSF "never operated or had any oversight of

[the AGS] system," and BNSF employee Mike Whitaker testified that Remprex was "independently managing [the AGS] as the experts in their field." *Id.* 589:21–22, 890:25–891:1.  In contrast, Ash testified that "there are nitty-gritty items that [BNSF] specifies for [Remprex]" and that Remprex "[c]oordinate[d], [c]ommunicate[d], [and] sometimes [took] specific direction" from BNSF in deciding "the manner and the method for the daily operations."  *Id.* 344:15–16, 344:18–345:2.  Ash also stated that (1) if a driver had asked not to be fingerprinted, it would have "need[ed] to be determined by BNSF[] if that's an option that is allowed," (2) BNSF sometimes decided to turn off the AGS or skip the "biometric validations step," and (3) BNSF was "calling the shots" and "had control of the ongoing decision to keep collecting and capturing" biometrics. *Id.* 222:17–24, 261:5–10, 433:12–13, 435:1–3.

Various witnesses testified regarding the ownership of the biometric data itself, the servers on which it was stored, and BNSF's ability to access the data.  BNSF employee Whitaker did not dispute that BNSF paid for the servers, but he stated that BNSF did not own the biometric data and that "Remprex spec-ed out, maintained, managed, refreshed, [and] kept [the servers] at the end of their useful life."  *Id.* 812:23–24.  In addition, BNSF's data systems expert explained that there were firewalls between the database and BNSF computers, and BNSF employee Burris stated that BNSF did not have access to the biometric data.

Burris also initially answered "no" when asked if BNSF "collect[ed], capture[d], purchase[d], receive[d] through trade, or otherwise obtain[ed]" the biometrics, but he later agreed that BNSF "owned the biometric data" and "at a minimum, obtained it." *Id.* 472:3–18, 530:3–5, 539:24–540:5.  Similarly, Remprex employee Ash testified that

BNSF owned the biometric data and stored it on computer servers that BNSF owned—after purchasing them from Remprex—and kept in server rooms located in its railyards. Ash also testified that BNSF licensed the AGS software and that it was "fair to say that it is . . . BNSF's hardware and software with that qualification," *id.* 434:7–17, and Remprex CEO Diebes stated that BNSF owned the data. Diebes further explained that Remprex was contractually obligated to provide the data to BNSF upon request and that he could not think of "any circumstances where BNSF wanted access to the data . . . [and] would not get access to that data." *Id.* 1083:18–21.

Rogers testified at trial about his experience with BNSF. He stated that he had worked as a truck driver for various trucking companies and that he visited BNSF's facilities many times. Rogers also explained that he was asked to register his fingerprints twice, and BNSF's data systems expert testified that Rogers's first registration was on November 5, 2012. Rogers brought this suit in April 2019.

BNSF employee Burris testified that after learning of Rogers's lawsuit, BNSF learned from Remprex that "there had not been . . . consents in place at the [facilities]." *Id.* 601:6–8. Burris also stated that BNSF "could have directed [Remprex] to turn off biometrics" and that "[BNSF's] position was Remprex was doing something illegal," but he admitted that BNSF did not turn off biometrics until March 2020 because of concerns related to "COVID-19 and the pending lawsuit." *Id.* 579:12–13, 582:17, 611:5. Remprex CEO Diebes similarly testified that after BNSF was sued (in April 2019), "the process of taking truck drivers' fingerprints without giving them disclosures" continued through the rest of 2019, and BNSF "did not direct [Remprex] to obtain consents from the drivers." *Id.* 1238:11–14, 22–25.

On the last full day of trial, BNSF filed an offer of proof regarding the issue of preemption. The Court accepted the offer of proof but overruled BNSF's apparent attempt to inject this issue into the trial, as it had previously ruled that preemption was not an issue for the jury.

BNSF also moved under Federal Rule of Civil Procedure 37 to preclude Rogers from arguing to the jury that each registration or subsequent scan of a driver's fingerprints constituted a separate BIPA violation or that each driver's registration constituted three violations because registration involved scanning three different fingers. Prior to trial, the Court had ruled that Rogers's expert could not testify regarding the total number of BIPA violations because he did not include this in the Rule 26(a)(2) disclosure provided to the defendants during discovery. At trial the Court concluded that Rogers had also failed to appropriately disclose his methodology for determining the total number of violations of BIPA, a determinative factor in calculating damages. As a result, the Court ruled that Rogers had not satisfied his disclosure obligations under Rule 26 and granted BNSF's Rule 37 motion.

As indicated earlier, the Court also concluded, prior to trial, that a monetary award under BIPA is a liquidated amount that would depend on the jury's findings regarding BNSF's intent. Thus the Court did not submit to the jury the question of the amount of money to award. Instead it asked the jury to determine the number of BIPA violations and the question of intent. The jury found that BNSF had recklessly or intentionally violated BIPA 45,600 times. The Court then entered judgment in favor of the plaintiff class in the amount of $228 million—45,600 BIPA violations multiplied by $5,000 per violation.

**Discussion**

Under Federal Rule of Civil Procedure 50(b), judgment as a matter of law is proper if "a reasonable jury would not have a legally sufficient evidentiary basis" to support a verdict for the nonmovant.  Fed. R. Civ. P. 50(a)(1), (b); *see Thorne v. Member Select Ins. Co.*, 882 F.3d 642, 644 (7th Cir. 2018).  On a Rule 50(b) motion, a court "construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence."  *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012).  "That includes drawing all reasonable inferences in that party's favor and disregarding all evidence favorable to the moving party that the jury is not required to believe."  *May v. Chrysler Group, LLC*, 716 F.3d 963, 971 (7th Cir. 2012).  Courts are "obligated to review the record to ensure that sufficient evidence exists to support the verdict, but [courts] will not otherwise consider the weight of the evidence" or "reevaluate the credibility of witnesses."  *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 515 (7th Cir. 1993).  Consequently, a jury verdict will be overturned only if the court concludes that "no rational jury could have found for the prevailing party."  *Stragapede v. City of Evanston*, 865 F.3d 861, 865 (7th Cir. 2017) (internal quotation marks omitted).

Under Rule 59(a), a new trial is warranted under Rule 59(a) if the verdict was "against the manifest weight of the evidence or if the trial was in some way unfair to the moving party."  *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018).  In making this determination, a court "has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength

of the facts put forth at trial." *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012). The Seventh Circuit has cautioned, however, that a court should grant a new trial "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017). Similarly, "Rule 59(e) allows a court to alter or amend a judgment only if the petitioner can demonstrate a manifest error of law or present newly discovered evidence." *Obriecht v. Raemisch*, 517 F.3d 489, 494 (7th Cir. 2008).

## A.     BNSF's motions

BNSF moves for judgment as a matter of law or a new trial or amended judgment on three grounds:  (1) there was insufficient evidence for a jury to find that BNSF itself or an agent of BNSF intentionally or recklessly violated BIPA, (2) federal law preempts Rogers's BIPA claim, and (3)(a) damages are discretionary under BIPA, and (b) the damages award in this case was violated constitutional due process limitations. The Court addresses each argument in turn.

### 1.     Sufficiency of the evidence

BNSF contends that based on the evidence presented at trial, no reasonable jury could have found that it directly violated BIPA or was vicariously liable for Remprex's violations of the statute. BNSF also argues that even if it did violate BIPA, it was unreasonable for the jury to find that it did so intentionally or recklessly. The Court disagrees.

#### a.     Direct violation

There was sufficient evidence for a reasonable jury to find that BNSF itself

9

"collect[ed], purchase[d], receive[d] through trade, or otherwise obtain[ed]" Rogers's and other class members' biometric information.  740 ILCS 14/15(b).  Although Remprex employees were the ones who collected or captured the drivers' fingerprints, a reasonable jury could find that BNSF "otherwise obtained" the data.  Three witnesses—BNSF employee Burris, Remprex employee Ash, and Remprex CEO Diebes—testified that BNSF owned the data.  Burris also agreed that BNSF obtained the data because it was stored on computer servers that BNSF owned, and Ash similarly testified that BNSF owned the servers and kept those servers in BNSF railyards in Illinois.  Ash and Diebes also stated that the data was not Remprex's to sell or treat as an asset, and even though BNSF did not have direct access to the database itself, it could ask Remprex to provide any it at any time and Remprex would be obligated to do so.

BNSF appears to argue that no reasonable jury could have credited this testimony over that of "[t]he BNSF witness familiar with the contracts"—Whitaker—who "testified that BNSF did not own the data or servers."  Def. BNSF.'s Reply at 12.  Yet even setting aside Burris's testimony on the basis that he "repeatedly stated that these questions of ownership are controlled by the contracts between BNSF and Remprex and he could not testify as to their meaning," *id.*, the jury was free to consider Ash's, Diebes's, and Whitaker's testimony "and resolve any inconsistencies in their testimony however it [saw] fit"; a Rule 50(b) motion does not call upon a court to "consider the weight of evidence" or "reevaluate the credibility of witnesses."  *United States v. Hodges*, 315 F.3d 794, 799 (7th Cir. 2003).  The jury therefore could have credited the testimony of Ash and Diebes over that of Whitaker and concluded that BNSF (1) owned the biometric data, (2) stored that data on servers that it also owned, (3) kept those

10

servers on its physical property, and (4) could access the data at any time. A jury that came to those conclusions could reasonably find that BNSF itself "otherwise obtained" the biometric data and thus directly violated section 15(b).

### b. Vicarious liability

Sufficient evidence also supports the alternative conclusion that BNSF is vicariously liable for Remprex's violations of BIPA. BNSF contends that Remprex was an independent contractor rather than an agent, pointing to language in its contract with Remprex to that effect. But "[t]he fact that the contract designated [a party] as an independent contractor is not controlling[,]" *McConnell v. Freeman United Coal Co.*, 198 Ill. App. 3d 322, 327, 555 N.E.2d 993, 996 (1990), and BNSF did not object to the jury instruction stating this. The instructions to the jury further stated that Remprex was an agent of BNSF's "[i]f BNSF had the right to control the actions of Remprex with regard to collecting, capturing, purchasing, receiving through trade, or otherwise obtaining biometric identifiers or biometric information[.]" Jury Instructions at 15. As relevant to this case, the Illinois Supreme Court has held that "it [is] not unreasonable for the jury to conclude that [a defendant]'s conduct was consistent with a principal exercising control over its agent by directing it to obtain specific information and providing it with the necessary tools to accomplish the task." *Lawlor v. N. Am. Corp. of Ill.*, 2012 IL 112530, ¶ 50, 983 N.E.2d 414, 429.

BNSF also cites to testimony by Ash that Remprex could hire, fire, and set pay for its employees without direction from BNSF and "g[ot] to use its own manner and methods in performing the service." Tr. Transcript 344:8–10. Yet Ash later clarified that "Remprex does not indicate [the manner and the method for the daily operations] on [its]

own" but instead does so "in coordination with BNSF[.]" *Id.* 344:18–24. He also stated that BNSF had the authority to decide whether to exempt a driver from registering his fingerprints or to turn off the AGS because it—not Remprex—was "calling the shots" and "had control of the ongoing decision to keep collecting and capturing" the biometrics. *Id.* 433:12–13, 435:1–3. The jury reasonably could have credited all of Ash's testimony on this topic. And given that BNSF purchased "the hardware, the kiosks, the intermodal gate arms, and the fingerprint scanners" from Remprex, *id.* 518:14–16, the evidence supported a finding that Remprex was an agent because BNSF "direct[ed] [Remprex] to obtain specific information and provid[ed] [Remprex] with the necessary tools to accomplish the task." *Lawlor*, 2012 IL 112530, ¶ 50, 983 N.E.2d at 429.

There is no merit to BNSF's argument that even if Remprex were an agent, BNSF cannot be liable for Remprex's violations of BIPA because those actions were outside the scope of its authority. BNSF did not object to language in the jury instructions stating that "[a]n agent acts within the scope of its authority if it is engaged in an activity that has been assigned to it by the principal, or if it does something that may reasonably be said to have been contemplated as a part of that activity that benefits the principal." Jury Instructions at 17. In this case, there was evidence that allowed a reasonable jury to find that Remprex was engaged in an activity—collecting the drivers' biometric information—that was assigned to it by its contract with BNSF, and this activity clearly benefitted BNSF because BNSF had specifically sought out a biometric system in the first place. BNSF provides no legal support for the assertion that the relevant "activity" is violating BIPA as opposed to collecting biometric data.

12

This would make no sense, because it would permit a principal to escape liability for its agent's actions unless it specifically assigned the agent to violate the law.

The Court concludes that there was sufficient evidence for a reasonable jury to find that Remprex was an agent of BNSF and, alternatively, that BNSF is vicariously liable for Remprex's collection of biometric data in violation.

### c. Intentional or reckless violations

BNSF also contends that even if it directly or vicariously violated BIPA, no reasonable jury could have found that it did so intentionally or recklessly. The Court disagrees.

"BNSF acted 'recklessly' if it consciously disregarded or was utterly indifferent to the plaintiffs' rights." Jury Instructions at 13. BNSF argues that it could not have been reckless because there is no evidence that either it or Remprex was aware of BIPA until April 2019. Although "it would not follow that ignorance of [a plaintiff]'s rights was reckless," *Soderbeck v. Burnett County*, 752 F.2d 285, 291 (7th Cir. 1985), recklessness means "something more than negligence but less than knowledge of the law's requirements." *Murray v. New Cingular Wireless Servs.*, 523 F.3d 719, 726 (7th Cir. 2008). As Rogers points out, at least two other courts in this district have concluded that because BIPA was enacted in 2008, a defendant's violation of the statute years later was enough at the pleading stage to allege recklessness when "[g]iving the Plaintiffs the benefit of reasonable inferences." *Marsh v. CLS Plasma Inc.*, 503 F. Supp. 3d 677, 686 (N.D. Ill. 2020); *see also Neals v. Par Tech. Corp.*, 419 F. Supp. 3d 1088, 1092–93 (N.D. Ill. 2019). Because a court must "draw all reasonable inferences in [the non-movant]'s favor and disregard all evidence favorable to the

moving party that the jury is not required to believe" in ruling on a motion for judgment as a matter of law, *May*, 716 F.3d at 971, this Court declines to conclude that BNSF could not have acted recklessly because it did not know of a law that, at the time of the first violations at issue, had been in effect for at least six years.

Rather, there is far more than "a mere scintilla of evidence" in the record that supports the jury's verdict. *Id.* When viewed in favor of Rogers, the evidence shows that BNSF (1) sought proposals from vendors for an automated gate system, (2) required that the system include biometric capabilities, (3) licensed the software and purchased the hardware and servers used to capture the data, and (4) owned—or at least led Remprex to believe it owned—the biometric data. Yet BNSF itself stated that despite having a legal department, it outsourced compliance with applicable laws to Remprex, which was a newly formed, two-person operation at the time BNSF selected it to implement the biometric system.

Years later, upon learning in April 2019 that this system of delegating compliance to Remprex may have led it to overlook and violate an applicable law, BNSF initiated discussions with Remprex about the BIPA's requirements and later sued Remprex. Yet BNSF continued collecting biometrics for nearly a year, until March 2020, and BNSF employee Burris stated that the decision to stop was driven by concerns about COVID-19 and Rogers's suit. Although BNSF is correct that it was not required to stop collecting biometrics immediately upon learning of the lawsuit, the Court cannot say it is unreasonable for the jury to infer conscious disregard or utter indifference—after all, at that point BNSF knew that collecting biometric data may violate BIPA but chose to continue doing so for almost another year. BNSF's argument that such recklessness

14

would only be limited to the post-April 2019 period is unpersuasive. As Rogers points out, "[t]he jury could have reasonably concluded that BNSF's benign explanation for its violations in the earlier years" was not credible "because once BNSF did learn, it took no steps to solve the problem." Pls.' Resp. in Opp. to Def.'s Renewed Mot. at 11.

For these reasons, the Court denies BNSF's motion for judgment as a matter of law as it relates to sufficiency of the evidence presented at trial.

### 2. Preemption

BNSF argues that it is entitled to judgment as a matter of law because three federal statutes—the Federal Aviation Authorization Act (FAAAA), the Federal Railroad Safety Act (FRSA), and the Interstate Commerce Commission Termination Act (ICCTA)—preempt Rogers's BIPA claim. The Court overruled the preemption defense when it ruled on summary judgment, and to the extent that BNSF reasserts those arguments, the Court overrules them for the reasons it stated in that ruling. *See Summary Judgment Decision*, 2022 WL 787955, at *2–6.

BNSF also relies on an offer of proof that it filed on the last day of trial, long after the Court ruled on the point on summary judgment, and also well after the Court granted Rogers's motion in limine to exclude from the trial evidence or testimony regarding preemption, which BNSF itself agreed was not a jury issue. BNSF now argues that the Court should allow BNSF to present this evidence in a new trial because its preemption arguments are "fact-bound," but it conceded during both the motion in limine hearing and the offer of proof colloquy that preemption is not an issue for the jury to decide. And it made no effort to present any of the evidence in its offer of proof in response to the motion in limine or at any time before the last day of trial. When the Court asked

why the jury would hear evidence on an issue that it does not decide, counsel for BNSF could offer no justification or reasoning. For all of these reasons, although BNSF unquestionably preserved preemption for appellate review by way of its submissions in connection with summary judgment, the Court considers forfeited any additional factual material found in the offer of proof that BNSF did not submit at summary judgment.

### 3. Damages

BNSF also contends that the amount of damages is a question for the jury to decide. The Court agrees.

Section 20 of BIPA states:

Any person aggrieved by a violation of this Act shall have a right of action in a State circuit court or as a supplemental claim in federal district court against an offending party. A prevailing party may recover for each violation:

(1) against a private entity that negligently violates a provision of this Act, liquidated damages of $1,000 or actual damages, whichever is greater;

(2) against a private entity that intentionally or recklessly violates a provision of this Act, liquidated damages of $5,000 or actual damages, whichever is greater;

(3) reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses; and

(4) other relief, including an injunction, as the State or federal court may deem appropriate.

740 ILCS 14/20. BNSF argues that damages—and the amount of any award of damages—are discretionary under BIPA because Section 20 provides that "[a] prevailing party *may* recover [damages, fees and costs, and other relief] for each violation." *Id.* (emphasis added). In contrast, the same section also states that "[a]ny person aggrieved by a violation of [BIPA] *shall* have a right of action," *id.* (emphasis added), and "[l]egislative use of the word 'may' is generally regarded as indicating a

permissive or directory reading, whereas use of the word 'shall' is generally considered to express a mandatory reading." *People v. Reed*, 177 Ill. 2d 389, 803, 686 N.E.2d 584, 586 (Ill. 1997); *see also Commonwealth  Edison Co. v. Illinois Commerce Comm'n*, 2014 IL App 132011, ¶ 41 n.2, 16 N.E.3d 801, 813 ("When the legislature has used both may and shall in the same paragraph of a statute, a court infers that the legislature acknowledged the difference and intended each word to carry its ordinary meaning.") (internal citation and quotation marks omitted).  Based on this reasoning, BNSF asserts that courts or juries may award any amount *up to* $1,000 for a negligent violation of BIPA and any amount *up to* $5,000 for an intentional or reckless violation.

The statute does not include the words "up to" or any other language suggesting that the Illinois legislature intended damages to be a range.  Rather, it states that a prevailing party may recover the greater of actual damages or "liquidated damages *of*" $1,000 or $5,000.  740 ILCS 14/20(1), (2) (emphasis added).  This Court has previously noted that "the term 'liquidated damages' has an established meaning in the law" and "[i]t means a fixed amount."  Tr. of Proceedings, Sept. 6, 2022, 14:1–3 (dkt. no. 229); *see also Karimi v. 401 N. Wabash Venture*, LLC, 2011 IL App 102670, ¶16, 952 N.E.2d 1278, 1290 ("The nature of a liquidated damages provision is such that the set amount may at times exceed actual damages, and other times actual damages may exceed the set amount."), *Int'l Capital Corp. v. Mayer*, 347 Ill. App. 3d 116, 124, 806 N.E.2d 1166, 1172 (2004) ("Moreover, 'liquidated damages' means 'an amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches.') (quoting Black's Law Dictionary 395 (7th ed. 1999)).  The Court therefore concluded prior to trial that the use of "may" in Section 20 permitted a

prevailing party to recover the greater of either actual damages or a fixed amount of $1,000 or $5,000, depending on the level of intent (if any) found by the jury.

Although Illinois courts have not squarely addressed the issue, BNSF is correct that this Court should decide this question based on how it believes the Illinois Supreme Court is likely to rule. Federal courts "apply the relevant decisions of the Illinois Supreme Court" in determining issues of state law, "and if a question of law has not yet been decided by that court, we are to make a 'prediction of how the Supreme Court of Illinois would rule' on it[.]" *Straits Financial LLC v. Ten Sleep Cattle Co.*, 900 F.3d 359, 369 (7th Cir. 2018) (quoting *Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 811–12 (7th Cir. 2018)). In making these "Erie Guesses," federal courts "are to take into account trends in a state's intermediate appellate decisions, but the focus is always a prediction about the state's highest court." *Cmty. Bank of Trenton*, 887 F.3d at 811. "[W]here direct expression by an authorized state tribunal is lacking, it is the duty of the federal court, in dealing with matters of either common law or statute, to have regard for any persuasive data that is available, such as compelling inferences or logical implications from other related adjudications and considered pronouncements." *Hartzler v. Chesapeake & Ohio Ry. Co.*, 433 F.2d 104, 107 (7th Cir. 1970)

Four months after the trial in this case, the Illinois Supreme Court cited to the use of "may" in section 20 and a decision by the Illinois Appellate Court in concluding that "[i]t also appears that the General Assembly chose to make damages discretionary rather than mandatory under [BIPA]." *Cothron v. White Castle Sys., Inc.*, 2023 IL 128004, ¶ 42. The Illinois Appellate Court decision that *Cothron* referenced, *Watson v. Legacy Healthcare Fin. Servs.*, 2021 IL App 210279, included a footnote stating that

18

"[a]lthough we do not address the issue of damages . . . we observe that damages are discretionary not mandatory. [Section 20 of BIPA] introduces a list of possible damages with the statement that this list constitutes what a 'prevailing party *may* recover.'" *Id.* ¶ 66 n.5, 198 N.E.3d 571, 582 (emphasis in original)

Rogers points out that these statements are dicta because the question of whether damages are discretionary under BIPA was not before the court in either case. But "[d]icta from a state supreme court is good evidence of how the court would decide an issue it has not yet directly encountered . . . . [and] offers the clearest insight into how the court would rule[.]" *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, 934 F.3d 553, 562 (7th Cir. 2019); *see also Hartzler*, 433 F.2d at 107 ("[T]he obligation to accept [state court] interpretation extends not merely to definitive decisions, but to considered dicta as well."). In *Allen v. Transamerica Insurance Co.*, 128 F.3d 462 (7th Cir. 1997), the Seventh Circuit affirmed a district court's conclusion that dicta in an Illinois Supreme Court opinion was controlling because "[a]s a court sitting in diversity, we have a duty to attempt to predict the actions of the Illinois Supreme Court." *Id.* at 466–67. Even though the district court was "critical of [the] position" and found the result to be "ludicrous," it nevertheless followed the dicta because that statement indicated how the Illinois Supreme Court would rule on the issue. *Id.* at 466. In this case, although the *Cothron* dicta does not address the statute's use of the term "liquidated damages of" a particular amount, it similarly suggests how the Illinois Supreme Court is likely to rule if it were to address this question in the future.

In response, Rogers argues that the *Cothron* dicta is limited to the specific context discussed in that case. The Illinois Supreme Court held in *Cothron* that "a

separate claim accrues under [BIPA] each time a private entity scans or transmits an individual's biometric identifier or information in violation of section 15(b) or 15(d)."  The court referenced discretionary damages in rejecting the argument that "allowing multiple or repeated accruals of claims by one individual could potentially result in punitive and 'astronomical' damage awards that would constitute 'annihilative liability' not contemplated by the legislature and possibly be unconstitutional."  *Cothron*, 2023 IL 128004, ¶ 1, 40.  At oral argument on the post-trial motions, counsel for Rogers contended that rather than making damages under BIPA entirely discretionary, the *Cothron* dicta was referring to a court's ability to reduce damages awards that reached "astronomical" heights because of multiple or repeated accruals.  Because this Court limited recovery in this case to a single violation for each class member, Rogers asserts that this is not a situation in which damages are discretionary.

Yet Rogers's reading of the statute would mean that a court or jury would determine the amount of damages for each violation if a plaintiff—or class of plaintiffs— had enough separately-accruing claims to give rise "annihilative liability" for the defendant, but those same plaintiffs could recover a liquidated sum of either $1,000 or $5,000 if each had only one claim.  This sort of a distinction is not supported by the text of the statute:  section 20 is clear that "[a] prevailing party *may* recover for *each* violation[]" without any limiting or qualifying language.  740 ILCS 14/20 (emphasis added).  In arriving at its holding regarding multiple accruals, the court in *Cothron* also pointed out that "where statutory language is clear, it must be given effect."  2021 IL 128004, ¶ 40.  That same canon of statutory interpretation applies to Section 20, and the use of "may" and "each violation" indicates to this Court that to the extent that

damages are discretionary, the discretion does not depend on the number of violations. The Court therefore sees no basis, in making an "Erie Guess," to disregard the Illinois Supreme Court's statement that "the General Assembly chose to make damages discretionary rather than mandatory under the Act." *Cothron*, 2021 IL 128004, ¶ 42.

Because the Court concludes damages under BIPA section 20 are discretionary, the Court agrees with BNSF that a damages award after a finding of liability is a question for the jury. Although the Illinois Supreme Court discussed the *court's* discretion because class actions are a creature of equity in Illinois courts, it is a settled issue in federal court that "class action plaintiffs may obtain a jury trial on any legal issues they present." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845–46 (1999) (internal citation and quotation marks omitted). The Seventh Amendment states that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved," U.S. Const., Amdt. 7, and it "applies not only to common-law causes of action, but also to 'actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty.'" *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348 (1998) (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989)). As relevant to this case, the Seventh Circuit has concluded that a BIPA violation is "an invasion of [the plaintiff]'s private domain, much like an act of trespass would be." *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 624 (7th Cir. 2020); *see also Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1153 (7th Cir. 2020) (noting that the Ninth Circuit had "analogized the privacy injury from a BIPA violation to the privacy injury that has

21

long been recognized as actionable at common law in a tort claim for invasion of privacy.").  The Court thus concludes that BNSF is entitled to have a jury determine the appropriate amount of damages.

For the reasons above, the Court partially grants BNSF's motion for a new trial, vacates the award of damages, and orders a new trial limited to the question of damages.[1]

## B.    Rogers's motion

For his part, Rogers moves the Court to amend the judgment and order a partial new trial regarding the number of BIPA violations.  He also contends that the Court should amend the judgment to include prejudgment interest.  The Court denies the motion on both grounds.

### 1.    Number of BIPA violations

In returning a verdict for Rogers, the jury found that BNSF violated BIPA 45,600 times.  Rogers contends that this number is erroneous.  He says that he should have been able to argue that:  (1) BNSF committed three violations of BIPA—rather than a single violation—when it scanned three different fingers in the process of registering each class member, and (2) BNSF committed an additional violation each time it re-scanned those class members' fingerprints during their subsequent visits to BNSF facilities.  As a result, Rogers asks the Court to amend the judgment to reflect that BNSF committed 136,800 BIPA violations (45,600 times three) and order a partial new trial on the total number of additional violations.

---

[1] Because of this ruling, the Court need not address BNSF's arguments regarding the constitutionality of the damages award.

On the last day of trial, BNSF moved under Rule 37 to preclude Rogers from presenting argument or evidence regarding the total number of fingerprint scans because it had not previously disclosed that information. Federal Rule of Civil Procedure 26 requires parties to disclose "a computation of each category of damages" and "make available for inspection . . . the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based[.]" Fed. R. Civ. P. 26(a)(1)(A)(iii). If a party "fails to provide information or identify a witness as required by Rule 26(a) or (e)," Rule 37 prohibits the party from "us[ing] that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The Court had ruled in a pretrial hearing on the parties' motion in limine that Rogers's expert could not testify regarding the total number of BIPA violations because he did not do so in the Rule 26(a)(2) disclosure provided to the defendants during discovery. That ruling did not, however, preclude Rogers from proving the number of total BIPA violations with other evidence aside from his expert's testimony. When asked by the Court about the number of violations during the colloquy at trial, Rogers's counsel stated that they intended to argue that BNSF committed 1,171,608 BIPA violations. Counsel conceded that they had not previously disclosed this number or their calculation and that they did not disclose until the pretrial conference that they believed BNSF had violated BIPA three times for each class member. Counsel argued that both of these failures to disclose were justified or harmless because (1) BNSF had moved to bar Rogers's expert from testifying about the total number of scans, and (2) one sentence in that expert's report stated that many drivers have three or more fingerprints

in the database.  The Court overruled both arguments and granted BNSF's Rule 37 exclusion request, ruling that there was no notice of the calculation or number of total violations and that the single mention of three fingerprint scans for some class members in Rogers's expert report was insufficient under Rule 26.

Rogers now contends that Rule 26 did not obligate him to disclose a calculation of the total number of BIPA violations—including the assumption that each class member suffered at least three violations—because it was a "factual issue that may ultimately relate to the determination of damages" rather than a computation of a monetary sum.  Pls.' Rule 59 Mot. to Amend J. at 10.  Yet because Rogers chose to seek liquidated damages rather than actual damages, the computation of damages in this case involves simply multiplying the total number of violations by either $1,000 or $5,000.  As a result, the Court agrees with BNSF that "the total number of statutory violations *is* the computation of damages," Def. BNSF's Opp. to Pls.' Rule 59 Mot. at 3 (emphasis in original), because it would be impossible to determine the damages Rogers seeks without knowing how many BIPA violations he contends occurred.

Rogers also reasserts that BNSF's Rule 37 exclusion request was untimely, contending that *Brandt v. Vulcan, Inc.*, 30 F.3d 752 (7th Cir. 1994), supports his position because BNSF had long known that Rogers was seeking damages on the "per scan" theory.  In *Brandt*, the Seventh Circuit that a district court did not abuse its discretion in finding a Rule 37 motion untimely when the plaintiff "filed no subsequent motions to compel" despite "his obvious suspicion that [the defendant]'s responses were incomplete or false" and "let the matter rest" when his requests for updated discovery responses "produced no additional information."  *Id.* at 756–57.  As BNSF points out,

24

however, it filed a motion in limine upon learning that Rogers planned to offer testimony about the total number of BIPA violations from an expert who had not previously offered an opinion on that point. As previously mentioned, the Court agreed with BNSF and precluded testimony on this topic from Rogers's expert at the final pretrial conference. In addition, the Court noted at trial that "it's been clear . . . from at least the time that the motions in limine were filed that [BNSF] has been complaining as loudly as it possibly could about being blindsided on the damages question." Tr. Transcript 1312:20–23. BNSF is thus not situated similarly to the plaintiff in *Brandt*. Given that notice of a legal theory is not equivalent to notice of "the evidence that [Rogers was] going to use and the number that [he was] going to come up with based on that legal theory," Trial Tr. 1254:6–8, the Court sees no basis to find BNSF's Rule 37 exclusion request untimely.

Lastly, Rogers contends that his failure to disclose was both justified and harmless. "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Mid–America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996). Relevant factors to consider include "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). Even assuming that there would have been minimal disruption to the trial, Rogers's failure to timely disclose the number of total violations or violations per class member was unfairly prejudicial to BNSF. When asked by the Court if "anybody said in any kind of a courtroom discussion or a filing . . . that it was likely that the [number of BIPA violations] to be argued to the

jury is over a million[,]" Rogers's counsel conceded that they had not.  Tr. Transcript 1253:15–21.  Counsel instead repeated the argument that BNSF knew of Rogers's "per scan" theory.  It is difficult to conclude, however, that BNSF would not be surprised or prejudiced when the case "goes from being a case of 44,000 . . . times a thousand or times 5,000, which, to be clear, is a very, very significant number to begin with, to being something that's literally 25 times greater than that."  *Id.* 1259:11–14.

Rogers also asserts that BNSF had notice that it was seeking damages on a "per scan" basis because it moved in limine to exclude Rogers's expert from testifying about the total number of violations.  But as the Court noted at trial, there is a significant difference between "is a legal theory viable" and "the evidence that [Rogers was] going to use and the number that [he was] going to come up with based on that legal theory[.]"  Trial Tr. 1254:4–8.  Even if BNSF was aware that Rogers planned to argue this theory, learning of Rogers's total number of claimed violations and methodology for calculating that figure during closing arguments would have left BNSF with no effective opportunity to respond or cure the prejudice.  Furthermore, the Court notes that Rogers's counsel conceded that, by the time of trial, they had planned to advance a "per scan" theory for "a couple of years," but did not "ha[ve] a responsive answer" when the Court asked why there had been no appropriate Rule 26(a) disclosure (or amended disclosure).  *Id.* 1255:13–17.  Consequently, there is no basis for a finding that Rogers's failure to disclose was either justified or harmless.

For these reasons, the Court denies Rogers's motion to amend the judgment and

order a partial new trial relating to the number of BIPA violations.[2]

### 2. Prejudgment interest

Rogers also moves to amend the judgment to include prejudgment interest. Even though the Court has ordered a new trial on damages, the Court addresses this point to guide the parties in preparation for that trial. Under Illinois law, "[i]n actions at law, prejudgment interest is recoverable only under the Interest Act or if the parties' agreement provides for it." *Prignano v. Prignano*, 405 Ill. App. 3d 801, 821, 934 N.E.2d 89, 109 (2010) (citing *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 255, 856 N.E.2d 389, 410 (2006)). The Illinois Interest Act states:

> Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment.

815 ILCS 205/2.

Rogers cites to two cases in which Illinois courts have awarded prejudgment interest on statutory damages and argues that the Court should do the same in this case. Yet as BNSF points out, the courts in both of those cases affirmed the award of prejudgment interest because the defendants' actions in delaying payment were vexatious and unreasonable. *See Millers Mut. Ins. Ass'n. of Illinois v. House*, 286 Ill. App. 3d 378, 387, 675 N.E.2d 1037, 1044 (1997) ("[The defendant]'s *delay in paying*

---

[2] To the extent that Rogers contends the Court should triple the damages because the undisputed evidence at trial shows that BNSF collected at least three scans, the Court's ruling on BNSF's Rule 37 motion precluded him from seeking damages on this basis.

[the amounts] due [to the plaintiff] was vexatious and unreasonable.") (emphasis added); *Boyd v. United Farm Mut. Reins. Co.*, 231 Ill. App. 3d 992, 999, 596 N.E.2d 1344, 1349 (1992) (jury did not err in finding that an insurance company's refusal to pay or negotiate with the plaintiffs was vexatious and unreasonable when the company "was adamant as to the amount [it owed to the plaintiff] and refused to arbitrate upon plaintiffs' request even though [the plaintiff's adjuster]'s adjustment suggested that losses were far greater than defendant was willing to acknowledge.").

Rogers's counsel asserted at oral argument that BNSF's actions were vexatious and unreasonable based on the jury's finding that BNSF violated BIPA intentionally or recklessly. The Interest Act, however, specifically refers to "*money* withheld by an unreasonable and vexatious *delay of payment*." 815 ILCS 205/2. There is no indication in the record suggesting that BNSF unreasonably delayed in making payments owed to Rogers or any other class member. To the extent that Rogers contends that BNSF's defense of this lawsuit is the relevant delay, "an honest dispute as to the existence of a legal obligation will not result in unreasonable and vexatious delays which would permit recovery of prejudgment interest." *Boyd*, 231 Ill. App. 3d at 1000, 596 N.E.2d at 1349. Because there were genuine issues of material fact, and because this was the first BIPA case to go to trial, BNSF's disputes regarding its legal obligations were honest rather than vexatious or unreasonable.

Consequently, the Court concludes that Rogers would not be entitled to prejudgment interest even had the Court upheld the damages award.

### Conclusion

For the foregoing reasons, the Court grants BNSF's motion for a new trial in part.

28

The jury's finding of liability and its determination regarding reckless/intentional violation of BIPA stands, but the Court vacates the award damages and orders a new trial limited to that issue. The Court otherwise denies BNSF's motion for judgment as a matter of law or to amend or alter the judgment [dkt. no. 235] and also denies Rogers's motion to amend the judgment [dkt. no. 236]. The case is set for a telephonic status hearing on July 7, 2023 at 9:05 a.m. to set a trial date and discuss the possibility of settlement. The following call-in number will be used: 888-684-8852, access code 746-1053.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 30, 2023